Fletcher CASEY, et al., Plaintiffs,

v.

Samuel A. LEWIS, et al., Defendants.

Nos. CIV 90–0054 PHX CAM,
CIV 91–1808 PHX CAM.

United States District Court,
D. Arizona.

March 19, 1993.

See also 803 F.Supp. 246.

Alice Loeb Bendheim, Phoenix, AZ, Adjoa A. Aiyetoro, Stuart Henry Adams, Jr., David Cyrus Fathi, Nat. Prison Project of America, Civ. Liberties Union Foundation, Washington, DC, for plaintiffs.

Kathleen L. Weinecke, Daniel Struck, Jones, Skelton & Hochuli, Phoenix, AZ, for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW MEDICAL, DENTAL AND MENTAL HEALTH CARE

MUECKE, District Judge.

Having considered the evidence presented by the parties relevant to the medical, dental and mental health care issues in this case, the Court concludes as follows:

### Background

This action was filed on January 12, 1990. The plaintiff class alleges that the defendants are deliberately indifferent to their serious health care needs including medical, dental and mental health care needs. The plaintiff class further alleges that the defendants discriminate against female prisoners in the delivery of mental health services. Defendants respond that their health care system complies with constitutional standards.

### Findings of Fact

## I. DEPARTMENT OF CORRECTIONS

At the time of trial in this action, January of 1992, the Arizona Department of Corrections (ADOC) consisted of nine prison facilities within the state of Arizona. On January 22, 1992, the total male population was 14,424 and the total female population was 922 inmates.[1] The nine facilities had the following populations on January 22, 1992:[2]

| | |
|---|---|
| Douglas | 1,957 |
| Gila Unit | |
| Mohave Unit | |
| Maricopa Unit | |
| Cochise Unit | |
| Papago DWI Unit | |
| Florence | 4,727 |
| Women's Division | |
| Central Unit | |
| North Unit | |
| South Unit | |
| East Unit | |
| SPU | |
| CB6 | |
| SMU | |
| Rynning Unit | |
| Fort Grant | 632 |
| Globe | 120 |
| Perryville | 2,210 |
| Santa Cruz Unit | |
| San Juan Unit | |
| San Pedro Unit | |
| Santa Maria Unit | |
| Phoenix | 962 |
| Alhambra | |
| Flamenco | |
| Aspen DWI | |

---

1. Keeney testimony, 1/27/1992, p. 11–12.

2. Keeney testimony, 1/27/1992, p. 11–12; Defendants' Exhibit 950.

| | |
|---|---|
| Picacho[3] | 203 |
| Safford | 476 |
| Tucson | 2,398 |
| Cimarron Unit | |
| Echo Unit | |
| Santa Rita Unit | |
| Winslow | 1,308 |
| Kaibab Unit | |
| North Unit | |
| South Unit | |
| Coronado Unit | |
| Yuma | 243 |

The facilities are classified for security purposes as level one (minimum security) through five (maximum security).

## A. Douglas

The main prison complex at Douglas has: (1) the Gila Unit which is a level two unit with a capacity of 626 inmates; (2) the Mohave Unit which is a level three unit with a capacity of 662 inmates; (3) the Maricopa Unit which is a level two unit with the capacity of 129 inmates; and (4) the Cochise complex detention unit located outside of the Mohave yard with a capacity of 66 inmates. The Douglas Complex also contains the Papago DWI Center located in downtown Douglas with a capacity of 208 inmates.[4]

## B. Florence

The Florence complex also contains numerous units. The Picacho Unit is a work camp located 20 miles from the main Florence prison. It has the capacity to house 203 inmates who work in the communities around Picacho. The Women's Division is a level three/medium custody women's unit with a capacity of 186 inmates. The South Unit is a men's level three facility with the capacity of 408 inmates. The South Unit also contains the Special Programs Unit (SPU) with a capacity of 137 inmates. CellBlock 6 (CB6) has the capacity to house 186 inmates. CB6 is comprised partly of death row inmates. The remainder of CB6 is a lockup detention facility for the complex. The Central Unit is a level four/five maximum security unit with a capacity to house 710 inmates. The infirmary is located in the Central Unit and contains 22 inmate beds. The North Unit is a level two/minimum custody unit with a capacity to house 385 inmates. The East Unit is a level two/three facility with the capacity to house 534 inmates. The Rynning Unit is an 800–bed level four unit that was very new at the time of trial. The Special Management Unit (SMU) is a level five/maximum security lockup unit with a capacity of 895 inmates.[5]

## C. Fort Grant

The Fort Grant facility is a level two institution with the capacity of 632 inmates.

## D. Perryville

The Perryville facility has a capacity of 2,210 inmates. The mens' facilities are level three/two facilities and include the Santa Cruz, San Juan and San Pedro Units. The Santa Cruz Unit is a level three unit with a capacity of 740 inmates. The San Juan Unit, also a level three unit, has a capacity of 740 inmates, including 185 protective custody inmates. The San Pedro Unit is a level two facility with a capacity of 431 inmates. The new complex detention building has a capacity of 40 inmates. The women's unit, Santa Maria, is a level four/five facility with a capacity of 269 inmates.[6]

## E. Phoenix

The Phoenix facilities contain the Alhambra reception center, Flamenco Mental Health Unit, B Ward, the Aspen DWI Center and the New Dawn Release Center. Alhambra is the male reception center and has the capacity to house 192 inmates with 30 resident workers. B Ward is the licensed psychiatric hospital with a capacity of 28 male inmates. G Ward, in the women's unit at Flamenco, has the capacity of 20 inmates.

---

3. Picacho is a separate facility near the Florence complex. Because the Picacho facility inmates obtain medical care from the Florence Complex, it will be considered part of the Florence facility for purposes of the medical/dental/mental health care issues.

4. Keeney testimony, 1/27/1992, p. 15–16; Defendants' Exhibit 950.

5. Keeney testimony, 1/27/1992, p. 17.

6. Keeney testimony, 1/27/1992, p. 14; Defendants' Exhibit 950.

The Aspen DWI Center, also in Phoenix, has the capacity for 248 DWI inmates. The New Dawn Release Center is a release center for women who are coming out of the system and need a temporary residence. The Arizona Center for Women (ACW) is a level two/minimum custody women's facility with a capacity of 359 inmates.[7] The Globe facility, located in Globe Arizona, is a level two facility with a capacity of 150 inmates. Although not in Phoenix, ADOC has made the Globe facility part of the Phoenix complex for administrative purposes.[8]

### F. Safford

The Safford facility is a level two, dormitory setting facility, with 476 inmates.

### G. Tucson

The Tucson complex has the capacity to house 2,398 inmates. The Cimarron Unit houses level four inmates with a capacity of 748 inmates. The Echo Unit houses level two inmates with a capacity to house 249 inmates. The Santa Rita Unit has the capacity to house 660 level three inmates. The complex detention unit, located in the center of the complex, has the capacity to house 71 inmates.[9]

### H. Winslow

The Winslow prison is divided into two units; the Kaibab Unit and Coronado Unit.

The Kaibab Unit is further divided into the North and South Units, each having a capacity of 400 inmates. The Kaibab Unit is a level four institution.[10] The Kaibab Unit also has a complex detention unit in the yard with a capacity of 36 inmates.[11] The Coronado Unit has the capacity to house 400 inmates and is a level two/minimum security unit. The majority of the inmates in the Coronado Unit work in the surrounding community.[12]

### I. Yuma

The Yuma facility is a 250–bed level two/minimum custody unit.[13]

## II. MEDICAL CARE SYSTEM

### A. Generally

Thomas Lutz, D.O., is Chief of Health Services for the Arizona Department of Corrections and has held that position since November of 1989.[14] Dr. Lutz participates in continuing medical education, attending conferences and professional seminars a minimum of 25 hours per year. He averages approximately 50 to 75 hours a year in continuing medical education.[15]

In his role as Director of Health Services, Dr. Lutz directly supervises program managers, key central office management level professionals representing various disciplines of

---

7. Keeney testimony, 1/27/1992, p. 20–21.

8. Keeney testimony, 1/27/1992, p. 21, lines 3–10.

9. Keeney testimony, 1/27/1992, p. 16; Defendants' Exhibit 950.

10. Keeney testimony, 1/27/1992, p. 13; Defendants' Exhibit 950.

11. Keeney testimony, 1/27/1992, p. 14; Defendants' Exhibit 950.

12. Keeney testimony, 1/27/1992, p. 13; Defendants' Exhibit 950.

13. Keeney testimony, 1/27/1992, p. 21–22.

14. Lutz testimony, 1/6/1992, p. 4, lines 5–25, p. 5, lines 1–10.
Dr. Lutz received his undergraduate degree from Kent State University and graduated in 1968 from the College of Osteopathic Medicine and Surgery in Des Moines, Iowa. Dr. Lutz conducted a rotating general internship in Cuyahoga Falls, Ohio between 1968 and 1969. For ten months, he worked in emergency room medicine in Ravenna, Ohio. He served two years in the Army and was general medical officer at Ft. Huachuca, Arizona. Dr. Lutz conducted a general practice in Ohio for sixteen years and entered into an urgent care business in 1982. In 1970 and 1971, he was commanding officer of the 575th Medical Battalion and commanding officer of the 327th Medical Company, 101st Airborne Division. In 1988, Dr. Lutz became primary care provider at Perryville. Lutz testimony, 1/6/1992, p. 5.
Dr. Lutz is a member of the National Correctional Health Care Commission, American Correctional Association, the College of American Physician Executives, a diplomat of the National Boards and is affiliated with Sigma, Sigma, Phi National Honorary, and United States Medical Honorary. Lutz testimony, 1/6/1992, p. 8.

15. Lutz testimony, 1/6/1992, p. 9, line 15—p. 10, line 3.

the medical profession, including medical, dental, mental health, pharmacy, medical records, administrative, and behavioral health.[16] Twenty percent of Dr. Lutz' time is spent in the field taking care of patients.[17] Dr. Lutz seeks out individual patients who have complaints of medical care, examines them and makes recommendations based on his physical examination. Additionally, he can provide services throughout the state when other physicians are absent or positions are vacant. He visits all of the facilities at least two or three times a year.[18]

### B. Statistics Regarding Inmate Use of Health Facilities

#### 1. *Medical*

The Health Services Bureau prepares a statistical activity report to chart the activities of health service professionals within the Department of Corrections.[19] A nursing encounter by definition is any time a nurse does anything regarding patient care. This could involve hands-on treatment, chart review, medication review, renewal or making appointments.[20] There were 1,073,951 nursing encounters in 1990 and 1,729,068 nursing encounters in 1991.[21]

In 1990, there were 34,664 direct physician-patient encounters, in which inmates were seen directly by the physicians.[22] In 1991, there were 58,483 physician-patient encounters.[23]

In 1990, there were 78,019 physician's assistant or nurse practitioner/patient encounters. In 1991, there were 90,137 physicians' assistant or nurse practitioner/patient encounters.[24]

In 1990, there were a total of 21 inmate deaths in the Arizona Department of Corrections, including, ten deaths by natural causes, two deaths by homicide, two deaths by suicide and seven accidental deaths. In 1991, there were a total of twenty-six inmate deaths. Of these twenty-six, twenty deaths were by natural causes, three deaths were by homicide, one death was by suicide and there were two accidental deaths.[25]

ADOC dispensed 621,393 prescriptions in 1990 and 678,673 prescriptions in 1991.[26]

#### 2. *Dental*

In fiscal year 1991, there were approximately 29,066 patient visits at the various dental clinics in the system.[27] The cost of dental procedures conducted in the fiscal year 1991 was $3,887,248.[28] In the fiscal year 1991, dentists in ADOC saw an average of 1.86 patients per hour.[29] Each patient had an average of 3.8 procedures performed each visit.[30] There were 19,550 dental encounters in 1990 and 21,966 dental encounters in 1991.[31] In 1991, ADOC performed over 17,-000 periodontal treatments, including 6,454 gross scalings, 6,706 oral hygiene instructions, 142 gingival curettages, 4,292 scal-

16. Lutz testimony, 1/6/1992, p. 11, line 21—p. 12, lines 6.

17. Lutz testimony, 1/6/1992, p. 8, line 25—p. 9, line 1.

18. Lutz testimony, 1/6/1992, p. 12, line 25—p. 13, lines 1–7.

19. Lutz testimony, 1/6/1992, p. 43 line 18—p. 44, line 1; Defendants' Exhibit 927, p. 1.

20. Lutz testimony, 1/6/1992, p. 44, lines 15–21, Defendants' Exhibit 927, p. 1.

21. Lutz testimony, 1/6/1992, p. 44, lines 16–17, Defendants' Exhibit 927, p. 1.

22. Lutz testimony, 1/6/1992, p. 46, lines 14–19, Defendants' Exhibit 927, p. 1.

23. Defendants' Exhibit 927, p. 1.

24. Lutz testimony, 1/6/1992, p. 47, lines 19–22; Defendants' Exhibit 927, p. 1.

25. Defendants' Exhibit 927, p. 1.

26. Defendants' Exhibit 927, p. 1.

27. Scalzo testimony, 1/6/1992, p. 218, lines 2–7, Defendants' Exhibit 928, p. 1.

28. Scalzo testimony, 1/6/1992, p. 218, lines 15–23.

29. Scalzo testimony, 1/6/1992, p. 219, lines 19–21.

30. Scalzo testimony, 1/6/1992, p. 219, line 22—p. 220, line 3; Defendants' Exhibit 928, p. 1.

31. Defendants' Exhibit 928, p. 1.

ing/root planings and 18 splintings.[32] In 1991, ADOC dental staff performed 4,572 one surface fillings, 3,128 two surface fillings, and 1,798 three surface fillings, and 926 four or more surface fillings.[33]

### 3. *Mental*

In 1990, there were 18,356 psychiatrist/patient encounters and 111,624 mental health encounters by psychologists or other mental health staff; 621,393 prescriptions dispensed and 231,035 psychotropic medications dispensed.[34] In 1991, there were 19,071 psychiatrist/patient encounters; 109,689 mental health encounters;[35] 678,673 prescriptions dispensed;[36] and 70,332 psychotropic medications dispensed.[37] Psychotropic medication usage went down in 1991 when Benadryl and Vistaril were eliminated from the definition of a psychotropic medication because they are used for nonpsychotropic purposes.[38]

### C. Experts

Both plaintiffs and defendants presented expert testimony regarding whether the medical care system met the serious medical needs of the inmates. Plaintiffs presented the testimony of two experts. One of plaintiffs' experts was Dr. Kim Thorburn. Dr. Thorburn, reviewed the medical facilities at SMU in Florence, Douglas and Tucson.[39] Dr. Thorburn was guided in her testimony principally by the community standard for the delivery of health services. Additionally, she was guided by the National Commission on Correctional Health Care standards and the American Public Health Association standards.[40] The National Commission on Correctional Health Care Standards consist of 71 goal standards for correctional health care that are "quite high."[41] There are no correctional health standards that are more stringent or more difficult to fulfill than the National Commission on Correctional Health Care Standards.[42] The National Commission on Correctional Health Care has a certification program for institutions that meet the standards.[43] According to Dr. Thorburn, the prison system that meets the National Commission standards has a fairly decent system of health care delivery.[44]

Plaintiffs' other expert, Charles Braslow, evaluated the health services at Phoenix, Perryville and Florence, with the exception of SMU.[45] Dr. Braslow evaluated the health care within ADOC based on the general community standard for acceptable medical practice. This standard is a nationwide standard.[46] Dr. Braslow selected records by going through sick call lists, medication lists and pulling files with color coded markers indicating a particular disease.[47] Dr. Braslow did not do a physical examination on any of the inmates.[48]

Defendants' medical expert was Dr. Michael Warren. Dr. Warren is a physician

---

32. Defendants' Exhibit 928, p. 1.

33. Defendants' Exhibit 928, p. 1 and 2.

34. Defendants' Exhibit 927, p. 1.

35. Defendants' Exhibit 927, p. 1.

36. Defendants' Exhibit 927, p. 1.

37. Defendants' Exhibit 927, p. 1.

38. Lutz testimony, 1/6/1992, p. 55, line 15—p. 56, line 9.

39. Thorburn testimony, 11/20/1991, p. 40, lines 12–13.

40. Thorburn testimony, 11/20/1991, p. 43, lines 13–23.

41. Warren testimony, 1/28/1992, p. 147, lines 10–11.

42. Warren testimony, 1/28/1992, p. 145, lines 19–25.

43. Warren testimony, 1/28/1992, p. 144, line 14—p. 145, line 25.

44. Thorburn testimony, 11/20/1991, p. 176, lines 5–8.

45. Braslow testimony, 11/25/1991, p. 13, lines 8–14.

46. Braslow testimony, 11/25/1991, p. 14, lines 20–25; 11/26/1991 p. 76, lines 3–13.

47. Braslow testimony, 11/26/1991, p. 169, lines 7–24.

48. Braslow testimony, 11/26/1991, p. 176, lines 19–21. A physician who examines a patient is in a better position to diagnose and treat an illness than a physician who simply reads a record or report. *Id.* p. 34, lines 6–9.

who is a faculty member at University of Texas. The University provides consultation and treatment care for inmates in the Texas Department of Corrections and supplies the top personnel to the Texas DOC for medical purposes. Dr. Warren was also the acting deputy director for health services for the Texas Department of Corrections for two year beginning in 1986.[49] To form his opinions, Dr. Warren reviewed policies and procedures and the map to determine the facilities and their locations. Over a period of six days, Dr. Warren visited Alhambra, ACW, Douglas, Tucson, Florence and Perryville. Dr. Warren also met with staff that he considered to be "key staff," including Dr. Lutz. To measure the system, he relied on the standards of the National Commission on Correctional Health Care.[50]

### D. Medical Staff

#### 1. *Generally*

Each prison facility within the Arizona Department of Corrections has a physician.[51] In order to be employed by the Department of Corrections, physicians must be licensed in the state of Arizona and hold a current valid Arizona license.[52]

The Department of Corrections also utilizes certified physician assistants (PA). A certified physician's assistant is an intermediary or secondary care provider that has graduated and been certified as a physician's assistant. A PA assists the physician in the practice of medicine and is directly supervised by a physician.[53] *The PAs within the Department of Corrections are supervised at a weekly meeting and through a chart review, either random or by specific patient.*[54]

The Department of Corrections also utilizes nurse practitioners (NP), registered nurses (RN), licensed practical nurses (LPN) and nursing assistants (NA).[55] A nurse practitioner is licensed and does not need direct immediate supervision of a physician. A supervision of weekly chart review or patient review is not required for a nurse practitioner.[56] ADOC uses the nursing assistants in a pilot program in Winslow and Florence. A nursing assistant is licensed to perform almost the same duties as a registered nurse, except for giving shots. There is no state licensing requirement for nursing assistants, but ninety percent of the Department of Corrections nursing assistants are certified.[57] The pilot program for using nursing assistants began in 1991 in Winslow and Florence and that program has allowed registered nurses to begin developing preventative medical programs.[58]

There are approximately 196 nurses within the Arizona Department of Corrections. Each institution has its own nursing supervisor.[59] Thirty-two of the nurses are specifically psychiatric (psych) nurses. Although the state qualification for a psych nurse II is that they have at least one year of psych nurse experience, psych nurses are not hired unless they have at least three to five years of psych experience or exposure.[60]

##### . a. Florence Facility

There are a total of thirty-five nursing staff at the Florence facility including twelve full-time RNs, nine LPNs, seven nursing assistants, four psych nurses and three nursing supervisors.[61] CB–6, the Women's Division, SPU, Central Unit, North Unit and South

49. Warren testimony, 1/28/1992, p. 133, line 15—p. 139, line 25.

50. Warren testimony, 1/28/1992, p. 141, line 13—p. 150, line 18.

51. Lutz testimony, 1/6/1992, p. 38, lines 8–9; Turner testimony, 1/9/1992, p. 38, lines 8–9.

52. Lutz testimony, 1/6/1992, p. 47, lines 10–16.

53. Lutz testimony, 1/6/1992, p. 47, line 21—p. 48, line 6.

54. Lutz testimony, 1/6/1992, p. 50, line 10—p. 51, line 3.

55. Lutz testimony, 1/6/1992, p. 52, lines 12–16.

56. Lutz testimony, 1/6/1992, p. 49, lines 2–9.

57. Turner testimony, 1/9/1992, p. 51, lines 6–19.

58. Lutz testimony, 1/6/1992, p. 54, lines 1–25.

59. Turner testimony, 1/9/1992, p. 39, lines 4–10.

60. Turner testimony, 1/9/1992, p. 48, lines 18–25.

61. Cory testimony, 1/14/1992, p. 8, lines 2–5.

Unit share one nursing supervisor, three assistant supervisors and twenty-seven to twenty-nine nurses.[62] The Rynning, East and Special Management Units in Florence share two assistant nursing supervisors, one nursing supervisor and twenty-three staff nurses.[63] There is one physician, one full-time physician's assistant—and one full-time nurse practitioner at the Central Unit in Florence.[64]

### b. Phoenix Facility

The Phoenix facility, including Alhambra reception, the women's facility (ACW), New Dawn, and Aspen, has twenty-five psychiatric nurses and a psychiatric nursing supervisor.[65] Additionally, there are approximately seventeen nurses and two supervisors for regular nursing services. All of the units, except for Globe, have twenty-four hour nursing care.[66] At the Arizona Center for Women, there are four RNs, one half-time LPN who covers nights between Alhambra and ACW, a medical records librarian, a physicians' assistant, a nursing supervisor, a psychologist, a psychiatrist and a physician who spends half a day, once a week.[67] Staff is insufficient to conduct sick call more than twice a week and the defendants have been unable to demonstrate to the Legislature the need to have sick call more frequently at ACW.[68]

### c. Perryville Facility

There are two full-time physicians and sixteen nursing positions at Perryville with no vacancies.[69] There are three dentists and one pharmacist working at Perryville.[70]

### d. Tucson Facility

The Tucson facility has a physician, nursing supervisor, three assistant nursing supervisors and fifteen staff nurses.[71]

### e. Winslow Facility

The staff at Winslow includes two psych associates, one psychologist, the facility health administrator, the medical records librarian, ten nurses, one nursing supervisor, two dental assistants, one dentist, one pharmacist, two pharmacy technicians, a mental health psychotherapist, a physician and two nurse practitioners.[72]

### f. Safford Facility

Safford has one physician, one nursing supervisor and seven staff nurses.[73]

### g. Ft. Grant Facility

The Ft. Grant facility has one physician, one nursing supervisor and six staff nurses.[74]

### h. Yuma Facility

At the Yuma facility, there are four staff nurses, one physician and one nursing supervisor.[75]

### i. Douglas Facility

The Douglas facility has one nursing supervisor and fifteen staff nurses.[76] Since December of 1991, Douglas has been operating with one physician's assistant and a half-time physician. Prior to that, Douglas had one physician and two physician's assis-

---

62. Turner testimony, 1/9/1992, p. 41, lines 3–13.

63. Turner testimony, 1/9/1992, p. 41, lines 14–23.

64. Norrish testimony, 1/8/1992, p. 78, lines 18–23.

65. Turner testimony, 1/9/1992, p. 40, lines 22–24.

66. Turner testimony, 1/9/1992, p. 40–41.

67. Guy testimony, 1/8/1992, p. 147, lines 2–17.

68. Guy testimony, 1/8/1992, p. 154, lines 15–18.

69. Charles testimony, 1/7/1992, p. 128, lines 15–22.

70. Charles testimony, 1/7/1992, p. 131, lines 8–11.

71. Turner testimony, 1/9/1992, p. 38, lines 8–9; p. 461 lines 15–18.

72. Sanders testimony, 1/14/1992, p. 63, lines 5–14, p. 67, lines 8–13.

73. Turner testimony, 1/9/1992, p. 38, lines 8–9; p. 46, line 25—p. 47, line 1.

74. Turner testimony, 1/9/1992, p. 38, lines 8–9; p. 47, lines 2–3.

75. Turner testimony, 1/9/1992, p. 38, lines 8–9; p. 47, lines 4–5.

76. Turner testimony, 1/9/1992, p. 46, lines 19–21.

tants.[77] To supplement the current shortage, the physician's assistant from Tucson fills in part-time, one day a week.[78] Douglas has two medical records personnel, two full-time dentists, two full-time dental assistants, thirteen nurses, two full-time pharmacists and a contract pharmacy technician.[79] Additionally, Douglas has two psych associates and one radiology technician.[80]

### j. Pharmacies

The ADOC also has staffed pharmacies. The Winslow facility has one pharmacist and two pharmacy technicians. A pharmacy technician assists in the preparation of prescriptions, helps with inventory control, and delivery of medications.[81] The Perryville facility has one pharmacist and two technicians, with a pharmacist vacancy which is in the process of being filled. Phoenix has two pharmacists and one technician. Florence has three pharmacists and two technicians. Eyman has two pharmacists and two technicians. Tucson has three pharmacists and one technician. Ft. Grant has one pharmacist and a contract pharmacy technician. That pharmacy also supports the Safford facility. Douglas has two pharmacists and one contract pharmacy technician.[82]

### 2. *Staffing Problems: Numbers and Vacancies*

#### a. Numbers of Staff

Defendants have requested additional staff to provide health services beyond the staff for whom they are currently budgeted, including physicians, nurses, nursing assis-

tants, psychologists and psychological associates.[83] Many of defendants' requests for funding of these additional positions have been denied by the Legislature.[84]

According to Dr. Thorburn, there are an insufficient number of nurse positions at Douglas and Tucson.[85] In addition, Dr. Warren recommended in his report that the defendants unfreeze nursing positions in Florence and hire more nurses in Perryville.[86]

#### b. Vacancies of Staff

There are vacancies in a number of health care positions throughout the ADOC, including the Mental Health Program Coordinator, nurses, physicians, physician assistants, psychologists, and psychological associates.[87] The defendants have attempted to fill these vacancies.[88] However, defendants have had difficulty filling these vacancies for various reasons, including difficulty in attracting qualified staff and retaining them in certain outlying areas such as Florence or Douglas; hiring freezes imposed by the governor; and limitations on salaries and benefits.[89]

As of December 2, 1991, the Arizona Department of Corrections Health Services had a 13.9% overall medical staff vacancy rate. This vacancy rate is much improved since December of 1989.[90] At the time of trial, the only vacancies in the primary care physician field in the correctional health care system were at the Douglas facility.[91] There were

77. Schwegler testimony, 1/13/1992, p. 8, lines 18–25.

78. Schwegler testimony, 1/13/1992, p. 9, lines 1–7.

79. Schwegler testimony, 1/13/1992, p. 10, lines 22–25, p. 11, lines 1–8.

80. Schwegler testimony, 1/13/1992, p. 11, lines 10–15.

81. Riggs testimony, 1/7/1992, p. 189, lines 10–19.

82. Riggs testimony, 1/7/1992, p. 189, line 21—p. 190, line 8.

83. PreTrial Statement (PTS), uncontested Fact A4.

84. PTS, uncontested Fact A5.

85. Thorburn testimony, 11/20/1991, p. 176, line 13—p. 180, line 7.

86. Warren testimony, 1/29/1992, p. 72, line 24—p. 73, line 16.

87. PTS, uncontested Fact A1.

88. PTS, uncontested Fact A2.

89. PTS, uncontested Fact A3.

90. Lutz testimony, 1/6/1992, p. 29, line 14—p. 30; Defendants' Exhibit 930.

91. Lutz testimony, 1/6/1992, p. 24, line 24—p. 25, line 2.

only one or two physician's assistant or nurse practitioner vacancies throughout the state.[92]

Since November of 1989, the vacancy of registered nurses decreased from approximately 24 percent to 8.5 percent.[93] Presently, there is not a significant nursing turnover due to the communication and reorganization of health services.[94] In response to nursing vacancies for permanent positions that ADOC cannot or will not fill, the Department hires private contracting nursing agencies or registry nurses to provide nursing services.[95] If a registry nurse does not perform up to the Department of Corrections' standards, the Department of Corrections will request that the nurse not return to the facility.[96]

Vacancies at Douglas are covered by contracting with the nursing registry service. The nurses from the registry service are former ADOC nursing employees who are used to dealing with inmates and know the policies and procedures of the Department of Corrections.[97] The quality of care provided by the registry nurses in Douglas is more than equal to the quality of care of regular RNs because of their years of experience and exposure to the correctional setting.[98]

The Department of Corrections also utilizes a stipend program for nursing positions in outlying areas, including Safford, Ft. Grant, Winslow, Douglas, Florence and Yuma.[99] There are other medical stipends for health care positions ranging from $2,000 to $4,800 for positions that are hard to fill.[100]

Additionally, to recruit new nurses, the Department of Corrections advertises in newspapers, recruits at junior colleges and has an inter-agency agreement with the University of Arizona to obtain students to work in the facilities for clinical experience.[101] The Department has successfully recruited health care professionals by virtue of aggressively pursuing recruitment through advertising, job fairs and word-of-mouth.[102]

There are seventeen pharmacy positions within the Arizona Department of Corrections and two vacancies which are in the process of being filled.[103] The vacancy rate at the pharmacies is low and it is very rare that a pharmacy has any vacancies.[104]

c. Impact of Staffing Problems

Plaintiffs' expert, Dr. Braslow testified that there are delays in the assessment and evaluation of serious health needs of the inmates in the facilities and that those delays exist because sick call access is not frequent enough and there are not enough medical practitioners to take care of those needs when the people do come for medical services.[105] Plaintiffs' expert, Dr. Thorburn also testified that there are insufficient numbers of staff, exacerbated by vacancies that results in diverting professionals work from their work. For example, nurses perform clerical tasks and dentists perform dental hygiene services that would be better performed by dental hygienists.[106]

Some of the units had adequate staffing at the time of trial. In Dr. Thorburn's opinion, health care staffing at the Special Management Unit is adequate.[107] Dr. Thorburn also opined that there are an adequate number of

92. Lutz testimony, 1/6/1992, p. 25, lines 2–4.

93. Lutz testimony, 1/6/1992, p. 24, lines 15–21.

94. Turner testimony, 1/9/1992, p. 44, lines 6–16.

95. Turner testimony, 1/9/1992, p. 45, lines 20–24.

96. Cory testimony, 1/14/1992, p. 27, lines 14–19.

97. Schwegler testimony, 1/13/1992, p. 13, lines 9–19.

98. Schwegler testimony, 1/13/1992, p. 13, lines 13–25, p. 14, line 1.

99. Turner testimony, 1/9/1992, p. 52, lines 22—p. 53, line 16.

100. Lutz testimony, 1/6/1992, p. 146, lines 12–16.

101. Turner testimony, 1/9/1992, p. 42, lines 2–19.

102. Lutz testimony, 1/6/1992, p. 25, lines 5–10.

103. Riggs testimony, 1/7/1992, p. 195, lines 13–24.

104. Riggs testimony, 1/7/1992, p. 196, lines 1–11.

105. Braslow testimony, 11/25/1991, p. 24, lines 14–19.

106. Thorburn testimony, 11/20/1991, p. 169, lines 11—p. 170, line 16.

107. Thorburn testimony, 11/20/1991, p. 63, lines 4–7.

physicians and physician's assistants at Tucson.[108]

Plaintiffs presented examples of delays in assessment and treatment of medical needs

**108.** Thorburn testimony, 11/20/1991, p. 63, line 16—p. 64, line 2.

**109.** In December of 1989, while incarcerated at Winslow, inmate # 66353 began receiving treatment for uncontrollable diarrhea and a skin condition commonly associated with HIV disease. The inmate was treated numerous times. However, HIV was not diagnosed until he was seen by an ophthalmologist for blindness in one eye. At that time, a test was ordered and the HIV diagnosis was confirmed. Thorburn testimony, 11/20/1991, p. 82, line 5—p. 83, line 10; Plaintiffs' Exhibit 264p.

**110.** Inmate Thompson had a hernia detected in April of 1990. However, because of transfers to numerous prisons within ADOC, surgery consults were ordered and cancelled. When he was transferred to Winslow, a surgery consult was ordered in October of 1990 and reordered as a priority consult in February of 1991. Surgery was completed in March of 1991. Thorburn testimony, 11/20/1991, p. 184, lines 5–22; Warren testimony, 1/29/1992, p. 31, line 18—p. 32, line 5; Plaintiffs' Exhibit 287.

**111.** Inmate Abernathy, while incarcerated at Florence, did not receive immediate evaluation and treatment of his eye problem; although he gave a description of a detached retina. Braslow testimony, 11/25/1991, p. 87, line 2—p. 88, line 17; Warren testimony, 1/28/1992, p. 202, lines 2–11; Plaintiffs' Exhibit 264w.

**112.** Inmate Douglas was a diabetic inmate at Perryville. The physician increased his insulin dosage on June 21, 1990. The next day, he was seen by the nurse complaining of an insulin reaction. A fingerstick blood test was done and showed low blood sugar. The nurse indicated that she would get the chart to the doctor for a chart review. However, the doctor did not review the chart for three days and did not reduce the insulin. Mr. Douglas continued to have an insulin reaction each evening and again requested that the dosage be decreased on July 5, 1990. On that day, the dosage was decreased. The dosage was decreased again a week later after continued insulin reactions. Braslow testimony, 11/25/1991, p. 32, line 12—p. 32, line 14; Warren testimony, 1/29/1992, p. 40, line 16—p. 42, line 1; Plaintiffs' Exhibit 575.

**113.** Inmate Saboria is an asthmatic patient who was confined in North Unit in Florence. On November 9, 1989, he was seen by an LPN complaining that his asthma was bad. The PA wrote a note on November 10, 1989, indicating that he would be seen in two weeks. When he was seen two weeks later, a prescription was written for him. According to Dr. Braslow, the

including inmates # 66353,[109] Thompson,[110] Abernathy,[111] Douglas,[112] Saboria,[113] Dennis,[114] Hines,[115] and Wilkerson.[116] Inmates

inmate should have had an immediate evaluation to rule out bronchitis or pneumonia. Braslow testimony, 11/25/1991, p. 33, line 11—p. 34, line 16.

**114.** Inmate Dennis, while at the Florence Women's Division, had a hysterectomy for fibroids of the uterus in March of 1990. On August 2, 1990, she saw a nurse, complaining of pain in the stomach. The nurse noted that her abdomen was large, she was having trouble breathing at night, was having chest pain and should be seen by a provider. When no provider examined her, she returned to the health unit two days later with the same complaint. She was again referred to a provider. Three days later, August 7, 1990, she still had not been seen by the provider and again returned and stated that her condition had worsened. Dr. Braslow saw her on August 8, 1990 and requested that a provider see her that day. After she was seen by a provider that day, medical attempted to make an appointment for the next available GYN clinic.

Dr. Braslow testified that after abdominal surgery a person can develop adhesions which can obstruct the bowel and that inmate Dennis should have been seen immediately and tested to rule out bowel obstruction. Braslow testimony, 11/25/1991, p. 35, line 6—p. 38, line 22; Plaintiffs' Exhibit 264ak.

**115.** Inmate Hines was incarcerated in the Central Unit in Florence when he was seen on October 23, 1989 with complaints of ear and throat pain. The nurse indicated that the left side of his face from the eyes to the neck had been hurting for about a week and referred him to the health provider with an appointment for November 1, 1989. A PA saw Mr. Hines on November 1, 1989, diagnosed inflammation of the throat and prescribed medication. Dr. Braslow felt that the inmate should have been seen earlier. Dr. Warren felt Mr. Hines care was appropriate because the November 1 treatment resolved the problems, but he probably should have been seen sooner than nine days after the initial health unit visit. Braslow testimony, 11/25/1991, p. 48, lines 1–20; Warren testimony, 1/28/1992, p. 180, line 25—p. 181, line 20 and 1/29/1992, p. 39, line 23—p. 40, line 1.

**116.** Inmate Wilkerson, an inmate at Central Unit in Florence had a history of heart attack, angina, asthma and chronic pulmonary disease. On April 22, 1989, he was seen by a LPN for problems breathing at night. The nurse gave him an appointment for May 4, 1989. Two days later, the inmate returned complaining of breathing problems. He was seen by a PA who prescribed

Douglas [117] and Hines [118] did not suffer any permanent injuries. Inmate Abernathy obtained 99% of his eye sight back after the detached retina surgery.[119] Inmate Soboria did not suffer any injuries.[120] .

medication and told him to keep the appointment in two weeks. The inmate returned to medical that day and the next day. At that time, the Nurse received telephone orders for treatment. He was not seen by a physician until May 21, 1989. On May 24, 1989, he was sent to Pinal General Hospital. Braslow testimony, 11/25/1991, p. 41, line 2—p. 43, line 18. Braslow testimony, 11/25/1991, p. 184, lines 1–5.

117. Braslow testimony, 11/26/1991, p. 178, lines 12–16; Warren testimony, 1/28/1992, p. 174, line 19—p. 175, line 10.

118. Braslow testimony, 11/26/1992, p. 190, lines 7–8, p. 191, lines 6–8.

119. Braslow testimony, 11/26/1991, p. 170, lines 5–7, p. 174, lines 15–19; p. 224, lines 8–13. Plaintiffs' Exhibit 43(h), inmate kite dated 11/8/90.

120. Braslow testimony 11/26/1991, p. 180, lines 7–12.

121. Inmate Lasoya, while incarcerated at Perryville, was seen by the treating physician, who suspected the inmate had liver failure or acute hepatitis but did not hospitalize immediately. Braslow testimony, 11/25/1992, p. 68, line 10—p. 70, line 23; Plaintiffs' Exhibit 32J; Warren testimony, 1/28/1992, p. 193, line 13—p. 194, line 13.

122. Inmate Harriss, at the Women's Division at Florence, had multiple episodes of passing out. Yet, medical did not order a blood count and evaluation by a physician. Braslow testimony, 11/25/1991, p. 71, line 22—p. 72, line 25; Plaintiffs' Exhibit 264yy.

123. Inmate # 67720 at Central Unit in Florence was a HIV positive inmate who complained of vomiting, aching all over and development of a rash. The inmate was not evaluated by a physician, had evaluations by a physician's assistant, mostly by telephone, and was not sent to the hospital for 48 hours. Braslow testimony, 11/25/1991, p. 75, line 9—p. 77, line 13; Warren testimony 1/29/1992, p. 132, line 13—p. 133, line 18; Plaintiffs' Exhibit 264cr.

124. Inmate Romney at ACW was seen July 30, 1990 by a NP for abdominal pains. She had a history of operations and endometriosis and urine tests showed bilirubin in her urine. Yet, she was not evaluated by a physician, no x-ray was taken and no follow-up appointment was scheduled. Braslow testimony, 11/25/1991, p. 182, line 20—p. 83, line 18; Plaintiffs' Exhibit 264aa.

125. Inmate Ison, incarcerated at East Unit in Florence, had incidents of passing kidney stones over an eight-month period in 1989 and 1990.

Plaintiffs also presented instances of alleged deficient evaluations of inmates including inmates Lasoya,[121] Harriss,[122] # 67720,[123] Romney,[124] Ison,[125] Furr,[126] Bradford,[127] Licano,[128] Culling,[129] and Mendoza.[130] Inmates

He was not seen by a physician until March 7, 1990. Braslow testimony, 11/25/1991, p. 84, line 13—p. 85, line 3. At that time, there was a work-up for the reason that inmate Ison was having kidney stones. Braslow testimony, 11/26/1991, p. 218, lines 3–11; Warren testimony, 1/28/1992, p. 197, line 16—p. 198, line 19.

126. Inmate Furr, incarcerated at ACW, complained of a sore throat and cough on October 4, 1990. The nurse noted "lung rales bilaterally, red throat, eardrums dull-looking and sinuses stuffed." Dr. Braslow testified that lung rales are usually a sign of pneumonia. The inmate was told to return if necessary, but was not evaluated by the NP and no follow-up was scheduled. Braslow testimony, 11/25/1991, p. 85, lines 9–25; Warren testimony, 1/28/1992, p. 199, line 12—p. 201, line 23.

127. Inmate Bradford, at Central Unit in Florence is a diabetic with high blood pressure and coronary artery disease. A September 11, 1990 nurse's note indicated he reported chest pain during the night, had blood pressure of 192/108 and was referred to the health provider. He did not see the provider because he was on a job assignment. The NP wrote "no reschedule, sick call as needed." Braslow testimony 11/25/1991, p. 86, line 1—p. 87, line 1; Warren testimony, 1/29/1992, p. 126, line 10—p. 127, line 5.

128. Inmate Licano was a diabetic inmate who suffered from hypertension and was incarcerated at CB6 at Florence. On August 7, 1989, the nurse evaluated him based on a complaint of chest pains. She found his blood pressure elevated and had difficulty assessing his lungs. The nurse referred him to the health provider. He complained two days later at sick call of continuing chest pain in the morning. The nurse again referred him to the provider who reviewed the chart and scheduled an evaluation for August 17, 1989. Braslow testimony, 11/25/1991, p. 29, line 13—p. 31, line 9.

129. Dr. Thorburn testified that inmate Culling was at Winslow when he complained of a rash that the PA and physician described as a "textbook version" of pityriasis rosea, an early stage of syphilis. According to Dr. Thorburn, there was no evidence that a blood test for syphilis was ordered. However, Dr. Warren testified that treatment was appropriate for the rash. Thorburn testimony, 11/20/1991, p. 183, line 6—p. 188, line 11; Plaintiffs' Exhibit 287; Warren testimony, 1/29/1992, p. 32, lines 11–18.

130. Inmate Mendoza is a 62–year old inmate at ACW who complained of severe back pain on

Mendoza[131] and Licano[132] suffered no permanent injuries. Inmates Romney[133] and Bradford[134] suffered no injuries.

Other than Mr. Lasoya, there is no evidence of any injury or serious medical problem resulting from the medical treatment administered to inmates within the Arizona Department of Corrections. Relevant to injury, Dr. Braslow felt improper treatment caused serious medical problems for Mr. Lasoya. However, Dr. Warren testified that treatment received by Mr. Lasoya was appropriate.[135] Thus, Dr. Palmer's treatment of inmate Lasoya was at most a disagreement between Dr. Braslow and the treating physician as far as how to treat a patient with symptoms exhibited by inmate Lasoya.[136] In addition, there is no evidence of long-term injury resulting from the care received by inmate Lasoya.[137]

Other problems exist because of staff shortages. The shortage of staff has caused sick call to be cancelled[138] and appointments to be cancelled and rescheduled.[139] Further, nurses make errors in medication, including giving the wrong medication or dosage to the inmates.[140] Finally, the Globe unit does not have 24–hour nursing coverage due to a shortage of nursing staff.[141]

E. Medical Care Programs

1. *Entry Procedure/Preventative Care*

a. Entry Procedure

Upon entry into the system, inmates within the Arizona Department of Corrections undergo a physical examination.[142] Health services run a complete blood count, urinalysis, serology syphilis, TB, measles, mumps and rubella tests on each inmate.[143]

Within twenty-four hours after the inmate is transferred to a permanent housing facility, the nurse performs a chart review. Based upon that nursing assessment, prioritization is made as to when the inmate should be seen by a provider.[144] The provider determines how often an inmate should visit to have his blood pressure checked. The nurse will establish a hypertensive flow sheet which is not initially a permanent record of the inmate's file. The hypertensive flow sheet is kept at the nursing stations where the nurses record the high blood pressure readings of the individuals when they come in specifically

October 9, 1990. The nurse noted that the inmate had fallen down the stairs a couple of days earlier. The next time the NP examined her she noted an "unknown reason" for pain, gave her Advil and told her to return in one month. Six weeks later, the inmate returned and was given wintergreen ointment and Advil by the correctional medical assistant (CMA). The CMA told her to return if the symptoms increased. Dr. Braslow testified that medical should have performed a full evaluation, including an x-ray because the inmates bones could have been brittle due to her increased age. Braslow testimony, 11/25/1991, p. 43, line 9—p. 44, line 25; Warren testimony, 1/28/1992, p. 178, lines 16–25, p. 38, lines 7–12.

131. Braslow testimony, 11/26/1991, p. 186, lines 9–20.

132. Braslow testimony, 11/26/1991, p. 180, lines 4–6.

133. Braslow testimony, 11/26/1991, p. 215, lines 6–10.

134. Braslow testimony, 11/26/1991, p. 220, line 67, p. 222, lines 22–24.

135. Warren testimony, 1/28/1992, p. 193, line 4—p. 195, line 3.

136. Braslow testimony, 11/26/1991, p. 203, lines 19–20, p. 204, lines 1–23.

137. Braslow testimony, 11/26/1991, p. 205, lines 1–5.

138. Plaintiffs' Exhibit 67, 86, 129, 251ss, 258ppp, 258bn, 43dd, 50, 139; Guy testimony, 1/8/1992, p. 154, lines 18–25.

139. Plaintiffs' Exhibit 3a, 3b, 3c, 3d, ef, 8b, 8e, 8g, 50.

140. Plaintiffs' Exhibit 158.

141. Turner testimony, 1/9/1992, p. 55, line 21— p. 56, line 6.

142. Lutz testimony, 1/6/1992, p. 83, lines 11–19.

143. Lutz testimony, 1/6/1992, p. 84, lines 5–9.

144. Lutz testimony, 1/6/1992, p. 83, lines 22—p. 84, line 4.

for the test. The flow sheet eventually becomes a part of the permanent medical records.[145] The PA or physician would have access to this flow sheet by simply asking the nurse for the information.[146]

### b. Movement Between Facilities

To ensure continuity of care, health services has established procedural guidelines for inmates that are moved inter-facility. Providers at the receiving facility respect the previous orders until they have an opportunity to review the medical record and the patient. This includes shaving waivers, prescriptions, and special orthotic devices.[147]

### c. Chronic Care

The Arizona Department of Corrections has implemented a limited tickler system to categorize and bring to the attention of the physician for review of inmates depending on their diseases. The system is used to schedule individuals that need physicals, TB tests and chronic disease management.[148] This tickler file system is used only at Cimarron Unit in Tucson, the Rynning Unit and the East Unit in Florence.[149] However, the system is in the process of being established at Perryville, Phoenix and Winslow and will eventually be used throughout the system.[150] Along with the system, ADOC holds chronic clinics for inmates with high blood pressure problems, seizure problems, chronic obstructive pulmonary diseases or asthma, cardiac problems, diabetes and for any other inmates who need to be monitored to ensure their conditions are under control.[151]

Except for the limited pilot program in Tucson and Florence, defendants have no system to follow chronic conditions including obstructive lung diseases [such as asthma], hypertension, diabetes, elevated cholesterol, seizure disorders, HIV disease, tuberculosis, and glaucoma.[152] In addition, defendants do not have a uniform system of patient education for diseases.[153]

Dr. Thorburn testified that the medical care provided in the facilities she reviewed, as far as management of chronic illnesses including obstructive lung disease, seizure disorders, HIV virus, and glaucoma, was not an optimal system.[154] Inadequately treated chronic diseases can cause permanent damage to a patient's organs or even death.[155] Because the medical care system is based on demand, Dr. Thorburn testified that defendants have substandard management of screening for tuberculosis which is transferred through breathing the air after an infected person breathes, coughs or sneezes.[156] However, the Center for Disease Control in Atlanta has certified the procedures and guidelines followed by Arizona De-

**145.** Lutz testimony, 1/6/1992, p. 90, lines 1–19.

**146.** Just because the blood pressure is not in the inmate's medical record, does not mean that it is not done or has not been recorded elsewhere. Lutz testimony, 1/6/1992, p. 91, lines 5–21.

**147.** Lutz testimony, 1/6/1992, p. 104, lines 3–22.

**148.** Lutz testimony, 1/6/1992, p. 82, lines 8–19.

**149.** Lutz testimony, 1/6/1992, p. 105, lines 15–19, p. 106, lines 1–5.

**150.** Lutz testimony, 1/6/1992, p. 86, lines 12–19.

**151.** Lutz testimony, 1/6/1992, p. 83, lines 5–12.

**152.** Thorburn testimony, 11/20/1991, p. 48, lines 25—p. 49, line 3; p. 55. lines 21–24, p. 60 line 22—p. 61, line 3; Lutz testimony, 1/6/1992, p. 105, lines 15—p. 106, line 6.

**153.** Stewart testimony, 1/16/1992, p. 56, lines 5–21.

**154.** Thorburn testimony, 11/20/1992, p. 48, lines 12–16; p. 50, lines 3–7; p. 63, lines 17–24. (treatment of inmates with seizure disorders was substandard because the ADOC does not always utilize the optimal medication), p. 68, lines 5–24.

Dr. Thorburn's testimony regarding treatment of inmates infected with the HIV virus was based on the review of two medical records. Thorburn testimony, 11/20/1992, p. 79, lines 18–20. Her opinion regarding glaucoma was based on her review of two records of inmates at Douglas. Thorburn testimony, 11/20/1992, p. 104, lines 8–9, p. 109, lines 18–19. Dr. Thorburn's testimony that the Arizona Department of Corrections adequacy of physical examinations of inmates was substandard was based on her review of the records of two inmates at Tucson. Thorburn testimony, 11/20/1992, p. 116, lines 2–3, 12–13.

**155.** Braslow testimony, 11/25/1991, p. 34, line 18—p. 35, line 1; p. 52, lines 12–16; p. 64, lines 1–15; Thorburn testimony, 11/20/1992, p. 103, lines 19–23.

**156.** Thorburn testimony, 11/20/1991, p. 91, line 22—p. 92, line 10.

partment of Corrections Health Services for the treatment of tuberculosis.[157]

#### d. Periodic Physical Exams

With the exception of the limited tickler system noted above in Tucson and Florence, defendants have no system of periodic physical examinations to detect the development of disease. Defendants know of the importance of periodic physical examinations in the delivery of health care.[158] Dr. Lutz believes that prisoners should be called back periodically for a physical examination.[159] Both Drs. Thorburn and Warren testified that inmates should receive regular physical examinations.[160] Periodic physical examinations are particularly important since a patient may be asymptomatic but have diseases developing that are not detected if the medical staff is focusing only on a specific symptom. It is the responsibility of the ADOC health provider to detect the chronic illness before it becomes so advanced that symptoms are known to the patient.[161] Prisoners have gone for a number of years without a physical examination.[162]

However, the ADOC has implemented a tickler system for pap smears and mammograms in the Florence Women's Unit.[163] At the time of trial, health practitioners in the Florence Women's Unit were revising the tickler system and attempting to reduce the backlog of prisoners who had not received their scheduled pap smears.[164]

#### 2. *Use of Outside providers*

#### a. System for Outside Providers

The Department of Corrections Health Services utilizes outside health providers including both individual specialists and hospitals to provide specialty care that is not available to the patient population on site. Some specialists come on-site for treatment of inmates. In other situations, the inmates are taken to the specialists for treatment. Optometric services and mammogram services come on site.[165]

Pursuant to policy, outside referrals are prioritized on a one through three system with a maximum of eight weeks between initiation and the patient being seen by the outside provider.[166] ADOC uses on-site institutional outside review committees to evaluate requests for a consultation and determine the priorities.[167] The review committees meet on a weekly basis in the more populated facilities and on a three to four week basis at the less populated facilities.[168] Medical care providers may accept or reject recommendations of an outside specialty consultant.[169]

**157.** Lutz testimony, 1/6/1992, p. 86, lines 5–19.

**158.** Lutz deposition, 11/13/1990, p. 75, lines 16–17.

**159.** Lutz deposition, 11/13/1990, p. 76, lines 10–13.

**160.** Thorburn testimony, 11/20/1991, p. 112, lines 3–5; Warren testimony, 1/29/1992, p. 85, lines 5–8.

**161.** Thorburn testimony, 1/20/1991, p. 112, lines 12–17; 11/21/1991, p. 2, lines 9–13.

**162.** Plaintiffs' Exhibit 33p, 8/10/90 progress note (ASPC–Perryville, Santa Maria; no pap smear since 1987); Plaintiffs' Exhibit 570, p. 26, 2/1/90 (last physical exam in 1979, *see* p. 133, been in ADOC custody since at least 1987, and p. 95, progress notes for 1983).

Dr. Thorburn found examples of unacceptably long delays between physical examinations during her inspection including (1) James Bridges, a 60 year old prisoner at Tucson, who rarely used health services except for a hernia, most recently had a physical in November 1978 and (2) George Rankovich, a 40 year old Tucson prisoner, had *no* physical in his chart, although he came into the system in 1985. Thorburn testimony, 11/20/1991, p. 116, lines 11–16.

**163.** Warren testimony, 1/29/1992, p. 85, lines 1–4; Holliday testimony, 1/13/1992, p. 67, lines 4–21.

**164.** Bolick testimony, 1/13/1992, p. 79, lines 137, p. 81, lines 19–25, p. 82, line 1.

**165.** Lutz testimony, 1/6/1992, p. 63, lines 3–17.

**166.** Lutz testimony, 1/6/1992, p. 64, line 16—p. 65, line 1.

**167.** Lutz testimony, 1/6/1992, p. 65, lines 17–23.

**168.** Lutz testimony, 1/6/1992, p. 65, line 24—p. 66, line 2.

**169.** Lutz testimony, 1/6/1992, p. 66, lines 5–16.

### b. Problems: Delays in Specialty Care

Because numerous problems exist with the specialty system, inmates experience delays in specialty care. ADOC contracts with some specialists only once every few months or after they have a minimum number of prisoners on the waiting list.[170] Appointments with specialists have been cancelled at the end of fiscal years because of funding;[171] although, those with serious needs did see specialists.[172] Specialist appointments are sometimes cancelled when inmates are transferred.[173] In addition, ADOC lacks a mechanism to determine if specialty referrals are completed.[174] According to Dr. Braslow, there are "frequently unacceptably long waits for specialist services and specialty clinic appointments for patients with significant medical conditions" including inmates Robertson;[175] Harriss;[176] Dennis;[177] Powell;[178] Lamson;[179] Chavez;[180] and Davis.[181]

**170.** Guy deposition, 10/22/1990, p. 38, lines 3–14; Charles testimony, 1/7/1992, p. 134, lines 4–18.

**171.** Guy testimony, 1/8/1992, p. 160, line 12—p. 163, line 5; Plaintiffs' Exhibit 160 ACW; 163 Perryville.

**172.** Guy testimony, 1/8/1992, p. 166, line 21—p. 168, line 1.

**173.** Guy testimony, 1/8/1992, p. 164, line 9—p. 165, line 2, Plaintiffs' Exhibit 243111, 258ddd, 258cm.

**174.** Braslow testimony, 11/25/1991, p. 96, line 14—p. 97, line 24.

**175.** Inmate Robertson was a prisoner at ACW who requested a dermatology appointment upon intake in August of 1990 for a mole that she indicated had changed color. A dermatologist examined her on October 12, 1990 and recommended that she see a surgeon. An appointment was scheduled for October 24, 1990. Dr. Braslow testified that a more rapid evaluation should have occurred. Braslow testimony, 11/26/1991, p. 5, line 14—p. 6, line 11; Warren testimony, 1/29/1992, p. 8, lines 9–12.

**176.** Inmate Harriss was a prisoner at Florence Women's Division. Dr. Williams had treated her for what he thought was a pelvic infection. On June 27, 1990, Dr. Williams referred her to Maricopa Medical Center gynecology "ASAP" because of continued bad pain. On August 8, 1990, she had not been seen. Dr. Braslow testified that such delay could have caused injury including sterility. Braslow testimony, 11/26/1992, p. 1, line 24—p. 2, line 15; Warren testimony, 1/29/1992, p. 58, line 20—p. 59, line 3.

Dr. Newkirk stated that the pain aggravated inmate Harriss' mental health problems resulting in her becoming psychotic. Newkirk testimony, 11/21/1991, p. 156, line 11—p. 158, line 7.

**177.** For the same gynecological problem referred to earlier, Inmate Dennis was not seen in a hospital until September 25, 1990. The gynecologist did not perform a complete work-up until September 27, 1990, over a month after she was referred. Braslow testimony, 11/26/1991, p. 40, lines 8–25.

**178.** Robert Powell, while incarcerated at Winslow, experienced a sixteen-month delay in seeing a dermatologist, even though he had a history of slow-growing cancerous skin lesions. Dr. Thorburn testified that he should have been seen every six months as such delay could cause disfigurement. Thorburn testimony, 11/20/1991, p. 187, lines 3–6; Plaintiffs' Exhibit 287g.

**179.** Inmate Lamson, a diabetic in Florence Central Unit, was examined by an ophthalmologist in May of 1989, who indicated early stages of diabetic retinopathy. He was scheduled for a follow-up visit in six months. There is no evidence in the record that he was scheduled for the follow-up appointment. He was not seen until over a year later in October of 1990, when he was sent to the Maricopa Medical Center emergency room for lost vision in the left eye. The medical examination found significant diabetic retinopathy. Dr. Braslow testified that there are treatments to prevent blindness, if detected earlier. Braslow testimony, 11/26/1991, p. 6, line 20—p. 7, line 13, p. 233, lines 10–15.

**180.** Inmate Chavez was incarcerated in Perryville when she waited over eight months to be seen by podiatry for a painful foot. Braslow testimony, 11/26/1991, p. 4, line 19—p. 5, line 7.

**181.** Inmate Davis was incarcerated in ACW when a pap smear on June 14, 1990 indicated possible cancer. The NP did not see the report until more than a month later, on July 30, 1990. She was referred to the dysplasia clinic on August 10, 1990 and seen October 1, 1990 for a biopsy of the cervix. Dr. Braslow testified that early diagnosis was very important for possible cancer. Braslow testimony, 11/25/1991, p. 63, line 16—p. 64, line 16.

Inmates Davis;[182] Harriss;[183] Chavez;[184] Lamson;[185] and Robertson[186] suffered no injuries. Dr. Warren also stated that such delays exist at Douglas, Perryville and Florence.[187]

### 3. *Use of Sick Call System*

#### a. Sick Call System

Defendants provide medical, dental and mental health care through a sick call system. An inmate can go to sick call and see a nurse at a pre-established day and time. In the event inmates have an illness or problem and it is not on a day with the established sick call, they can notify the correctional service officer that they need to be seen by a provider. The correctional service officer relays the request to nursing. Therefore, based upon the seriousness of the problem, an inmate can be seen seven days a week.[188]

#### b. Problems with Sick Call System

Numerous problems exist with the sick call system. The system discourages use because inmates may stand in line two to three hours.[189] If inmates leave the line, they may not see the provider. In Douglas, once an inmate checks in he cannot leave the area.[190] In the Perryville Santa Maria Unit, after they sign up for sick call, the inmates must wait outside the units until seen.[191] Once an inmate signs up for sick call, she must stay in the area or she will be considered a refusal.[192]

### 4. *Use of infirmaries*

The Department of Corrections utilizes an infirmary system for males located in Florence.[193] The infirmary in Florence is fully operational.[194] There is no women's infirmary within the Arizona Department of Corrections. Rather, women who normally would be placed in an infirmary setting are kept in the hospital longer.[195] Dr. Lutz testified that if an individual cannot return to general population by virtue of the fact there is not an infirmary at that particular facility, the individual inmate will be kept in the hospital until he or she is released.[196]

Because of the lack of infirmaries for women and limited space for men, prisoners stay in a hospital longer than necessary, or fairly sick people are returned to housing units.[197] Defendants' expert, Dr. Warren, has recommended increasing the capacity of the infirmary.[198]

### 5. *Emergency Care*

Emergency health care is available to inmates seven days a week, twenty-four hours a day, by land or air. If an inmate has a problem after hours and there are no doctors on-site, the nursing personnel would be notified about the problem by security staff. The inmate would then be brought to the health unit for a nursing assessment. If the nurse decides something needs to be discussed with the on-call provider, she will have a telephone consultation with a physi-

---

**182.** Braslow testimony, *11/26/1991*, p. *200 lines* 22–25, p. 201, lines 1–4.

**183.** Braslow testimony, *11/26/1991*, p. 229, line 15—p. 230, line—24.

**184.** Braslow testimony, *11/26/1991*, p. 229, line 15—p. 230, line—24.

**185.** Braslow testimony, *11/26/1991*, p. 229, line 15—p. 230, line—24.

**186.** Braslow testimony, *11/26/1991*, p. 229, line 15—p. 230, line—24.

**187.** Braslow testimony, *11/25/1991*, p. 25, lines 1–10; p. 96, line 1—p. 98, line 4; Warren testimony, *1/29/1992*, p. 93, lines 12–15.

**188.** Lutz testimony, *1/6/1992*, p. 70, lines 1–7.

**189.** Lutz testimony, *1/6/1992*, p. 71, lines 4–8.

**190.** *Plaintiffs' Exhibit 248dd.*

**191.** *Plaintiffs' Exhibit 248dd 8/3*, 8/1989.

**192.** *Plaintiffs' Exhibit 248dd 8/3*, 8/1989.

**193.** Lutz testimony, *1/6/1992*, p. 67, lines 15–21.

**194.** Lutz testimony, *1/6/1992*, p. 68, line 25—p. 69, lines 1–2.

**195.** Lutz testimony, *1/6/1992*, p. 67, lines 22–24.

**196.** Lutz testimony, *1/6/1992*, p. 68, lines 10–15.

**197.** Warren testimony, *1/29/1992*, p. 105, line 24—p. 106, line 7.

**198.** Warren testimony, *1/29/1992*, p. 106, lines 8–10.

cian.[199] If the inmate has a life threatening problem, he can be referred to the emergency care facility associated with that prison. There are emergency care facilities contracted all over the state at every facility. Inmates will be transferred by a Department of Corrections' vehicle, private ambulance service or paramedic service.[200]

### 6. *Specific Facilities*

#### a. Florence Facility

##### (1) *Unit Facilities*

###### (a) Central Unit

The Central Health Unit is the primary location for health care at Florence. There are 62 satellite health units at SPU, CB6, the Women's Division, the East Unit and the North Unit.[201] The Central Unit health facility has x-ray capabilities, laboratory facilities, a medical records repository and an infirmary that serves the entire state. The capacity of the infirmary at the Central Unit is fifteen beds and it is fully operational.[202] The infirmary is used in situations where an inmate is discharged from the hospital sooner than he normally would be discharged.[203]

Central Unit also contains Housing Unit 8, which is a long-term bed facility for inmates who are chronically impaired. Housing Unit 8 is an open room with twelve beds and a toilet and shower facility with easy accessibility to medical providers who work at the Central Health Unit, twenty feet away. Nursing assistants help inmates with personal daily care and other medical needs.[204]

The Central unit and the infirmary have twenty-four hour nursing coverage. The nursing assistant and infirmary nurse cover the infirmary and Housing Unit 8.[205] The Central Unit, SMU and the Rynning Unit have twenty-four hour nursing coverage.[206]

Nurses undergo a one month orientation prior to employment at the prison. The orientation consists of three weeks of on-the-job training with a correctional nurse.[207] Further, Nurses undergo educational and service training in cultural diversity, substance abuse, professionalism and ethics. Nurses also receive paid time off to attend outside seminars and the department offers updated assessment information, pharmacology updates and TB testing.[208]

The physician, PA and NP work out of the Central Health Unit Monday through Friday.[209] When no provider is on-site, a medical provider is on call and may be reached through a beeper system.[210] On-site contract services provided inmates at the various units within Florence include a surgeon, podiatrist, radiologist, optometrist, ophthalmologist and psychiatrist.[211] If an inmate is in need of a specialty service which is not provided by on-site or contract physicians, the inmate may be referred to an outside medical facility. These appointments are made at the Maricopa County Hospital outpatient services as well as other specialty services that the Florence facility utilizes in Tucson.[212]

###### (b) Rynning Unit

Health care providers at the Rynning Unit in Florence are on-call twenty-four hours a

199. Lutz testimony, 1/6/1992, p. 64, lines 5–7, p. 76, lines 6–20.

200. Lutz testimony, 1/6/1992, p. 77, lines 12–19.

201. Norrish testimony, 1/15/1992, p. 67, line 11—p. 69 line 3.

202. Norrish testimony, 1/15/1992, p. 71, lines 17–19.

203. Norrish testimony, 1/8/1992, p. 72, lines 4–9.

204. Norrish testimony, 1/15/1992, p. 69, line 21—p. 70, line 22.

205. Cory testimony, 1/14/1992, p. 10, lines 2–7.

206. Norrish testimony, 1/8/1992, p. 77, lines 16–19.

207. Cory testimony, 1/14/1992, p. 9, lines 4–10.

208. Cory testimony, 1/14/1992, p. 6, lines 17–25, p. 7, lines 1–24.

209. Norrish testimony, 1/8/1992, p. 78, lines 18–23.

210. Norrish testimony, 1/8/1992, p. 79, lines 17–21.

211. Norrish testimony, 1/8/1992, p. 77 line 20—p. 78, line 3.

212. Norrish testimony, 1/8/1992, p. 79, lines 3–16.

day seven days a week.[213] When a mid-level provider such as a family nurse practitioner or physician's assistant is on-call, there is always an M.D. on back up call.[214]

#### (c) Picacho Unit

Inmates who are housed at the Picacho Unit obtain medical care through the Central Health Unit at Florence. Generally, the inmates at the Picacho facility have only minor health concerns. For non-emergency services, they are transported to the Central Unit complex medical by van. For emergency services, inmates at the Picacho facility are taken to Casa Grande Regional Medical Facility.[215]

#### (d) SMU

The SMU health clinic is fully equipped and staffed twenty-four hours a day by the nursing staff with two providers on a full-time basis and a full dental operatory.[216] Sick call is conducted five days a week at SMU.[217]

#### (e) Women's Unit

Gynecological exams are conducted on female inmates annually at the Women's Division.[218] The Women's Division in Florence has a tickler system for tracking pap smears and mammograms.[219] The tickler system was developed in 1988 or 1989.[220] If the pap smear is abnormal, the patient is referred to Maricopa County Medical Center for a Ob/Gyn consult.[221] At the Women's Division in Florence, every woman would have a baseline mammogram at age thirty-five, every two years after age forty and annually after age fifty. The mammogram is a mobile unit that comes to the grounds twice a year. An inmate who has a breast lump or discharge would be sent to Maricopa County Medical Center for the mammogram rather than waiting for the routine mammogram.[222]

#### (2) *Intake Procedure*

When a new inmate comes into the Florence facility, the medical records librarian forwards the charts to the charge nurse. Either an RN or an LPN will review the chart and forward the chart for appropriate follow-up, including medical, dental or mental health care.[223]

#### (3) *Sick Call*

Inmates are scheduled through sick call or a nurse's line to see the doctor at a provider's line. A provider's line is conducted by a physician and a nurse practitioner or physician's assistant. The provider's line is held five days a week in the Central Unit, North Unit, Picacho work camp, South Unit and SPU; three days a week in the women's division; and two days a week at Cell Block 6.[224]

The nurse's line is held five days a week in the Central Unit.[225] At Cell Block–6 in Florence, the nurse has daily rounds for sick call, going from cell to cell.[226] Pill call at CB–6 is twice a day, seven days a week.[227] Picacho work camp and the North Unit have sick call

**213.** Holliday testimony, 1/13/1992, p. 66, lines 2–6.

**214.** Holliday testimony, 1/13/1992, p. 66, lines 6–9.

**215.** Norrish testimony, 1/8/1992, p. 66, line 12—p. 67, line 2.

**216.** Norrish testimony, 1/8/1992, p. 68, lines 20–24.

**217.** Norrish testimony, 1/8/1992, p. 73, lines 14–24.

**218.** Norrish testimony, 1/8/1992, p. 80, lines 9–11; Bolick testimony, 1/13/1992, p. 79, lines 13–18.

**219.** Holliday testimony, 1/13/1992, p. 67, lines 4–21.

**220.** Holliday testimony, 1/13/1992, p. 68, line 25, p. 69, line 1.

**221.** Holliday testimony, 1/13/1992, p. 70 lines 9–14.

**222.** Holliday testimony, 1/13/1992, p. 60, lines 6–18.

**223.** Cory testimony, 1/14/1992, p. 23, lines 17–25.

**224.** Cory testimony, 1/14/1992, p. 22, lines 11–18.

**225.** Cory testimony, 1/14/1992, p. 16, lines 2–3.

**226.** Cory testimony, 1/14/1992, p. 12, line 20–25, p. 20, lines 6–12.

**227.** Cory testimony, 1/14/1992, p. 20, line 19—p. 21, line 6.

twice a week. The RN visits Picacho twice a week for the sick call and pill call.[228] The North Unit has pill call seven days a week.[229] The Women's Division in Florence has sick call twice a week. The nursing assistant assists the provider by taking vital signs.[230] Sick call at the South Unit is two days a week and pill call is five days a week.[231]

The Department of Health Services, in an effort to improve the sick call system, has implemented a self-referral system utilized at the Rynning Unit and Central Unit in Florence. This pilot program is designed to replace traditional sick call with the self-referral system. Before it was implemented, a video was shown over the in-house television system for inmates as to how the self-referral system works. The video continues to be shown for inmates that are new to the Central Unit.[232] The video informs the inmates what forms are available in the cell block and how to request eye clinic, dental appointments, psych appointments, doctor's appointments, over-the-counter medication or a nursing assessment. The format for the video is an inmate asking the nursing supervisor, Beth Cory, questions about the self-referral system. There is another inmate in the video who interprets the questions and answers in Spanish.[233]

An inmate writes down his problem on a self-referral form and drops the form in the medical box. The self-referral forms are in both English and Spanish.[234] Illiterate inmates may drop an identification card in the medical box and the nurse will go to their cell that morning.[235] The forms are picked up every morning at 6:00, stamped, dated and an RN triages them. She sends the dental referrals to the dentist, the eye clinic referrals to the eye clinic and the mental health referrals to the psych nurse. The prescription refills are sent directly to the pharmacy. The remainder of the forms are triaged by the nurse and either referred to the medical provider or to the nurse's line for a nurse's assessment.[236] The form is then returned to the inmate informing him or her of the disposition of the referral. If the information on the self-referral form is inadequate, medical staff will request that security transport the inmate to medical to determine the problem.[237] This form expedites inmate access to health care for treatment of non-emergencies.[238] Anyone that needs to be seen that day will be brought up to the health unit.[239]

Because of the self-referral system, the health unit of the Central Unit has been able to expand health delivery services. They have been able to start a daily medication delivery at the North Unit and have been able to designate a nurse to go out and give skin tests for TB. The quality assurance audits are now being done on a more regular basis. In-service education is now being offered twice a month instead of once a month. Inmates do not have to wait in line for sick call. They do not have to wait to have an issue addressed until the next sick call happens, which was only twice a week prior to nurse's line.[240]

The inmate population at Florence is currently giving favorable reports on the new self-referral system.[241] Inmates like it be-

**228.** Cory testimony, 1/14/1992, p. 13, lines 4–8.

**229.** Cory testimony, 1/14/1992, p. 13, lines 10–13.

**230.** Cory testimony, 1/14/1992, p. 12, lines 1–19.

**231.** Cory testimony, 1/14/1992, p. 21, line 12, line 17—p. 22, line 1.

**232.** Cory testimony, 1/13/1992, p. 13, lines 14–22.

**233.** Cory testimony, 1/14/1992, p. 14, lines 9–19.

**234.** Holliday testimony, 1/13/1992, p. 73 lines 1–5; Cory testimony 1/14/1992, p. 17, lines 14–16.

**235.** Holliday testimony, 1/13/1992, p. 73, lines 6–13; Cory testimony 1/14/1992, p. 17, lines 17—p. 18, line 1.

**236.** Cory testimony, 1/14/1992, p. 15, lines 5–25.

**237.** Holliday testimony, 1/13/1992, p. 72, lines 2–7.

**238.** Lutz testimony, 1/6/1992, p. 70, lines 17–25, p. 71, lines 1–3.

**239.** Lutz testimony, 1/6/1992, p. 71, lines 18–23; Holliday testimony, 1/13/92, p. 64, lines 2–9.

**240.** Cory testimony, 1/14/1992, p. 16, lines 4–17.

**241.** Lutz testimony, 1/6/1992, p. 72, lines 23–25.

cause they don't have to stand in line; it is easier for them to access health care on a needs basis; and it opens the line of communication between the inmate and health services.[242]

### b. Perryville Facility

#### (1) *Medical Facilities*

The main medical unit at the Perryville facility is at the complex area and is comprised of a laboratory, x-ray, doctors' exam rooms, emergency room, pharmacy, medical records and administration.[243] Each unit at Perryville has a satellite health unit that includes a nurses' office and exam room.[244] At the satellite health units, sick call is conducted by a nurse practitioner or physician.[245] An optometrist visits Perryville at least once a month. An orthotics specialist visits Perryville when there are a sufficient number of inmates that have been approved through the outside referral committee for special shoes, braces or prosthesis.[246]

#### (2) *Sick Call*

Sick call at Perryville is conducted from 6:30 to 7:15 in the morning. The inmates come to the health unit to sign up and write down the reason why they need to be seen by the provider. The nurse triages the list and takes patients by priority. Sick call is conducted at Santa Maria five days a week and at the San Pedro, Santa Cruz and San Juan units four days a week.[247] If the nurse determines that the inmate needs to be seen that day, she will call the main complex to let the doctors' line nurses know an inmate needs to be seen. The doctors' line nurse will schedule a time for the inmate to be transported to the complex to see the doctor or nurse practitioner.[248]

In addition to sick call, an inmate can obtain medical treatment by notifying the yard officer, who in turn notifies the shift commander who informs the on-duty nurses that there is a problem. After normal working hours, there are three nurses on-site and either a physician or nurse practitioner on call.[249]

In an emergency, the on-duty nurse will make an assessment of the inmate's condition and notify the on-call provider, who will instruct the nurse as to what treatment to provide or whether to transport the inmate to an outside facility.[250] If it is a severe emergency, the inmate is taken to West Valley Emergency Center, which is approximately five miles from the Perryville facility.[251]

#### (3) *Female Reception Center*

The Perryville facility is the reception center for female inmates. The medical staff at Perryville performs complete medical examinations, medical history, routine laboratory work, and dental on every female inmate who is processed at Perryville.[252] Gynecological exams are performed on female inmates upon initial intake [253] and at the main complex one day a week.[254]

#### (4) *Intake from Other Facilities*

When inmates are transferred to Perryville, an initial intake assessment is per-

---

242. Lutz testimony, 1/6/1992, p. 72, line 23—p. 73, line 19.

243. Charles testimony, 1/7/1992, p. 123, lines 2–7.

244. Charles testimony, 1/7/1992, p. 123, lines 7–8.

245. Charles testimony, 1/7/1992, p. 123, lines 12–14.

246. Charles testimony, 1/7/1992, p. 133, line 21—p. 134, line 8.

247. Charles testimony, 1/7/1992, p. 124, lines 2–16.

248. Charles testimony, 1/7/1992, p. 125, line 24—p. 126, line 13.

249. Charles testimony, 1/7/1992, p. 127, lines 1–8.

250. Charles testimony, 1/7/1992, p. 127, lines 17–25.

251. Charles testimony, 1/7/1992, p. 128, lines 5–14.

252. Charles testimony, 1/7/1992, p. 132, lines 9–19.

253. Charles testimony, 1/7/1992, p. 148, lines 14–16.

254. Charles testimony, 1/7/1992, p. 148, lines 21–23.

formed and medical records are reviewed to see if there is any ongoing medical treatment that has to be continued and if there are any mental health problems that might require psychotropic medication. The initial assessment is performed by nurses as soon as the inmate arrives at Perryville. If the nurse determines an inmate should be seen by a provider, the medical records are given to the physician or nurse practitioner for review, and the provider will determine if the inmate needs an appointment.[255]

### c. Yuma Facility

There is a contract physician who visits the Yuma facility two afternoons a week.[256]

### d. Phoenix Facilities

According to plaintiffs' expert, Dr. Braslow, the Alhambra facility provided adequate health services with the exception of the Aspen DWI Unit.[257] Dr. Braslow found the Aspen Unit unacceptable as it has sick call only one day a week.[258]

#### 1. *Aspen*

The Aspen Unit at Phoenix is a DWI center.[259] The average stay for inmates at the Aspen DWI Unit is six to eighteen months.[260] Medical coverage at Aspen includes a nursing triage line five days a week. The nurse sees all of the inmates who sign up for sick call or who have complaints, treats them with over-the-counter drugs and refers inmates who need further evaluation to the physicians' assistant or physician at Alhambra. Inmates with routine problems are referred to the next physician's assistant line, conducted twice a week.[261] If necessary, an inmate can be seen by a physician or physician assistant at Alhambra within two hours after the nurses assessment.[262] Inmates at Aspen with dental problems are seen by a dentist at the Alhambra Reception Center twice a week.[263]

If a health problem develops with an inmate at the Aspen Unit after hours, there is a nurse on duty twenty-four hours a day at Alhambra. There is a physician or a PA on call twenty-four hours a day. Emergency situations are taken to the emergency room at Maricopa County Medical Center.[264] The Aspen Unit is a block and a half from the emergency room at the Maricopa County Medical Center.[265]

If an inmate at Aspen needs to see an outside consultant, the PA makes a referral to the outside referral committee. The outside referral committee prioritizes the visit to a specialist based on need. This prioritization should take place within the week.[266]

#### 2. *ACW*

At the Arizona Center for Women, four RNs and one half-time LPN cover nights between Alhambra and ACW and a physician spends half a day, once a week.[267] ACW is approximately six blocks from Alhambra.[268] Sick call is conducted twice a week.[269]

Defendants have an agreement with the administration at the Maricopa County Medical Center that if an inmate has a serious condition, needs to be seen at a particular clinic and the clinic is booked, the Department of Corrections physician makes a direct call to the physician's supervisor in that clinic

---

255. Charles testimony, 1/7/1992, p. 133, lines 2–18.

256. Charles testimony, 1/7/1992, p. 147, line 22—p. 148, line 4.

257. Braslow testimony, 11/25/1991, p. 24, lines 7–10.

258. Braslow testimony, 11/26/1991, p. 128, lines 10–16.

259. Guy testimony, 1/8/1992, p. 142, lines 13–14.

260. Guy testimony, 1/8/1992, p. 145, lines 12–14.

261. Guy testimony, 1/8/1992, p. 143, lines 6–18, lines 22–24, p. 144, lines 1–3.

262. Guy testimony, 1/8/1992, p. 144, lines 7–11.

263. Guy testimony, 1/8/1992, p. 144, lines 20–25, p. 145, lines 1–2.

264. Guy testimony, 1/8/1992, p. 145, lines 15–25.

265. Guy testimony, 1/8/1992, p. 143, lines 1–3.

266. Guy testimony, 1/8/1992, p. 146, lines 6–19.

267. Guy testimony, 1/8/1992, p. 147, lines 2–17.

268. Guy testimony, 1/8/1992, p. 147, lines 21–23.

269. Guy testimony, 1/8/1992, p. 154, lines 15–18.

and the inmate receives a timely appointment.[270]

### e. Douglas Facility

#### (1) *Facilities*

There is a health unit in each of the units within the Douglas facility.[271] The Papago DWI Unit has eight-hour-a-day medical coverage on-site five days a week. The Maricopa Unit has on-site coverage twenty-four hours a day seven days a week from the Mohave Unit. The Gila Unit has twenty-four hour coverage seven days a week and the Complex Detention Unit has twenty-four hour coverage seven days a week.[272]

#### (2) *Sick Call System*

Sick call at Douglas is held three days a week at all the units, with the exception of Maricopa. At the Maricopa Unit with a capacity of 125 inmates, sick call is held twice a week between 6:30 and 7:30 and is open to any inmate who wants to see a nurse or provider or make an appointment for a provider. The actual encounter with inmates at sick call goes from 6:30 until 11:00 or 11:30 in the morning. Inmates in the Cochise lockdown unit are seen door-to-door seven days a week. There is one nurse who is responsible for the lockdown unit.[273] The nursing supervisor at Douglas is on-call twenty-four hours a day, seven days a week.[274] In non-emergency situations, inmates are seen within a week to ten days by a provider.[275]

If an inmate has a severe problem and needs to be seen immediately, he will be seen by a provider. If there is no doctor's line at the yard that day, the inmate will be seen at the unit within a three to four hour period.

In an emergency situation, if the physician is on-site he will immediately examine the inmate and make arrangements for the inmate to be picked up by the City of Douglas Fire Department ambulance and transported to the Southeast Arizona Medical Center, ten miles away in Douglas.[276] If further referral is needed the inmate is sent to Sierra Vista Hospital or St. Mary's Hospital by land or air transport.[277] It takes approximately 40 minutes to get from the Douglas facility to Sierra Vista by car or ambulance.[278] If the physician is not on-site, there is a contact emergency physician at Sierra Vista Hospital who handles the problem. That physician will make a decision as to whether an inmate should be transported to Sierra Vista.[279]

#### (3) *Chronic Care Clinics*

Staff run clinics for hypertensive, diabetic and chronically diseased individuals. A board certified orthopedic surgeon holds a clinic twice a month.[280] The clinics for hypertensive and diabetic inmates are scheduled for every week. These inmates are seen individually on those days in addition to the daily medication encounters.[281] Other chronic care clinics are conducted on a bi-monthly basis.[282]

#### (4) *Outside Providers*

In addition to on-site medical people and contract physicians who come into the facility, Douglas utilizes medical facilities at Sierra Vista Community Hospital and at St. Mary's Hospital including cardiologists, der-

270. Guy testimony, 1/8/1992, p. 158, lines 15–24.

271. Schwegler testimony, 1/13/1992, p. 7, lines 22–25.

272. Schwegler testimony, 1/13/1992, p. 8, lines 2–13.

273. Schwegler testimony, 1/13/1992, p. 15, lines 1–5.

274. Schwegler testimony, 1/13/1992, p. 16, lines 23–25.

275. Schwegler testimony, 1/13/1992, p. 16, lines 1–7.

276. Schwegler testimony, 1/13/1992, p. 22, lines 7–17; p. 15, lines 13–25.

277. Schwegler testimony, 1/13/1992, p. 22, lines 18–21.

278. Schwegler testimony, 1/13/1992, p. 22, lines 22–24.

279. Schwegler testimony, 1/13/1992, p. 23, lines 3–13.

280. Schwegler testimony, 1/13/92, p. 17, lines 1–12.

281. Schwegler testimony, 1/13/92, p. 17, lines 22–25, p. 18, lines 1–4.

282. Schwegler testimony, 1/13/92, p. 18, lines 5–7.

matologists, general surgical consultants, radiologists, ophthalmological specialists, urologists, neurosurgeons, cardiovascular surgeons and anesthesiologists.[283] An optometrist comes in twice a month for eye exams and glasses prescriptions. Inmates who need to be seen by an outside consultant on an emergency basis are seen within twenty-four hours.[284] Douglas contracts with a board certified psychiatrist to follow inmates on psychotropic medication.[285]

#### (5) *Expert Opinion*

Defendants' expert, Dr. Warren, testified that at the time of trial, the Douglas facility was close to accreditation by the National Commission on Correctional Health Care and would only need to work on the sick call and chronic clinics areas to seek and receive accreditation.[286]

#### f. Winslow Facility

Sick call at Winslow is conducted on Monday, Wednesday and Friday on the Kaibab yard and the Coronado yard. Providers lines are held the same days on Monday, Wednesday and Friday. If a nurse determines that an inmate needs to see a provider and the inmate is seen at sick call, the provider will generally see the inmate that day or at least within forty-eight hours.[287]

Emergencies are handled at Winslow by having the inmate brought to medical and providing treatment or medications if necessary. If the problem is more severe than the level of staffing can handle, the inmate is sent to the emergency room at Winslow Memorial Hospital, approximately five miles away.[288]

#### g. Tucson Facility

Dr. Warren testified at the time of trial that the Tucson facility could seek accreditation by the National Commission on Correctional Health Care and obtain the accreditation with a modest amount of work.[289]

#### 7. *Pharmacies*

##### a. Facilities

The Arizona Department of Corrections has eight pharmacies located in Winslow, Perryville, Phoenix, Alhambra, Florence, Tucson, Ft. Grant and Douglas.[290]

Most medications are given to inmates with a one-week supply. Psychotropic medications, controlled substances and pain medications are distributed in a daily package or unit dose watch swallow, in which the nurse delivers the medication in one dose and waits until the inmate takes the medication. Some medications are given out on more than a seven-day supply because of their packaging, i.e., asthma inhaler or ointment. Vitamins are given out on a thirty-day supply.[291]

##### b. Delays in receipt of medication

When inmates are moved inter-facility, the providers at the receiving facility respect previous orders until they review the medical record and patient.[292] Non-psychotropic medications are part of the inmates' personal property and if the medications are in a container produced from the pharmacy in the correctional system, they are transferred with the patient, subsequently given to nursing along with the medical record upon arrival.[293]

Inmates experience delays in receiving prescribed medications.[294] However, there is

---

**283.** Schwegler testimony, 1/13/92, p. 18, lines 17–25, p. 19, lines 1–25, p. 20, lines 1–7.

**284.** Schwegler testimony, 1/13/92, p. 20, lines 23–24.

**285.** Schwegler testimony, 1/13/92, p. 25, lines 16–17, lines 20–22.

**286.** Warren testimony, 1/28/1992, p. 167, lines 22–25.

**287.** Sanders testimony, 1/14/1992, p. 62, lines 7–22.

**288.** Sanders testimony, 1/14/1992, p. 68, lines 20–25, p. 69, lines 1–2.

**289.** Warren testimony, 1/28/1992, p. 168, lines 1–6.

**290.** Riggs testimony, 1/7/1992, at p. 188, lines 19–24.

**291.** Riggs testimony, 1/7/1992, p. 191, lines 1–20.

**292.** Lutz testimony, 1/6/1992, p. 104, lines 3–9.

**293.** Lutz testimony, 1/6/1992, p. 104, lines 15–20.

**294.** Plaintiffs' Exhibit 158.

no evidence of any damages as a result of the delays. Overall, medications within the Arizona Department of Corrections are being distributed in a timely manner, given the staff.[295] The Department could use another three to four technicians to assist in the delivery of medication.[296]

### 8. *Problems with Security Involvement in Health Care*

The most serious problems with health care occur because of security involvement in health care. In some cases, lack of security staff causes delays in treatment of medical, dental and mental health care.[297] Lack of security staff and transportation also delay care provided outside of the prison.[298] Defendants are aware of the insufficient security staff and transportation problems.[299]

In some cases, security staff interfere with delivery of health care. For example, security staff sometimes do not allow prisoners from South Unit in Florence to pass through the gate to the Central Health Unit.[300] Inmates are sometimes unable to receive medical care due to security lockdowns of the unit or complex.[301] Security staff sometimes de-prive prisoners of their medication.[302] In addition, security staff sometimes fail to cooperate with health staff.[303]

Security officers are also involved with the provision of medical care, including performing periodic health and welfare checks on inmates with physical or mental health problems.[304] Dr. Braslow testified that it is inappropriate for security officers to maintain health and welfare checks if it is suspected a prisoner will lose consciousness or have other medical problems.[305] During non-sick call times, inmates must access care through security staff. Dr. Braslow also testified that it was inappropriate for security staff to control access to medical care.[306]

Finally, security staff are allowed to overrule medical judgments of health staff. For example, a psychiatrist, can recommend that a prisoner be released from lockdown for mental health reasons, but security may overrule that medical order.[307]

### 9. *Medical Records*

Medical Records are routinely transferred with the patient upon arrival at the facility.[308] Some problems exist with medical records.

**295.** Riggs testimony, 1/7/1992, p. 200, line 23—p. 201, line 1.

**296.** Riggs testimony, 1/7/1992, p. 197–200.

**297.** Plaintiffs' Exhibit 33e, note 3/7/1990; Plaintiffs Exhibit 249ppp; Plaintiffs' Exhibit 250xx; Plaintiffs' Exhibit 31k, notes 10/23/1990, 11/8/1990, 11/9/1990, 11/28/1990, 11/30/1990, 12/5/1990; Plaintiffs' Exhibit 24k, note 9/14/1990; Plaintiffs' Exhibit 30h, note 10/1/1990; Plaintiffs Exhibit 19hh, Plaintiffs' Exhibit 574, p. 52, note 7/2/1990; Plaintiffs' Exhibit 247de; Plaintiffs' Exhibit 28n, note, 10/11/1989; Hanson deposition, 10/24/1990, p. 62, line 17—p. 63, line 10; Hanson testimony, 1/9/1992, p. 127, lines 6–17.

**298.** Plaintiffs' Exhibits 150; 142; 146; 159; 160; 163; and 164.

**299.** Plaintiffs Exhibit 117, Plaintiffs' Exhibit 50; Lewis deposition, 2/28/1991, p. 56, lines 13–22; Scalzo deposition, 11/13/1990, p. 38, lines 7–23; Guy testimony 1/8/1992, p. 165, lines 11–17; Norrish deposition, 10/24/1990, p. 75, lines 10–19; Jolley testimony 1/15/1992, p. 45, line 22—p. 46, line 3.

**300.** Plaintiffs' Exhibit 256c, Plaintiffs' Exhibit 256d, Norrish testimony, 1/8/1992, p. 96, lines 15–21.

**301.** Plaintiffs' Exhibit 28L, note 9/24/1990; Plaintiffs' Exhibit 3e, 9/24/1990; Plaintiffs' Exhibit 19ff, note 3/18/1988, Plaintiffs' Exhibit 250ttt.

**302.** Plaintiffs' Exhibit 28r; Plaintiffs' Exhibit 230n; Plaintiffs' Exhibit 19aaa.

**303.** Braslow testimony, 11/26/1991, p. 26, line 8—p. 27, line 16; *See also*, Warren testimony, 1/29/1992, p. 107, lines 1–19.

**304.** Plaintiffs' Exhibit 72; Plaintiffs' Exhibit 249xx; Plaintiffs' Exhibit 262ggg; Plaintiffs' Exhibit 1(1); Plaintiffs' Exhibit 36j.

**305.** Braslow testimony, 11/26/1991, p. 236, lines 13–19, p. 237, lines 4–10; *See also* Plaintiffs' Exhibit 36j.

**306.** Braslow testimony, 12/16/1991, p. 10, lines 10–14.

**307.** Plaintiffs' Exhibit 309, p. 118, lines 17–25; *See also*, Findings of Fact in *Arnold v. Lewis*, 91–1809 (consolidated into this case).

**308.** Lutz testimony, 1/6/1992, p. 105, lines 17–22.

In some cases, the medical record is not transferred with the inmate.[309] In addition, medical records are not always available at sick call treatment.[310] Further, medical records do not always have the appropriate or required documentation of treatment or assessment of medical problems.[311]

#### 10. Special Diets

According to Douglas FHA Michael Schwegler, the Douglas facility has had problems providing "some of the esoteric diets" for prisoners.[312] Problems do occur in provision of special diets.[313] However, inmates generally receive the diets that are written for them.[314]

#### 11. Confidentiality

In some cases, inmates have to list their medical problems on sign up sheets or state the problem in front of other inmates.[315]

### III. DENTAL CARE SYSTEM

#### A. Generally

Dental services are available at all facilities in the State of Arizona.[316] Dental clinics in all of the facilities operate ten hours per day, with the exception of Perryville.[317] The Santa Maria Unit at Perryville has a satellite dental unit at which the dentists see the female inmates once or twice a week. The male inmates at Perryville seek dental treatment at the main complex.[318]

The Director of Dentistry for the ADOC is Dr. Scalzo.[319] Dr. Scalzo, meets with the lead dentist of every facility every other Tuesday on a conference call. In addition, the lead dentists and Dr. Scalzo meet quarterly.[320]

**309.** Plaintiffs' Exhibit 578, 199, 284H, 28q.

**310.** Plaintiffs' Exhibit 28g, 31c, 31h, 32f, 309, p. 73–74, 564, p. 131–132; 574, p. 58.

**311.** Plaintiffs' Exhibit 29y, 33k, 592, p. 012856, 012855, 012854; 90; 284B, p. 1, 284C, 284D, 284G; Warren testimony, 1/29/1992, p. 29; lines 15–21; p. 116, line 15—p. 120, line 22.

**312.** Schwegler testimony, 1/13/1992, p. 24, lines 22–25, p. 25, lines 1–10.

**313.** See Plaintiffs' Exhibit 28h, notes 3/5/91, 3/7/91 (Florence–North prisoner experienced one-month delay between expiration of special diet and renewal); note 11/8/89 (low sodium diet not renewed for three weeks); Plaintiffs' Exhibit 32q, diet form 10/24/90, note 10/24/90 (Perryville prisoner had bland diet ordered in September 1990, but it was not received); Plaintiffs' Exhibit 254ak (Winslow–Coronado prisoner complains that he is not receiving low fat, low cholesterol diet; staff responds that Service America staff have received warnings and been disciplined, and that diets are being reviewed and updated); Plaintiffs' Exhibit 258g (SMU prisoner not receiving soft diet); Plaintiffs' Exhibit 259k (error in special diet of Florence–East prisoner); Plaintiffs' Exhibit 261t (Florence–CB6 prisoner on bland diet given food items not called for by that diet); Plaintiffs' Exhibit 62mm (Florence–Central prisoner erroneously taken off bland diet list).

**314.** Schwegler testimony, 1/13/1992, p. 24, lines 22–25, p. 25, lines 1–10. Plaintiffs presented testimony of Frank Bartholic to support their position. However, the Court found Mr. Bartholic's testimony to be not very credible. In addition, Plaintiffs' Expert Dr. Thorburn testified that the care provided Mr. Bartholic did not fall below the appropriate standard of care. Thorburn testimony, 11/20/1991, p. 204, lines 12–15. Plaintiffs also presented testimony of Donald Johns. Johns testimony, 12/18/1991, p. 77 p. 78, lines 9–15. However, the evidence does not establish that Mr. Johns did not receive his special diet. Thorburn testimony, 11/21/1991; p. 67, line 24—p. 68, line 5; 12/18/1991, p. 96, lines 3–13; Hughes testimony, 1/9/1992, p. 130, line 1—p. 136, line 14.

**315.** Plaintiffs' Exhibits 5f and 5g (ACW sick call sign-up sheet requires prisoners to write their specific medical problem, and the prisoners sign in serially); Plaintiffs' Exhibits 10, 11, 12 (Perryville sign-up sheet with column for complaint); Abernathy testimony, 12/16/1991, p. 160, lines 20–25, p. 161, lines 1–25, p. 162, line 1 (at the South Unit in Florence, prisoners would line up for sick call outside in front of a window, and when they got to the window, they would tell the person inside their medical problem. While standing in line, inmate Abernathy was able to hear other prisoners describing their problems).

**316.** Lutz testimony, 1/6/1992, p. 149, lines 9–10.

**317.** Scalzo testimony, 1/6/1992, p. 227, lines 15–18.

**318.** Scalzo testimony, p. 123, lines 12–18.

**319.** Scalzo testimony, 1/6/1992, p. 194, lines 17–25.

**320.** Scalzo testimony, 1/6/1992, p. 202, lines 12–17.

B. Intake Procedure

The Department of Corrections policy requires that each inmate at Alhambra reception be examined by a dentist.[321] This examination includes recording of the soft tissue, recording of oral hygiene, and recording of the pocket depths as an indices of periodontal status in diagnosing the periodontal condition. A panoramic x-ray is taken of each individual.[322] If any problems need attention, the intake dentist will call ahead to the facility to which the inmate is to be transferred to have that inmate called in for treatment.[323] Dentists also give inmates oral hygiene instructions at the reception center. ADOC hands out a pamphlet prepared by Colgate that gives an outline as to oral hygiene.[324] The examining dentist has the discretion to instruct the individual in reference to oral hygiene practices. The chart will note "OHI" for oral hygiene instructions.[325] If the dentist feels it is necessary for the treatment of an individual case, ADOC will provide dental floss to the inmates. Some institutions have dental floss available in inmate stores. ADOC will purchase specialty toothbrushes if the dentist feels a more specific type is necessary in the treatment of a case.[326]

At Perryville, the intake reception center for women, inmates are brought in for a panoramic x-ray and examined by a dentist.[327]

C. Experts

Drs. Thorburn, Braslow and Easley testified for plaintiffs regarding the adequacy of the dental care system. Dr. Easley has a dental degree from Ohio State University and a Masters degree in public health from the University of Michigan. Relevant to prison dental care, Dr. Easley has three years clinical experience with the United States Federal Bureau of Prisons. Dr. Easley measured the ADOC dental system against the basic community standard of care for dentistry. This is a nationwide standard. Dr. Easley based his opinion of the ADOC dental system on the January 6, 1992 testimony of Dr. Scalzo and two dental and medical records of inmates.[328] Dr. Scalzo, the Director of Dentistry at ADOC, testified for defendants.

D. Staff

1. Generally

Dentists employed by the Department of Corrections provide on-site dental care and are licensed in the State of Arizona.[329] There are sixteen full-time dentists employed by the Arizona Department of Corrections.[330] At Perryville, there are three full-time dentists and staff.[331] These dentists also provide care to the Yuma facility.[332] There are five full-time dentists assigned to the Florence facility;[333] one dentist assigned to the Phoenix facilities;[334] two full-time dentists at the

321. Scalzo testimony, 2/28/1992, p. 2, lines 8–10.

322. Scalzo testimony, 1/6/1992, p. 206, lines 17–20.

323. Scalzo testimony, 1/6/1992, p. 207, lines 1–8.

324. Scalzo testimony, 1/6/1992, p. 211, lines 11–24.

325. Scalzo testimony, 1/6/1992, p. 214, lines 11–15.

326. Scalzo testimony, 1/6/1992, p. 216, lines 1–8.

327. Scalzo testimony, 1/6/1992, p. 207, lines 17–21.

328. Easley testimony, 2/27/1992, p. 5, line 19—p. 9, line 20; p. 22, line 17—p. 23, line 1; p. 24, lines 4–20.

329. Lutz testimony, 1/6/1992, p. 51, lines 17–24.

330. Scalzo testimony, 1/6/1992, p. 199, lines 9–11.

331. Scalzo testimony, 1/6/1992, p. 201, lines 11–12.

332. Scalzo testimony, 1/6/1992, p. 201, lines 13–14.

333. Scalzo testimony, 1/6/1992, p. 201, lines 16–17.

334. Scalzo testimony, 1/6/1992, p. 201, lines 14–15.

Tucson facility;[335] two full-time dentists assigned to the Douglas facility;[336] and one full-time dentist assigned to the Winslow facility.[337] Ft. Grant and Safford share one full-time dentist.[338]

The Department of Corrections has two dental hygienist positions. One of these positions is filled at Phoenix.[339] A dental hygienist is licensed to take a radiograph, to perform subgingival curettage and cleanings, and administer local anesthesia under the direct supervision of a dentist.[340]

There are nineteen full-time dental assistants to assist dentists in the provision of dental services.[341] A dental assistant prepares the patient, assists the dentist in providing care, sterilizes dental equipment and conducts inventory of supplies and schedules appointments.[342]

### 2. Problems with Staffing

#### a. The need for additional staff

The evidence establishes that the defendants could provide better care with additional staff. In the Fiscal Year 1991 budget request, Dr. Scalzo requested nine additional positions; one dentist, six or seven dental assistants, and two or three dental hygienists. These positions would have helped the defendants to accomplish the infection control guidelines of OSHA and the Center for Disease Control (CDC) as well as to perform general duties associated with provision of dental services.[343] None of these positions were funded.[344]

The January 1991 Quality Assurance Report for Florence indicated there were no functional dental clinics in SPU and the South Unit, suggesting a need for more dental staff for Florence.[345]

Dr. Weekly, the dentist for the SMU, considers his two dental assistants overworked and ideally could use two full-time dental assistants rather than one and one-half dental assistants.[346] Dr. Weekly also thinks it would be helpful to have another dentist.[347]

Dr. Scalzo has recommended that there be more hygienist positions in the ADOC to perform the preventive and periodontal treatment that currently takes 14% of the dentists' time, thus freeing the dentists to perform services only they can provide.[348] However, dental hygienist positions are very difficult to fill. There are only one thousand seven hundred dental hygienists licensed in the State of Arizona. They are primarily employed by private practitioners.[349] The Department of Corrections advertises extensively for dental hygienists and recruits dental hygienists at job fairs.[350]

#### b. Impact of lack of staff

The defendants have tailored their dental priority system to accommodate the staffing pattern of the ADOC.[351] That priority system results in treatment of those needing the

---

335. Scalzo testimony, 1/6/1992, p. 201, lines 17–18.

336. Scalzo testimony, 1/6/1992, p. 201, lines 18–19.

337. Scalzo testimony, 1/6/1992, p. 201, lines 20–21.

338. Scalzo testimony, 1/6/1992, p. 201, lines 19–20.

339. Scalzo testimony, 1/6/1992, p. 202, line 21—p. 203, line 1.

340. Scalzo testimony, 1/6/1992, p. 203, lines 11–17.

341. Scalzo testimony, 1/6/1992, p. 203, lines 3–5.

342. Scalzo testimony, 1/6/1992, p. 203, lines 6–9.

343. Scalzo deposition, 11/13/1990, p. 27, line 25—p. 30, line 7.

344. Scalzo deposition, 11/13/1990, p. 32, lines 21–23.

345. Plaintiffs' Exhibit 284G, ASPC–Florence,

346. Weekly deposition, 10/24/1990, p. 18, lines 13–14, 22–24, p. 35, line 24—p. 36, line 8.

347. Weekly deposition, 10/24/1990, p. 38, lines 5–8.

348. Scalzo testimony, 1/6/1992, p. 204, lines 11–21.

349. Scalzo testimony, 1/6/1992, p. 203, line 22—p. 204, line 2.

350. Scalzo testimony, 1/6/1992, p. 204, lines 5–8.

351. Scalzo testimony, 1/6/1992, p. 207, lines 24–25.

most urgent care.[352] Thus, some prisoners with dental problems do not receive routine dental treatment such as routine fillings and cleanings.[353] The problem with this policy is that if caries (cavities) are not treated when they are detected, they progress until they involve the nerve, at which point the patient can get an abscess and require either a root canal or an extraction.[354]

Because of a lack of dental staff, nursing staff at sick call are performing dental screening services. For urgent care, nurses are educated by the dental staff to recognize an inmate that presents symptoms that fit under the "urgent" category, such as swelling. The nurses have standing orders to prescribe antibiotics and pain medication for such conditions.[355]

### E. Dental Care System

An inmate can request dental care through sick call, by a kite or by informing a correctional services officer.[356] Inmates presenting at sick call in acute dental pain will be seen that day or the next working day based on the severity of the problem.[357]

Dentists within the Arizona Department of Corrections provide general dental care, including examinations, prosthetics and, oral surgical techniques. The Department of Corrections provides treatment for TMJ conditions, including splinting, occlusal adjustments and surgery.[358] Any procedures beyond the scope of the Department of Correc-

tions' dentists are referred to specialists. Generally, inmates are referred out for oral surgery or periodontal treatment.[359]

After the inmates are examined, based on their dental condition, they are placed in various categories. The first classification is "emergency" characterized by extreme swelling, fractured jaw or uncontrollable bleeding. The second category is "urgent" and includes inmates who are in severe pain or have lesions. The third category is "significant" and includes inmates who are exhibiting the worst dental problems such as extensive caries. Fourth is the "routine" category which includes fillings or routine periodontal care.[360]

Pursuant to policy, inmates who are classified as emergency should be seen within twenty-four hours.[361] Those classified as urgent should be seen within fourteen (14) days.[362] However, an inmate who may be classified as "urgent" or "emergency" may have to wait three to four days to allow antibiotic medication treatment prior to initiation of dental treatment.[363] All other dental problems are scheduled "based on the availability of services at each facility."[364]

If an emergency occurs after hours, the dentist comes in or the inmate is sent to a local emergency room based on his condition.[365] Generally, if an inmate is in acute dental pain he will come in either through sick call or through referral from medical

352. Scalzo testimony, 1/6/1992, p. 229, lines 24–25, p. 230, lines 1–5, 7–13.

353. Scalzo testimony, 1/6/1992, p. 229, line 24—p. 230, line 13.

354. Easley testimony, 2/27/1992, p. 69, lines 17–25, p. 70, lines 1–3; Thorburn testimony, 11/20/1991, p. 135, lines 2–4.

355. Scalzo testimony, 1/6/1992, p. 209, lines 7–25.

356. Scalzo testimony, 1/6/1992, p. 211, lines 4–10; *See also* Braslow testimony, 11/26/1991, p. 32, line 12—p. 33, line 19.

357. Scalzo testimony, 1/6/1992, p. 228, lines 13–21.

358. Scalzo testimony, 1/6/1992, p. 241, lines 7–15.

359. Adu–Tutu testimony, 1/15/1992, p. 54, lines 15–23.

360. Scalzo testimony, 1/6/1992, p. 208, lines 1–14.

361. Scalzo testimony, 1/6/1992, p. 209, lines 4–5.

362. Scalzo testimony, 1/6/1990, p. 207, lines 11–14; p. 208, lines 7–9.

363. Scalzo testimony, 1/6/1992, p. 209, lines 16–25.

364. Scalzo testimony, 1/6/1992, p. 208, line 22—p. 209, line 3.

365. Scalzo testimony, 1/6/1992, p. 227, lines 17–20.

staff or a correctional services officer.[366] Normally, inmates do not request dental services for acute pain through the kite system, because there is no guarantee as to how long the kite is going to take to get to the dental clinic.[367]

To request dental services at the women's unit in Florence, an inmate can go to sick call or access dentistry through security if it is an emergency. If a dental emergency takes place after hours, the on-call dentist can be reached by beeper. The women's unit in Florence utilizes the self-referral form. If the inmate states in the form that it is an emergency, a dentist will contact the inmate to determine whether its a true emergency.[368]

The Department of Corrections is equipped with ultrasonic scanning instruments at each dental clinic in the Department of Corrections.[369] When inmates within the Arizona Department of Corrections report to the dentist with significant plaque and tartar, the dentist will remove the plaque and tartar.[370] If an inmate presents with an acute periodontal condition, he will be treated. If an inmate presents for other dental care, the dentist will address any periodontal condition while the anesthesia is taking effect.[371] If an inmate is undergoing treatment for periodontal disease and the dentist wants that individual to return, he may be called back for the remainder of his treatment.[372] Seventy percent of the treatment in the early

stages of periodontal disease are in the patient's hands, i.e., proper brushing.[373]

An inmate does not have to report he is in pain before he will receive periodontal treatment[374] or treatment of caries (cavities).[375]

Dr. Thorburn testified that the dental services in the Arizona Department of Corrections are substandard because they are delivered on a "come and complain" basis.[376] However, according to Dr. Thorburn, prison health care systems traditionally have been set up very similar to how the Arizona Department of Corrections system is set up, i.e., health services delivered on demand based on a person's complaint.[377] In addition, Dr. Thorburn based her testimony regarding the frequency of sick call on the National Commission on Correctional Health Care standards.[378] However, the National Commission of Health Care standards regarding dental care state that dental care should be provided on a treatment priority basis which is up to the dental provider to determine.[379]

### F. Problems with Dental Care System

#### 1. *Delays in Dental Treatment*

##### a. Non-painful, routine care

The experts testified that the wait for non-painful (routine) dental services should not be longer than two or three months.[380] Delays greater than two to three months exist

366. Scalzo testimony, 1/6/1992, p. 227, line 24—p. 228, line 1.

367. Scalzo testimony, 1/6/1992, p. 228, lines 1–4.

368. Cory testimony, 1/14/92, p. 17, line 1—p. 19, line 19.

369. Scalzo testimony, 2/28/1992, p. 3, lines 2–12.

370. Scalzo testimony, 1/6/1992, p. 119, lines 8–10.

371. Scalzo testimony, 1/6/1992, p. 229, lines 3–14.

372. Scalzo testimony, 1/6/1992, p. 230, line 19—p. 231, line 2.

373. Scalzo testimony, 1/7/1992, p. 47, lines 2–5.

374. Scalzo testimony, 2/28/1992, p. 3, line 24—p. 4, line 1.

375. Scalzo testimony, 2/28/1992, p. 52, lines 21–25.

376. Thorburn testimony, 11/20/1991, p. 25, lines 13–28.

377. Thorburn testimony, 11/20/1991, p. 112, lines 7–11.

378. Thorburn testimony, 11/20/1991, p. 163, lines 12–23.

379. Thorburn testimony, 11/21/1991, p. 26, lines 5–9.

380. Thorburn testimony, 1/20/1991, p. 134, line 23—p. 135, line 1; Warren testimony, 1/29/1992, p. 78, line 10—p. 80, line 8 (two to three months, although in deposition he said two months).

in the treatment of non-painful routine care.[381]

In April 1991, there was a sixteen-month waiting list for routine dental care at Winslow.[382] The Facility Health Administrator recommended a moratorium on transfers to Winslow of prisoners with serious dental problems and asked for another dentist for one month to assist in eliminating the backlog. These requests were not approved.[383] As of January of 1992, the waiting list for routine dental care at the Kaibab yard at Winslow was two and one-half to four weeks, and on the Coronado yard it was eight weeks.[384]

In one case, it took more than two years to complete restoration work on cavities that had been identified in March and August of 1989.[385] Plaintiffs' expert presented other instances of delays greater than two to three months including inmates Paul Davis[386] and Lonnell Johnson.[387]

### b. Delays for inmates with complaints of pain

According to Dr. Braslow, prisoners who complain of painful dental problems wait inappropriately long periods of time before having the problem evaluated by a dentist.[388] Dr. Thorburn noted that dental pain should be responded to within a matter of days since "[it] can really be quite agonizing."[389]

**381.** Plaintiffs' Exhibit 587, p. 011485, Supplement 1991, p. 7 (prisoner at CB6 was referred to dental services for treatment of chipped filling in right upper molar on April 27, 1990 and was not seen in dental until April 15, 1991); Plaintiffs' Exhibit 230m (Director Lewis chronicled a four-month delay in being evaluated by a dentist after prisoner requested appointment, and another four-month delay between that appointment and the next appointment. He indicated the long time between appointments was because Papago prisoners were scheduled at Douglas dental clinic once per week, and emergencies take priority over routine appointments); Plaintiffs' Exhibit 247dc (prisoner seen by Dr. Shah for treatment of gum disease on 12/15/89, was on list for cleaning and by March 4, 1990 cleaning still had not been done); Plaintiffs' Exhibit 2520b (prisoner requested dental services on February 28, 1990 and March 15, 1990 and appointment was scheduled for June 19, 1990); Plaintiffs' Exhibit 255ba (due to the long list it takes several months to get an appointment for cavities).

**382.** Sanders deposition, 4/8/1991, p. 36, lines 4–7.

**383.** Sanders testimony, 1/14/1992, p. 72, lines 12–25.

**384.** Sanders testimony, 1/14/1992, p. 74, lines 10–12.

**385.** Pamela McQuillen was a prisoner at Florence Women's Division, when she was seen by Dr. Beard on March 7, 1989. At that time, he determined she had caries and gingivitis and indicated she should be scheduled as a medical priority for restorations. Plaintiffs' Exhibit 593, p. 13801. On August 4, 1989, Dr. Shah did a scaling, gave oral hygiene instructions, and indicated that during the next visit he would do fillings. On December 29, 1989, Dr. Shah filled two teeth and indicated he would do more fillings the next visit. Shah testimony, 1/15/1992, p. 13, lines 6–8. Dr. Shah called her back in July 1990, filled two more cavities and indicated there would be a third visit scheduled for two more fillings. Shah testimony, 1/15/1992, p. 13, lines 8–18; Plaintiffs' Exhibit 593, 1991 supplement, p. 28, note 7/5/90. The last two fillings were done in November of 1991, when the teeth were causing the inmate pain. Shah testimony, 1/15/1992, p. 20, lines 2–5.

**386.** While incarcerated in Tucson in August of 1987, inmate Davis had the first step of a root canal. His next dental appointment was January 13, 1988. Thorburn testimony, 11/20/1991, p. 130, lines 1–5. At the January 13, 1988 appointment, the dentist noted infection in the tooth subjected to root canal therapy, "irreversible pulpitis." Thorburn testimony, 11/20/1991, p. 130, lines 5–11. Three months later, in April of 1988, the dentist put a post in the tooth. This was the last root canal treatment. Thorburn testimony, 11/20/1991, p. 131, lines 2–6. After the tooth split in March of 1990, the dentist extracted the tooth. Thorburn testimony, 11/20/1991, p. 131, lines 7–8.

**387.** Lonnell Johnson, a prisoner at Douglas, had a root canal initiated in August 1987. Six months later, in April of 1988, the dentist noted an abscess in the tooth with the initiated root canal and treated the abscess for a month. In July of 1989, the dentist indicated in the record "incomplete root canal treatment." The root canal was completed in August 1989—two years after it was begun. Thorburn testimony, 11/20/1991, p. 131, line 3—p. 132, line 9; Johnson testimony, 12/17/1991, p. 19, line 14—p. 20, line 19; Plaintiffs' Exhibit 589 (dental record), p. 12031, notes 10/7/87, 4/11/88, 4/18/88, 4/22/88, 5/22/88, 9/12/88, p. 12032, notes 7/5/89, 8/14/89.

**388.** Braslow testimony, 11/26/1991, p. 38, lines 18–19.

**389.** Thorburn testimony, 11/20/1991, p. 134, lines 20–22.

Plaintiffs' expert presented the following examples of delays where inmates were complaining of pain:

Michael David was a prisoner at Perryville who had been receiving Tylenol for dental pain for six days prior to being seen by the health provider on June 21, 1990. The health provider noted that his tooth was broken to the gum line and referred the prisoner to dental.[390] The prisoner returned to the health unit the next day, again asking for something for pain, and the provider noted his cheek was swollen and once again referred him to dental. The dental assistant and dentist noted they tried to get him to dental that day, but he could not be transported. The dentist gave him prescription for pain and antibiotics, and saw him three days later.[391]

On July 23, 1990, Joe Harris, while incarcerated at Florence, South Unit, was seen by a nurse with a complaint of tooth pain radiating to his eye. He was placed on the dental sick call list and given no medication.[392] The dentist saw him on August 9, 1990. At this time, he found severe cavities and removed three teeth.[393]

Mr. Licano, a prisoner at CB6, was seen by the nurse on September 23, 1989 complaining of a toothache, draining and past swelling. The nurse observed one tooth with exposed roots that was movable. She noted "some drainage noticed. Gum is read (sic) and edematous (swollen), breath is malodorous. Inmate is insulin dependent diabetic." She concluded "possible infected tooth." [394] The nurse obtained a telephone order for penicillin from the dentist, but Mr. Licano was not seen by the dentist until May 15, 1990. At that time the tooth was extracted.[395] Dr. Braslow testified that this was a very unfortunate delay in a diabetic, for whom any infection is serious.[396]

Mary Centrella complained of tooth pain February 9, 1990. The nurse noted the tooth was broken and chipped and referred the information to the dental department.[397] She was not seen by the dentist until April 19, 1990, when he noted a cavity.[398]

Stephen Herndon, a prisoner at Tucson, wrote a kite dated April 11, 1988 requesting an appointment for tooth pain. The response indicated that he was on the list; would be given an appointment when his name got to the top of the list, and advised him to research the correct way to make a request.[399] He did not receive an appointment between April 1988 and September 1990.[400]

On October 31, 1985, a dentist at the Tucson facility evaluated Vince Bryan, found gingivitis and indicated that he needed orthodontics and maxillofacial surgery. The note further indicated that ADOC does not provide the orthodontics and maxillofacial surgery.[401] He was diagnosed as having severe bilateral crossbite and anterior open bite.[402] There was no orthodontic consult done in

**390.** Braslow testimony, 11/26/1991, p. 38, lines 22–25, p. 39, lines 1–7.

**391.** Braslow testimony, 11/26/1991, p. 39, lines 8–21.

**392.** Braslow testimony, 11/26/1991, p. 43, line 22—p. 44, line 2; Plaintiffs' Exhibit 582, p. 009797 (61), note 7/23/90.

**393.** Braslow testimony, 11/26/1991, p. 44, lines 2–5; Plaintiffs' Exhibit 582, p. 009762(51), note 8/9/90.

**394.** Braslow testimony, 11/26/1991, p. 44, lines 87.

**395.** Braslow testimony, 11/26/1991, p. 44, lines 18–22.

**396.** Braslow testimony, 11/26/1991, p. 44, line 22—p. 45, line 1.

**397.** Braslow testimony, 11/26/1991, p. 45, lines 2–6; Plaintiffs' Exhibit 23f.

**398.** Braslow testimony, 11/26/1991, p. 45, lines 6–8; Plaintiffs' Exhibit 23f, dental chart.

**399.** Thorburn testimony, 1/20/1991, p. 133, lines 13–23.

**400.** Thorburn testimony, 1/20/1991, p. 133, lines 24–25, p. 134, line 1; Warren testimony, 1/29/1992, p. 130, lines 6–16 (prisoner should have been examined).

**401.** Plaintiffs' Exhibit 567, dental record, note 10/31/85 ("O").

**402.** Easley testimony, 2/27/1992, p. 42, line 24—p. 43, line 2; Plaintiffs' Exhibit 567, note 12/7/85, dental record.

1985; although, the problem appeared in the medical record to be severe.[403] On December 23, 1987 the dentist indicated study models were needed for "collie maxilla, bulldog mandibular." [404] The dentist's objective findings were "severe skeletal maxillary" but a "note" at bottom of the plan indicated ADOC policy would not allow the surgery.[405] In November of 1988, Mr. Bryan wrote a grievance concerning the problem and the response indicated the problem was congenital and not covered by ADOC.[406] The November 16, 1988 note in the dental record indicated he needed orthognathic surgery, but added "DOC will not cover this." [407] Dr. Easley and Dr. Scalzo testified that because of his tooth alignment, food becomes impacted in his soft tissues.[408] This could cause irritation of the gum [409] and exacerbate any periodontic condition he may have.[410] Mr. Bryan, based on his current dental condition, is able to chew and eat foods.[411] Mr. Bryan's physical form from the outside is perfectly normal.[412]

Dr. Scalzo testified that he personally examined inmate Bryan,[413] who had requested that the constricted congenital deformation be corrected.[414] Dr. Scalzo discussed the situation with staff.[415] Defendants recommended Mr. Bryan be seen by an outside oral surgeon.[416] In August of 1991, Mr. Bryan was seen by Dr. Seglecky, an oral surgeon who stated that to correct the congenital deformity would require extensive dental treatment, including oral surgery consistent of the breaking of bones, orthodontic cosmetic dentistry and specific dentistry.[417] Dr. Seglecky opined that for continuity of care reasons, extensive treatment should not be started by ADOC because the treatment plan would be a minimum of four years and Mr. Bryan had only two years remaining on his sentence.

Based on inmate grievances, plaintiffs presented other examples of delays in evaluation by a dental practitioner when the inmates complained of pain.[418]

403. Easley testimony, 2/27/1992, p. 53, lines 2–6.

404. Plaintiffs' Exhibit 567, note 12/23/87, dental records.

405. Plaintiffs' Exhibit 567, note 4/3/88, dental record.

406. Plaintiffs' Exhibit 19ff.

407. Plaintiffs' Exhibit 567, note 11/16/88, dental record.

408. Easley testimony, 2/27/1992, p. 64, lines 15–20; Scalzo testimony, 1/6/1992, p. 239, line 3—p. 240, line 12.

409. Scalzo testimony, 1/6/1992, p. 240, line 24—p. 241, line 2.

410. Easley testimony, 2/27/1992, p. 64, lines 20–22.

411. Scalzo testimony, 1/6/1992, p. 238, line 23—p. 239, line 1.

412. Scalzo testimony, 1/6/1992, p. 239, lines 16–18.

413. Scalzo testimony, 1/6/1992, p. 236, lines 1–8.

414. Scalzo testimony, 1/6/1992, p. 236, lines 9–11.

415. Scalzo testimony, 1/6/1992, p. 236, lines 1–25.

416. Scalzo testimony, 1/6/1992, p. 237, lines 20–22.

417. Scalzo testimony, 1/6/1992, p. 238, lines 20–25.

418. Plaintiffs' Exhibit 36d (prisoner complained of pain on 10/17/90 and name was put on the dental list; on 12/10/90 the nurse noted she spoke with the dentist who said the prisoner would be seen in a week); Plaintiffs' Exhibit 31i (on 8/19/86 prisoner complained of tooth pain, and a cavity in tooth # 14 was noted; the tooth was extracted on 3/18/87 after developing an abscess); Plaintiffs' Exhibit 38a (prisoner seen in dental on 11/15/90 for complaints of back teeth hurting and treatment started; kited dental on 11/23/90 with complaint of continuing pain and response indicated that he would be scheduled for restorative work and seen in dental on 1/25/91); Plaintiffs' Exhibit 247ds (three grievances, 4/25/89, 6/14/89, 6/25/89 and the response indicates name is on the "high priority list and will be scheduled in the near future." Director Lewis' response to an appeal indicated prisoner was seen 8/30/89 and further work is scheduled). There was no expert testimony regarding these delays.
Based on the ruling on the motion in limine, these grievances are admissible to establish the defendants' response to the plaintiffs' complaints. They are not admissible for the truth of the inmates' complaints.

### 2. *System for Continuity of Care/Preventative Care*

Defendants have no system to see prisoners who have not requested treatment, unless the intake exam indicates an urgent need.[419] In addition, defendants have not developed a system to follow up on prisoners who do not show for an appointment. Unless it is an emergency or the inmate specifically contacts dental services, the dental department assumes that if a prisoner is a "no show" he or she is refusing the service.[420] In most cases, prisoners must seek another appointment.[421]

The defendants also have no policy for periodic dental examinations.[422] There are conditions, such as periodontal disease, that may be asymptomatic for a time, but routine examinations and hygiene services will detect the problem and possibly prevent tooth loss.[423] Early detection is one of the most important treatment tools for periodontal disease.[424] If periodic dental hygiene services are not provided, periodontal disease will produce pain, infection and eventual loss of teeth.[425]

Plaintiffs presented evidence of such a case of periodontal disease in inmate Nicholson.

Inmate Walter Nicholson returned to the ADOC custody in 1983 and an intake x-ray indicated there was bone loss. In 1988, he developed acute periodontitis. Between 1983 and 1988 the inmate was not examined or treated by a dentist.[426] Since 1988, Mr. Nicholson has experienced episodes of pus and painful gums.[427] Dentists in ADOC have recommended to Mr. Nicholson that all his teeth be extracted.[428] Although they did not provide preventative care, as soon as the defendants discovered the condition in 1988, they took appropriate steps to treat the condition.[429]

## IV. MENTAL HEALTH CARE SYSTEM

### A. Generally

#### 1. *General Administration*

The Department of Corrections formerly divided the psychologist and psychology associates between Health Services and Adult Services. There were psychologists in both Health Services and Adult Services.[430] As of January 1, 1992, all psychologists in the Department of Corrections report to Health Services.[431]

---

**419.** Scalzo testimony, 1/6/1992, p. 231, lines 3–14; Thorburn testimony, 11/20/1991, p. 116, lines 20–23 (findings from the physical examination were not regularly given); p. 127, lines 18–25 (no evidence that dental problems identified at intake were treated). *Cf.* Shah testimony, 1/15/1992, p. 13, lines 13–25, p. 14, lines 1–2 (even if he knows a prisoner needs fillings, he does not schedule them for a return appointment; the prisoner must request an appointment); Weekly deposition, 10/24/1990, p. 33, lines 7 (no system in place to assure that a prisoner who is receiving dental treatment at one institution and needs additional treatment, but is transferred, gets that treatment at the new facility; prisoner must request dental services at the new facility).

**420.** Plaintiffs' Exhibit 128, § 4.3.1.

**421.** Shah testimony, 1/15/1992, p. 4, lines 14–19.

**422.** Scalzo testimony, 1/7/1992, p. 23, line 24–p. 24, line 6.

**423.** Scalzo testimony, 1/7/1992, p. 47, lines 20–24; Thorburn testimony, 1/20/1991, lines 9–13.

**424.** Scalzo testimony, 1/7/1992, p. 51, lines 15–17.

**425.** Thorburn testimony, 11/20/1991, p. 126, lines 14–16.

**426.** Scalzo testimony, 1/6/1992, p. 233, line 15—p. 234, line 15; 1/7/1992, p. 49, lines 8–23; Easley testimony, 2/27/1992, p. 40, line 21—p. 42, line 7; Plaintiffs' Exhibit 599, p. 105446–015450.

**427.** Nicholson testimony, 12/18/1991, p. 175, lines 15–21, p. 176, lines 1–3; Plaintiffs' Exhibit 599, p. 015446.

**428.** Plaintiffs' Exhibit 599, p. 015450, 3/9/90.

**429.** Scalzo testimony, 1/6/1992, p. 234, lines 2–20.

**430.** Newkirk testimony, 11/21/1991, p. 175, lines 10–19.

**431.** Garabedian testimony, 1/7/1992, p. 219, lines 14–22.

Dr. Stellman found that this fragmentation of the mental health staff was cumbersome and impaired communication. Dr. Newkirk found a lack of communication between the two groups of mental health professionals, as well as some duplication. Dr. Warren similarly perceived this

## 2. *Experts*

Plaintiffs' mental health expert, Cassandra Newkirk toured the facilities at Phoenix, Tucson, Perryville, Douglas and Florence.[432] Dr. Newkirk, formulated her opinion in part by reviewing the medical records of certain inmates. Some of the records were chosen at random and others were reviewed after she had obtained signed releases from inmates. Dr. Newkirk reviewed a total of 95 inmate records.[433] Dr. Newkirk interviewed some inmates but did not review their medical records. She interviewed other inmates along with their medical records.[434]

Defendants' expert, Dr. Roberta Stellman, is a board certified psychiatrist and an expert in the mental health delivery system in a correctional setting.[435] Dr. Stellman provided psychiatric services for the New Mexico Department of Corrections for eight years ending September 1991.[436] While working for the New Mexico Department of Corrections, Dr. Stellman provided clinical services

to inmates who were classified as maximum security prisoners.[437]

## 3. *Intake Procedure*

### a. Male Inmates

The Department of Corrections has a routine procedure for intake of new male inmates. A portion of that procedure focuses on identifying mental health problems. The nursing staff screens the new inmates by asking specific questions about history of mental illness, self injury, substance abuse, and hospitalizations. The inmates receive psychological testing that may pick up either major deficits in intellectual functioning or psychological distress. The inmates have ready access to the psychiatrist and the psychologist at the intake facility [Alhambra].[438]

### b. Female Inmates

The Santa Maria Unit lacks a system to identify and evaluate female inmates with mental illness upon intake. In addition, ADOC does not obtain past psychiatric rec-

division to be a problem, and recommended that all psychologists be in the Health Services Division. Warren testimony, 11/29/1992, p. 92, line 25—p. 93, line 7. The separation of mental health professionals into two different divisions of the Department also caused significant problems with record-keeping. Lang deposition, 10/25/1990, p. 31, line 25—p. 32, line 23; Hanson testimony, 1/9/1992, p. 128, line 24—p. 129, lines 1–8; Sloboda deposition, 10/29/1990, p. 32, lines 3–17; Cassady deposition, p. 60, line 21—p. 61, line 24; Stellman testimony, 1/28/1992, p. 42, lines 3–7. Thus, Dr. Stellman found that the division of mental health staff made it difficult to get a complete picture of mental health services. Dr. Stellman believes that the consolidation of mental health staff under Health Services will improve continuity of documentation and increase accountability.

432. Newkirk testimony, 1/21/1992, p. 83, line 19—p. 84, line 1.

433. Newkirk testimony, 11/22/1991, p. 44, lines 5–7.

434. Newkirk testimony 11/22/1991, p. 45, line 25—p. 46, line 8.

435. Stellman testimony, 1/27/1992, p. 93, lines 4–12, p. 102, lines 11–15.

436. Stellman testimony, 1/27/1992, p. 95, line 10, p. 96, line 3. The American Correctional Associ-

ation has accredited the delivery of health care, including mental health care, at the New Mexico Department of Corrections. Stellman testimony, 1/27/1992, p. 99, lines 9–19. The New Mexico Department of Corrections has been under a Federal Consent Decree for approximately ten years. The mental health monitor for the special master in the case has recommended that mental health services and medical services be moved up to a lower level of monitoring because of the improvements in those areas. Dr. Stellman is familiar with how the federal court has proceeded with the case and with how the monitors have surveyed and critiqued the New Mexico Department of Corrections. Stellman testimony, 1/28/92, p. 1, line 16—p. 2, line 15. Dr. Stellman was retained as an expert by a special master appointed by the District Court in Jacksonville, Florida for a class action lawsuit against the Florida Department of Corrections. Dr. Stellman served as a team leader for several multidisciplinary survey teams that reviewed specific prisons in Florida to see if they had come into compliance with guidelines set down by the District Court. Stellman testimony, 1/27/1992, p. 103, line 6, p. 104, line 22.

437. Stellman testimony, 1/28/1992, p. 114, line 22, p. 115, line 9.

438. Stellman testimony, 1/27/1992, p. 141, line 9, p. 143, line 3.

ords of inmates.[439] Because the Perryville facility does not have a full-time psychiatrist, it is left to staff to identify an inmate who is seriously mentally ill. Staff then initiate transfer or treatment based on a verbal order.[440] At Perryville, Dr. Lang found a tendency by security staff to bring inappropriate referrals to mental health. These were prisoners security did not want to handle, so they would "dump them on the mental health person," thus taking time away from those prisoners who genuinely needed services.[441]

c. Identification and Treatment of Inmates with Serious Mental Health Problems

Defendants fail to identify seriously mentally ill prisoners in their custody, so that those prisoners might receive treatment. According to the ADOC Mental Health Services Manual, review of a prisoner's medical record upon arrival at an institution is a main source of mental health referrals.[442] Dr. Busfield believes that evaluating persons who have a recent history of mental illness, even if they are not on medication, is "professionally responsible" and "only prudent."[443]

However, such reviews are not routinely performed. At SMU, not all arriving prisoners are assessed to determine whether they have mental problems.[444] Mr. Hanson, the psychiatric nurse, does not see every prisoner who comes to SMU who is on psychotropic medication or has a history of mental illness.[445] Similarly, at Douglas, Dr. Centric does not know if he routinely sees all prisoners who come to the facility with a history of mental illness or on psychotropic medication,

because when he sees a prisoner, he does not know the reason for the appointment, unless he asks the prisoner.[446]

As a result of the lack of systems to identify them, seriously mentally ill prisoners go undetected in the prisons, and do not receive treatment. Plaintiffs presented evidence of the following inmates who did not receive treatment:

Henry Simms, a prisoner at Douglas, was quite psychotic when Dr. Newkirk saw him, and was out of touch with reality during the entire interview.[447] Although he had a history of hospitalization at Baker Ward, the ADOC psychiatric hospital, he had been transferred to Douglas and not followed by mental health staff at that facility.[448] His record contained two notes from psychological associates, in 1987 and 1988, noting his unusual or psychotic behavior and stating that he needed treatment. However, there was no evidence that he had received treatment by the time Dr. Newkirk saw him in August of 1990.[449]

Defendants' expert, Dr. Stellman, testified that at the time she reviewed Mr. Simms' chart, there was no evidence that he was having any acute problems.[450] Dr. Stellman was "uncomfortable" with Mr. Simms' record. According to Dr. Stellman, Mr. Simms had been at Douglas many years; was a chronic paranoid schizophrenic; and by the nature of his disease, he had refused treatment. He would periodically decompensate, or his mental condition would worsen, and be called to the attention of staff.[451] Dr. Stell-

439. *See, Arnold v. Lewis*, CIV 91–1808 [Consolidated into this case] Findings of Fact and Conclusions of Law, p. 15.

440. Stellman testimony, 1/27/1992, p. 143, lines 4–21.

441. Lang deposition, 10/25/1990, p. 44, lines 12–21.

442. Plaintiffs' Exhibit 1(2), pp. 23–24.

443. Busfield deposition, 10/26/1990, p. 22, lines 3–16.

444. Hanson testimony, 1/9/1992, p. 121, line 25, p. 122, lines 1–3.

445. Hanson deposition, 10/24/1990, p. 15, line 11—p. 18, line 20.

446. Centric deposition, p. 27, lines 9–23.

447. Newkirk testimony, 11/21/1991, p. 100, line 25—p. 101, line 7.

448. Newkirk testimony, 11/21/1991, p. 101, lines 8–13.

449. Newkirk testimony, 11/21/1991, p. 101, lines 13–20.

450. Stellman testimony, 1/28/1992, p. 24, lines 1–2.

451. Stellman testimony, 1/28/1992, p. 22, line 25, p. 23, lines 1–8.

man was disturbed by the fact that the most recent note in the chart was several years old.[452] There was no indication in the record that anyone had responded to this note, which was a referral to mental health.[453] Dr. Stellman requested that the nursing director have Mr. Simms seen by the physician the following day.[454]

Another such inmate was Mr. Bryce, a prisoner who was on psychotropic medications when he was transferred from SMU to Douglas.[455] He had a history of prior suicidal gestures.[456] According to his medical record, Mr. Bryce was not seen by a psychiatrist at Douglas between June 1989 and April 1990. His record from Adult Services was not available.[457] In Dr. Stellman's opinion, it would be desirable for a prisoner who is on psychotropic medication and is transferred to be evaluated at the receiving facility regarding his or her need or desire to continue the medication; this should be noted in the record.[458] Dr. Stellman testified that in her opinion Mr. Bryce suffered an adjustment reaction to the facility, rather than a mental illness.[459]

When she visited Perryville, Dr. Newkirk found inmate Michael Tyler in a lockdown unit/isolation cell. He was psychotic at the time, and was hearing voices.[460] A review of his record showed that he had a history of psychiatric illness, and had previously been on psychotropic medication while in ADOC, but his medication had been discontinued.[461] Although he was psychotic when Dr. Newkirk saw him, his record revealed that he had only been seen by psych associates when he was in lockdown.[462] He had not been seen by a psychiatrist in several months.[463]

Dr. Newkirk also testified about Ms. Velah, a woman with a 22-year history of depression and other psychiatric problems. Inmate Velah was in lockup at the Perryville-Santa Maria Unit.[464] Although a psychological report done shortly prior to her incarceration showed a history of psychiatric problems and treatment, there was no indication in her record that she had had psychiatric evaluation upon her entry into the prison system.[465]

Another prisoner, Tommy Wilson, was acutely ill and psychotic when he entered the system, and was evaluated at Alhambra and sent to the Perryville facility.[466] While at Perryville, he was not seen by any mental health staff; nor was he given psychotropic medication. After he decompensated, he was transferred to SPU.[467]

Inmate Alex Heil's October 26, 1989 assessment report states that the Perryville prisoner suffers from substantial depression, dysthymic disorder or neurotic depression, and needs to see a competent provider.

**452.** Stellman testimony, 1/28/1992, p. 23, lines 12–14.

**453.** Stellman testimony, 1/28/1992, p. 71, lines 3–14.

**454.** Stellman testimony, 1/28/1992, p. 23, lines 15–18.

**455.** Stellman testimony, 1/28/1992, p. 72, lines 5–12.

**456.** Stellman testimony, 1/28/1992, p. 74, lines 16–17.

**457.** Stellman testimony, 1/28/1992, p. 72, lines 18–19, p. 73, lines 10–16.

**458.** Stellman testimony, 1/28/1992, p. 74, lines 8–24.

**459.** Stellman testimony, 1/28/1992, p. 119, lines 1–25.

**460.** Newkirk testimony, 11/21/1991, p. 98, lines 15–19.

**461.** Newkirk testimony, 11/21/1991, p. 98, line 20–p. 99, lines 1–4.

**462.** Newkirk testimony, 11/22/1991, p. 54, lines 1–7.

**463.** Newkirk testimony, 11/21/1991, p. 98, line 20–p. 99, line 4.

**464.** Newkirk testimony, 11/21/1991, p. 101, line 25—p. 102, line 1.

**465.** Newkirk testimony, 11/21/1991, p. 102, lines 7–22.

**466.** Newkirk testimony, 11/21/1991, p. 153, lines 16–24.

**467.** Newkirk testimony, 11/21/1991, p. 53, lines 23–25.

However, he was not seen by psychiatrist until July 5, 1990.[468]

Inmate Hayes entered the ADOC in 1986. A psychological assessment in August of 1986 diagnosed him as having serious mental illnesses, including schizophrenia, paranoid type, schizoaffective disorder, and schizophrenia, undifferentiated type.[469] The 1986 assessment report indicated that Mr. Hayes "shows severe depression and extreme anxiety."[470] On November 25, 1987, a mental health team review indicated that he had a history of mental illness, especially depression and possible schizophrenia, with three suicide attempts. On December 28, 1987, he was evaluated and the medical records note a direction to "r/o [rule out] atypical depression."[471] The March 5, 1988 note states "r/o major depression, r/o atypical depression."[472] On March 22, 1989, Dr. Gopolan evaluated the prisoner after Mr. Hayes' complaint of depression but again found no mental illness.[473] Mr. Hayes began receiving treatment from mental health on April 28, 1989 when he complained of feeling depressed.[474] He also signed a no intent to harm document, indicating that he was not suicidal.[475] He was given medication for depression.[476] On August 7, 1989, he was put on suicide watch because he was hoarding his medication.[477] On August 9, 1989, his medication was discontinued by Dr. Pera based on the report of hoarding, but without a face-to-face evaluation.[478]

At the time Dr. Newkirk saw Mr. Hayes in CB6, he had not been seen by mental health in approximately one year.[479] He was psychotic. On questioning, he said he was hearing voices. He was anxious and tense, exhibiting the type of tension often seen in paranoid prisoners.[480] He had a past history of violence against women and was in CB6 at that time for allegedly assaulting a female staff member.[481]

Inmate Cordray was an inmate at the Perryville Santa Maria Unit when Dr. Newkirk interviewed her. The inmate said she was depressed and had been unable to see a psychiatrist.[482] Her medical record revealed a history of untreated depression. On December 26, 1989, she cut her wrists and was referred to mental health by officers to Dr. Lang and the CPOII.[483] She was seen by a nurse on December 27, 1989 who obtained telephone orders for medication from Dr. Palmer and referred her to psychology but not mental health (psychiatry).[484] There was no follow-up of this incident noted in the medical record.[485] On May 7, 1990, she was seen by a nurse who quoted her as saying she "was about to go off."[486] She was not seen by a psychiatrist until August 11, 1990.[487]

468. Plaintiffs' Exhibit 35b.

469. Plaintiffs' Exhibit 264qq, pp. 94–100.

470. Plaintiffs' Exhibit 264qq, p. 95.

471. Plaintiffs' Exhibit 264qq, pp. 81, 88.

472. Plaintiffs' Exhibit 264qq, p. 79.

473. Plaintiffs' Exhibit 264qq, p. 74; Stellman testimony, 2/7/1992, p. 124, lines 8–17.

474. Plaintiffs' Exhibit 264qq, p. 72.

475. Plaintiffs' Exhibit 264qq, p. 73.

476. Plaintiffs' Exhibit 264qq, pp. 70, 71.

477. Plaintiffs' Exhibit 264qq, p. 67.

478. Plaintiffs' Exhibit 264qq, p. 69.

479. Newkirk testimony, 11/21/1991, p. 95, line 22—p. 96, line 5.

480. Newkirk testimony, 11/21/1991, p. 95, lines 1–16.

481. Newkirk testimony, 11/21/1991, p. 96, lines 12–16, p. 97, lines 6–10.

482. Newkirk testimony, 11/21/1991, p. 99, lines 9–13.

483. Plaintiffs' Exhibit 264vv, pp. 63, 64.

484. Newkirk testimony, 11/21/1991, p. 99, lines 14–20; Stellman testimony, 2/7/1992, p. 140, lines 14–25; Plaintiffs' Exhibit 264vv, p. 21.

485. Newkirk testimony, 11/21/1991, p. 99, lines 20–22.

486. Plaintiffs' Exhibit 264vv, p. 18.

487. Plaintiffs' Exhibit 264vv, p. 62.

Inmate Lewis was treated for depression while in jail, prior to her incarceration at ADOC, between April 16, 1990 and July 3, 1990. She requested mental health services at Perryville, Santa Maria Unit and was evaluated by Dr. Pera on August 14, 1990. Dr. Pera gave her a prescription and diagnosed her as having an adjustment reaction. On August 21, 1991, without seeing the prisoner, Dr. Pera indicated there was no need for renewal of the prescription. She was subsequently transferred to ASPC–Florence, Women's Division and on November 1, 1990 referred herself to mental health. She was hearing voices, "very paranoid," and "very nervous." She was seen regularly after that by Dr. Busfield for depression.[488]

### 4. *System for Providing Care to Mentally Ill Inmates Who Decompensate*

The mental health staff learns about an inmate who decompensates in his housing area through a number of ways. First, the inmate may initiate a request to the medical department requesting to see the psychiatrist or be put on the psych line. Second, an inmate may make the same request to the CPO or the psych associate assigned to his unit. Third, requests for treatment are initiated by security officers or the warden at the facility. Finally, other inmates bring problems to the attention of the staff.[489]

If an inmate begins to decompensate within a facility in the Arizona Department of Corrections, a correctional service officer or nurse will make an assessment and could make a referral to the on-site psychiatrist or psychologist. If there is no on-site psychiatrist or psychologist, the officer or nurse may call the licensed correctional mental health facility in Phoenix.[490] At that point, an individual male may be referred to the Baker

Ward for seventy-two hour mental health evaluation.[491]

Pursuant to policy, if a patient fails to pick up a psychotropic medication, the nurse or psychiatric nurse should determine why the individual did not pick up their medication. The nurse will either have the inmate brought to them or go to their cell to find out why the medication was not picked up by the inmate. If the inmate continues to refuse to take the medication and has not decompensated, a right of refusal form is witnessed and signed either by the inmate or by two witnesses.[492]

### B. Mental Health Facilities
#### 1. *Phoenix*

##### a. Alhambra, Flamenco, and ACW facilities

The mental health component of the Alhambra facility is the maximum security special psychiatric hospital for male inmates known as Baker or B Ward. B Ward is licensed by the Arizona Health Services Division of Licensing as a special psychiatric hospital. Annually, B Ward must meet the same criteria as any other psychiatric hospital to retain its license. The hospital is licensed for forty beds and has a useful capacity of thirty-six beds.[493] Male inmates may be involuntarily committed to B Ward pursuant to state law procedures.[494]

Also at the Alhambra facility is the Flamenco Mental Health Center. Flamenco Mental Health Center is licensed by the State of Arizona as a mental health residential facility. A mental health residential facility has lesser requirements than a special psychiatric hospital and is intended for patients who are more stable.[495] Flamenco is a medium custody facility with three male wards and

**488.** Plaintiffs' Exhibit 24e.

**489.** Stellman testimony, p. 33, line 7, p. 35, line 5.

**490.** Lutz testimony, 1/6/1992, p. 61, lines 4–18.

**491.** Lutz testimony, 1/6/1992, p. 61, line 21—p. 62, line 3.

**492.** Lutz testimony, 1/6/1992, p. 59, line 15—p. 60, line 15.

**493.** Garabedian testimony, 1/7/1992, p. 212, line 16—p. 213, line 14.

**494.** Garabedian testimony, 1/7/1992, p. 213, lines 17–25.

**495.** Garabedian testimony, 1/7/1992, p. 213, lines 4–14; p. 215, lines 20–15.

one female ward.[496] G Ward, one of the four wards in Flamenco, is used to house mentally ill female inmates. G Ward was activated in 1990 and has a bed capacity of twenty inmates.[497] Psychiatrists and psychologists provide treatment to inmates incarcerated at Baker Ward, Flamenco, and G Ward.[498]

Plaintiffs admit that the mental health treatment provided at Alhambra and the Arizona Center for Women (ACW) meet the serious mental health needs of inmates.[499]

### b. Aspen

Although Dr. Garabedian supervises mental health services at Aspen, neither he nor the psychological associates under his supervision provide mental health services to the Aspen DWI Unit.[500] Rather, inmates requiring mental health treatment are transported about 300 feet from Aspen to Alhambra.[501]

In addition, Aspen provides its own programs through outside providers.[502] Those programs include everything from 12–step programs to life skills and to how to make it on the streets.[503]

### 2. *Florence (excluding SMU)*

Mr. Veloz is the mental health coordinator who is responsible for mental health services throughout the Florence complex, with the exception of SMU.[504]

### a. SPU in Florence

The Special Programs Unit (SPU) in Florence is a halfway house for mentally ill and retarded male inmates who, under Arizona law, cannot be admitted to any of the mental health treatment facilities. SPU provides services to male inmates who are seriously mentally ill, severely mentally retarded, or who suffer from organic illness.[505] Inmates housed at SPU may receive mental health treatment and programming.[506]

The SPU has a capacity of 139 beds. The SPU facility is a dormitory style facility with an open yard where the inmates can be out most of the time.[507] The SPU is not classified in terms of a level of custody, but rather accepts inmates based on their mental health needs.[508]

The SPU takes a team approach to the delivery of mental health care. Master level therapists, CPOs, and registered nurses [509] offer group therapies in anger management, communication skills, current events, and sexual dysfunction. The groups consist of five to ten patients, and the facility offers six groups per week. The facility also has groups on self-awareness, self-esteem, current events, substance abuse education, choices and changes, coping with frustration, beyond depression, rational emotive therapy, and Alcohol and Narcotics Anonymous.[510]

The psychologist conducts group therapy and psychological evaluations for the parole board and for developing treatment plans. The psychologist also holds individual therapy or assessments with inmates. The SPU offers individual counseling and appoint-

**496.** Garabedian testimony, 1/7/1992, p. 216, line 1.

**497.** Garabedian testimony, 1/7/1992, p. 214, line 21—p. 215, line 3.

**498.** Garabedian testimony, 1/7/1992, p. 217, lines 8–17.

**499.** PTS, uncontested Facts 12–13; R.T. of 11/21/1991, p. 93, lines 17–21; Plaintiffs' Response to Request for Admissions.

**500.** Garabedian testimony, 1/7/1992, p. 231, lines 8–16.

**501.** Garabedian testimony, 1/7/1992, p. 241, lines 1–6.

**502.** Garabedian testimony, 1/7/1992, p. 231, line 20—p. 232, line 2.

**503.** Garabedian testimony, 1/7/1992, p. 231, lines 16–26.

**504.** Veloz testimony, 1/9/1992, p. 139, lines 18–24.

**505.** Busfield testimony, 1/9/1992, p. 24, lines 8–20.

**506.** Garabedian testimony, 1/7/1992, p. 216, line 17—p. 217, line 2.

**507.** Veloz testimony, 1/9/1992, p. 142, lines 4–11.

**508.** Veloz testimony, 1/9/1992, p. 141, line 23—p. 142, line 3.

**509.** Veloz testimony, 1/9/1992, p. 162, lines 1–15.

**510.** Veloz testimony, 1/9/1992, p. 154, line 20—p. 156, line 22.

ments with the psychologist virtually every day.[511] In addition, the psychiatrist, psych associates, and at times registered nurses at SPU provide individual therapy to the inmates at SPU. About 90% of the inmates requiring treatment are seen by psychiatrists or masters level care providers weekly.[512]

The SPU has a recreation therapy room where the inmates can watch television or videotapes, participate in arts and crafts, play games, or read.[513] Recreational therapy is offered two hours a day.[514] The facility also offers educational support, and 24-hour crisis intervention.[515]

The Department has a policy for assigning inmates to the SPU once they are referred for placement to the facility. When the mental health staff receives a referral, they discuss the referral. The staff then composes a Mental Health Admissions Board made up of two mental health professionals and one corrections officer that goes to the facility where the inmate is assigned and performs a cursory mental status exam. The Admissions Board also reviews the medical and institutional file to determine whether the inmate's behavior is a management problem.[516]

The medical records of all patients coming to the SPU are reviewed by a psychiatrist when the medical records show that the inmate either has or has had emotional difficulties.[517] As part of the mental status exam, the mental health team determines whether the inmate has experienced auditory problems or visual hallucinations. Staff look at the inmate's gait and perform other exams necessary to assess whether the inmate is seriously impaired and belongs in a chronic unit like the SPU or if he is acute enough to be considered for admission to the psychiatric hospital B ward. The mental health team also determines whether the inmate can function in an open yard dormitory setting and whether the inmate has a history of repeated aggressive behavior against either other inmates or corrections employees.[518] If an inmate requires institutional care but is not a candidate for the SPU because of a history of assaultive behavior, the inmate is referred to B Ward at Alhambra.[519]

The majority of the inmates at SPU that receive medications are receiving psychotropic medications. The psychiatric nurse gives out those medications dose by dose.[520]

The Department of Corrections has no SPU for women. Women who require the intermediate mental health care offered to the men at the SPU can be treated at G Ward.[521]

Some of the inmates decompensate at SPU.[522] For example, Dr. Stellman observed Phillip Gonzales in CB6 and noted that he had had frequent moves between

---

**511.** Veloz testimony, 1/9/1992, p. 151, line 22—p. 152, line 8.

**512.** Veloz testimony, 1/9/1992, p. 162, line 18—p. 163, line 17.

**513.** Veloz testimony, 1/9/1992, p. 154, line 20—p. 156, line 22.

**514.** Veloz testimony, 1/9/1992, p. 159, line 9—p. 160, line 5.

**515.** Veloz testimony, 1/9/1992, p. 159, line 9—p. 160, line 5.

**516.** Veloz testimony, 1/9/1992, p. 145, lines 1–24.

**517.** Busfield testimony, 1/9/1992, p. 25, line 18—p. 28, line 9.

**518.** Veloz testimony, 1/9/1992, p. 146, line 21—p. 147, line 21.

**519.** Veloz testimony, 1/9/1992, p. 148, lines 14–25.

**520.** Cory testimony, 1/14/1992, p. 12, lines 1–19.

**521.** Garabedian testimony, 1/7/1992, p. 218, line 24—p. 219, line 13.

**522.** Plaintiffs' Exhibit 199, SPU treatment team briefing, 1/15/90 (prisoner Phelan decompensating, has become more agitated; broke out counselor's office window; placed in Central Unit isolation on 15–minute precaution), 2/7/90 (inmate Boykin decompensating and paranoid), 2/22/90 (inmate Green decompensating; Dr. Pera increased medications), 3/2/90 (inmate Cooksey decompensating badly), 3/30/90 (inmate Mokake decompensating, voicing suicidal ideas), 5/15/90 (Inmate Gholson has decompensated badly; "totally out of it;" sent to B-ward yesterday), 5/16/90 (inmate Tucker "decompensating badly; rambling speech, disoriented," "wandering around lost").

SPU and Baker Ward for decompensation.[523] Plaintiffs allege that this decompensation is caused by lack of programming or staff. However, the nature of mental illness, which follows a cyclical pattern, may be the cause of such decompensation.[524]

### b. Women's Division in Florence

Inmates at the Women's Division obtain care through sick call which is conducted twice a week and a provider line which is conducted three days a week.[525] Inmates at the Women's Division are referred to a psychiatrist through the psychiatric nurse. Counselors and security staff members advise the nurse about women who need assistance. The nurse also has open office hours where female inmates come to speak with her, and she determines whether the inmate requires a psychiatric evaluation.[526]

### 3. *SMU in Florence*

### a. Referral System

SMU conducts a psych line once a week.[527] Inmates at SMU are scheduled for appointments with the psychiatrist through various ways. First, the psychologist or the psychotherapist can refer the inmate for psychiatric care. A new inmate may be referred for psychiatric care if one of the nurses reviews his chart and finds a significant history of mental health care or determines that the inmate is on medications. The inmates can pick up self-referral forms from the nurse. The inmate also may be referred by a CPO or by other nurses.[528]

When a referral comes in, the psychiatric nurse goes to the inmate's cell and talks with him face-to-face to determine how quickly the inmate needs to be scheduled for an appointment.[529] If the patient is referred because of medications, the psych nurse contacts the pharmacy and ensures that the inmate receives his medications promptly. He or she then advises the inmate when his medications will be arriving and when he will be seeing the psychiatrist. When an inmate is referred because of a significant history of mental illness, the psych nurse visits with the inmate and makes a clinical judgment of the inmate's condition.[530]

### b. Medications

The psychiatric patients at the SMU receive their psychiatric medications by unit dosage. Each day the medications are put in individual envelopes and delivered to the inmate at his cell.[531] If an inmate refuses to take his prescribed medication, the person dispensing the medication will work with the inmate, remind him why the medication was ordered, and explain the consequences of his refusing to take the medication. If the inmate continues to refuse to take his medication, the refusal generally is noted on the med sheet. After a period of time, at the next appointment, the med sheets are looked at and sometimes the nurse again tries to negotiate with the patient.[532]

### c. Mental Health Programming

SMU has very little programming for seriously mentally ill inmates. At the time of his deposition on January 31, 1991, Dr. Pushkash indicated the mental health programming in the SMU consisted of one therapy group involving four prisoners, a levels system for prisoners with behavioral problems, and individual therapy.[533] At the time of trial, SMU

---

523. Stellman testimony, 1/28/1992, p. 107, lines 7–20.

524. Stellman testimony, 1/27/1992, p. 163, line 1—p. 164, line 9.

525. Cory testimony, 1/14/92, p. 12, lines 1–19.

526. Busfield testimony, 1/9/1992, p. 14, lines 14–24.

527. Hanson testimony, 1/9/1992, p. 93, lines 2–7.

528. Hanson testimony, 1/9/1992, p. 91, line 17—p. 92, line 4.

529. Hanson testimony, 1/9/1992, p. 92, line 8—p. 93, line 7.

530. Hanson testimony, 1/9/1992, p. 93, line 17—p. 94, line 25.

531. Hanson testimony, 1/9/1992, p. 96, line 25—p. 97, line 7.

532. Hanson testimony, 1/9/1992, p. 98, line 22—p. 99, line 23.

533. Pushkash deposition, 1/31/1991, p. 25, lines 14–22, p. 17, lines 14–25, p. 18, line 1.

provided a group therapy program, the levels system, the pod for self-abusive inmates, and a bibliotherapy program.[534]

The levels system program is a behavioral modification/levels system program in which sixteen inmates are eligible to participate at any given time. The inmates proceed through a four phase system based on their behavior. As the inmates proceed through the phases, they accumulate points and privileges, such as being able to "buy" extra time out of their cells.[535] The levels system was actually implemented by security officers. Some of the officers had received forty hours of training. However, due to turnover, other officers had been assigned to the levels system unit but received no training. In addition, in 1991, defendants were not developing a training program for officers.[536] Dr. Newkirk testified that such training is very important because the levels system deals with behaviors in a treatment modality.[537] Further, Dr. Stellman testified that officers should have some mental health training from a mental health professional, especially in suicide prevention, how to deal with assaultive patients, side effects of psychiatric medications and general training regarding the program being implemented.[538]

At the time of his deposition on January 31, 1991, Dr. Pushkash also indicated that SMU had a problem with suicidal and self-abusing prisoners. He had developed an outline for a housing pod for these prisoners that had been submitted to Warden Crist, but he had not heard whether it had been approved at the time of his deposition.[539] This self-abuser pod was established in 1991

or early 1992 at SMU to set aside those people who had some kind of emotional disorder, not necessarily a mental illness, while they were at SMU.[540]

### 4. Tucson

Inmates in the Tucson facility may obtain referrals for psychiatric treatment through a number of ways. First, an inmate can write a kite or an inmate letter if he feels the need for psychiatric care. Second, the nurses or general medical providers can refer an inmate after the inmate expresses a need for care or the medical providers observe a need for care. Third, the psychologist interviewing inmates for other reasons may observe that the inmate is having an emotional problem. Fourth, when inmates are transferred from other prisons, they are evaluated on arrival or shortly thereafter if they have either a current or past history of mental illness.[541]

Inmates with histories of psychiatric illness are seen by a psychiatrist within ten days. If an inmate in the Tucson complex requests early in the week, on Monday or Tuesday, to be seen by a psychiatrist, he will be seen that week.[542] Otherwise, he will be seen the next week.[543] Priority is given to scheduling appointments with inmates who are displaying psychiatric difficulties. At the appointment, the psychiatrist determines whether the inmate has stabilized and whether he needs medical care. If the inmate needs a more comprehensive diagnostic evaluation than the psychiatrist can perform, the psychiatrist at B Ward is contacted. After

**534.** Hanson testimony, *1/9/1992, p. 105, line 25—p. 106, line 23.*

**535.** Hanson testimony, *1/9/1992, p. 104, line 23—p. 105, line 17.*

**536.** Newkirk testimony, *1/21/1991, p. 11, lines 12–22, p. 116, lines 1–5;* Pushkash deposition, *1/31/1991, p. 48, line 12—p. 49, line 4.*

**537.** Newkirk testimony, *11/22/1991, p. 116, lines 6–8.*

**538.** Stellman testimony, *1/28/1992, p. 28, line 18—p. 29, line 7.*

**539.** Pushkash deposition, *1/31/1991, p. 28, line 1—p. 29, line 15.*

**540.** Stellman testimony, *1/28/1992, p. 35, line 17—p. 36, line 7.* The self-abuser pod was established about a year or a year and one-half prior to Mr. Hanson's testimony in January 9, 1992 and had no mental health staff assigned to it at the time of trial. Hanson testimony, *1/9/1992, p. 115, lines 17–24.*

**541.** Busfield testimony, *1/9/1992, p. 10, line 18—p. 11, line 15.*

**542.** Jolley testimony, *1/15/1992, p. 32, line 25—p. 33, line 6.*

**543.** Jolley testimony, *1/15/1992, p. 33, line 6.*

consultation, the inmate most likely will be transferred to Alhambra.[544]

### 5. *Yuma*

The Yuma facility has no psychiatric services.[545] It also has no psychologists.[546] This facility is a full duty work camp with a capacity of 250 inmates.[547] Thus, inmates who need mental health services are not assigned to Yuma. If inmates with mental health problems are assigned to Yuma, they are transferred within forty-eight to seventy-two hours.[548]

### C. Staffing Problems

### 1. *Numbers and Vacancies of Staff*

Plaintiffs expert, Dr. Newkirk, testified that defendants fail to provide sufficient staff to diagnose and treat the serious mental health needs of the prisoners in their custody.[549] With the exception of Alhambra, none of defendants' facilities has a full-time psychiatrist.[550]

Defendants clearly have a shortage of mental health staff. In recent years, the prisoner population has grown, and this has increased the need for psychological services.[551] In January of 1988, ADOC's prisoner population was 10,877. Four years later, in January of 1992, it had grown to 15,346.[552] As a result, the prisoner-to-staff ratio is too high to allow the mental health staff to do thorough work.[553] Caseloads are too heavy, and there is a tendency for mental health staff to "burn out." [554]

Shortages of mental health staff are found throughout the system. At the time of trial [November 1991—February 1992], the position of the mental health program manager, the person responsible for mental health services throughout the Department, had been vacant since July of 1990.[555] Defendants' expert, Dr. Stellman, noted staffing shortages at some of the facilities.[556] She believes that the vacant mental health positions in the SMU, Perryville and Tucson facilities should be filled; [557] that the number of psychological associates in outlying areas should be increased; and that each major prison should have one or two more psychological associates.[558]

### a. Florence

As of October, 1990, the Florence complex, excluding SMU, had no psychologists.[559] Mr. Veloz has repeatedly requested additional mental health positions for the Florence complex, including psychiatrists, psychologists, and psychological associates. However, at the time of trial, he had not received any of these positions.[560] In fact, since 1986, there have been no new mental health positions at

544. Busfield testimony, 1/9/1992, p. 28, line 12, p. 29, line 4.

545. Charles deposition, 10/23/1990, p. 9, lines 13–14.

546. Keeney deposition, 11/14/1990, p. 60, lines 2–12.

547. Keeney testimony, 1/27/1992, p. 22, lines 16–19.

548. Charles deposition, 10/23/1990, p. 9, lines 15–20.

549. Newkirk testimony, 11/21/1991, p. 160, line 24—p. 161, line 1.

550. PTS, uncontested Fact A9.

551. Veloz testimony, 1/9/1992, p. 181, lines 15–21, p. 182, lines 5–14 ("we find it very difficult to keep up with the population growth"); Keeney, deposition, 11/14/1990, p. 59, lines 1–7.

552. Plaintiffs' Exhibit 191; Keeney testimony, 1/27/1992, p. 12, lines 20–22.

553. Lang deposition, 10/25/1990, p. 26, line 6—p. 27, line 13.

554. Lang deposition, 10/25/1990, p. 45, line 5, p. 46, lines 1–3.

555. Lutz testimony, 1/6/1992, p. 36, lines 5–11, 25, p. 37, lines 1–10.

556. Stellman testimony, 1/28/1992, p. 61, lines 9–12.

557. Stellman testimony, 1/27/1992, p. 187, lines 14–18, p. 196, lines 1–5.

558. Stellman testimony, 1/27/1992, p. 196, lines 5–11; 1/28/92, p. 66, lines 17–21.

559. Veloz testimony, 1/9/1992, p. 179, line 6.

560. Veloz testimony, 1/9/1992, p. 180, lines 2–14.

Florence, except SMU.[561] Because in recent years the legislature has allocated money only for new prisons, Dr. Veloz has found himself "borrowing and stealing" staff from the budgets for new prisons.[562] During Dr. Stellman's tour of Florence, Mr. Veloz told her that the mental health staffing of the facility is "sub-average." [563] Dr. Stellman believes that Florence should have two full-time psychiatrists.[564] However, in October of 1990, the facility had one and one-sixth full time equivalent psychiatrists.[565]

As of October of 1990, there were either two or three psychologist positions vacant, and they had been vacant for over a year.[566] When Dr. Warren visited Florence, all three psychologist positions were vacant.[567] Similarly, at the time of trial, there were two psychologist positions vacant at Florence.[568]

### (1) Florence SPU

SPU has a psychiatrist, psychiatric nurses, counselors, and security officers.[569] As of October 1990, there was no psychologist at SPU.[570] The psychological associates at the SPU are supervised by the doctor level psychologist. The psych associates provide orientation to new inmates about the services provided by the Mental Health Department.

The psych associates run groups, do individual therapy, and ensure that inmates are not decompensating in the dorm. The psych associates also introduce the inmates to the psychiatric nurse, who does a nursing evaluation; schedules appointments for the psychiatrist; and ensures that the necessary paperwork is done so that the inmate can attend the appointment.[571] SPU also utilizes a recreational therapist at SPU, who is a certified recreation professional, to work with the lowest functioning inmates in the yard.[572]

### (2) Florence—SMU

Although SMU has the capacity to house 895 male inmates,[573] at the time of trial, a psychiatric social worker and a psychiatric nurse were the only mental health staff at SMU.[574] There were no psychologists.[575] A psychiatrist [Dr. Gopalan] visits SMU for three days every two weeks. This schedule is such that there are nine consecutive days when he is not at the facility.[576]

Mr. Hanson, the psychiatric nurse, believes SMU needs two psychologists.[577] Turnover is "pretty high" among mental health staff at SMU.[578] Mr. Hanson is sometimes unable to do formal rounds because of

561. Veloz deposition, 10/25/1990, p. 5, lines 3–4; p. 21, lines 3–7.

562. Veloz testimony, 1/9/1992, p. 166, line 18—p. 167, line 15.

563. Stellman testimony, 1/28/1992, p. 66, lines 1–4.

564. Stellman testimony, 1/28/1992, p. 67, lines 2–5.

565. Norrish deposition, 10/24/1990, p. 17, lines 13–22.

566. Veloz deposition, 10/25/1990, p. 14, line 10—p. 16, line 24.

567. Warren testimony, 1/29/1992, p. 93, lines 8–11.

568. Veloz testimony, 1/9/1992, p. 165, lines 15–21.

569. Garabedian testimony, 1/7/1992, p. 217, lines 37.

570. Veloz deposition, 10/25/1990, p. 68, line 25—p. 69, line 4.

571. Veloz testimony, 1/9/1992, p. 152, line 9—p. 154, line 19. In maximum security prisons, the psych nurses also do out-patient. The recreational therapist at SPU is a certified recreation-professional who also works with the lowest functioning inmates in the yard. Id.

572. Veloz testimony, 1/9/1992, p. 152, line 9—p. 154, line 19.

573. Keeney testimony, 1/27/1992, p. 18, lines 20–23.

574. Hanson testimony, 1/9/1992, p. 117, lines 10–25.

575. Hanson testimony, 1/9/1992, p. 116, lines 17–21.

576. Hanson deposition, 10/24/1990, p. 7, lines 4–14.

577. Hanson testimony, 1/9/1992, p. 118, lines 8–18.

578. Hanson testimony, 1/9/1992, p. 118, line 19—p. 119, line 1.

the demands on his time.[579] Shortly before trial, the psychiatrist line at SMU was decreased from one and a half days a week to one day a week, as the Rynning unit was demanding more staff time.[580] When Dr. Stellman visited SMU, Dr. Pushkash, a psychologist, told her that the psychiatric coverage at the facility needs to be increased to three days per week.[581] Dr. Gopalan and Dr. Menendez, both psychiatrists, agree that sixteen to twenty hours per week would be a minimum for conscientious coverage.[582]

### (3) Women's Unit

The Florence women's facility has one half day a week of psychiatrist time.[583] It is not clear whether the women have access to a psychologist.[584]

### b. Tucson

The Tucson facility has four or five institutional psychologists as part of its mental health staff.[585] Tucson also has one half-time psychiatrist, Dr. Busfield.[586] Dr. Busfield visits the Tucson prison Tuesday, Wednesday and Friday of one week and then Tuesday and Friday of the next week.[587] By contrast to the Tucson facility, Dr. Stellman testified that the Penitentiary of New Mexico, with only about 1,000 prisoners, has two half-time psychiatrists.[588] Dr. Stellman believes that a

facility the size of Tucson should have a full-time psychiatrist.[589]

Numerous vacancies exist in Tucson. Except for an eight-month period, the Tucson facility has not had a psychiatric nurse since at least October of 1990.[590] There is a Ph.D. psychologist position that has been vacant for over a year.[591] Another psychologist position had been vacant for a year and a half, but was filled in approximately November of 1991.[592]

Dr. Stellman also noted that there were some mental health positions that were frozen; she believes these positions should be unfrozen and filled.[593]

### c. Douglas

The Douglas facility, which houses 1,957 inmates,[594] is visited by a psychiatrist, Dr. Centric, approximately one day a month, although sometimes more than a month elapses between his visits.[595] Dr. Centric, gives orders for prescriptions over the telephone.[596] He does no therapy at Douglas, except in the sense of psychopharmacologic management.[597] This arrangement was characterized by the Douglas Facility Health Administrator as a "band-aid."[598] Prior to

579. Plaintiffs' Exhibit. 193, September 1989.

580. Hanson testimony, 1/9/1992, p. 113, line 21—p. 114, line 9.

581. Stellman testimony, 1/28/92, p. 66, line 22—p. 67, line 1.

582. Plaintiffs' Exhibit 193, October 1989.

583. Busfield testimony, 1/9/1992, p. 15, lines 1–17.

584. Busfield testimony, 1/9/1992, p. 35, lines 6–8.

585. Busfield testimony, 1/9/1992, p. 22, line 17—p. 23, line 10.

586. Jolley testimony, 1/15/1992, p. 32, lines 14–18.

587. Jolley testimony, 1/15/1992, p. 32, lines 14–24.

588. Stellman testimony, 1/28/1992, p. 48, line 15—p. 49, line 4.

589. Stellman testimony, 1/28/1992, p. 69, lines 5–12.

590. Busfield testimony, 1/9/1992, p. 15, line 24—p. 17, line 16.

591. Jolley testimony, 1/15/1992, p. 31, lines 7–25.

592. Jolley testimony, 1/15/1992, p. 39, lines 6–9.

593. Stellman testimony, 1/28/1992, p. 69, lines 13–23.

594. Keeney testimony, 1/27/1992, p. 11, line 22–p. 12, line 15.

595. Centric deposition, p. 9, lines 3–13, p. 46, lines 2–18.

596. Schwegler testimony, 1/13/1992, p. 43, lines 1–8.

597. Centric deposition, p. 10, lines 19–25, p. 11, lines 1–3.

598. Schwegler testimony, 1/13/1992, p. 25, line 14–25, p. 26, lines 14–19.

1990, there was no psychiatrist at Douglas at all.[599]

Douglas has no Ph.D. psychologist. There is such a position, but it has never been filled.[600] Psychological associates should not treat patients without the supervision of a Ph.D. psychologist.[601] ADOC policy also requires that psychological associates be supervised by a Ph.D.-level psychologist.[602] Although the psych associates are now supervised by a Ph.D. psychologist,[603] until recently the psychological associates were supervised by Steven Sloboda, who does not have Ph.D. in psychology.[604]

### d. Perryville

As of October 23, 1990, Perryville had three psychologists and one psychologist vacancy.[605] At that time, the San Pedro Unit had no psychologist, only a psych associate.[606] Dr. Cassady, a psychologist at Perryville, believes a psychologist should be available to the San Pedro Unit.[607]

In October of 1990, the psychiatrist position at the Perryville facility had been vacant for approximately eighteen months.[608] The position was finally filled effective December 31, 1991, after being vacant for two and a half years.[609] Because Perryville did not have a full-time psychiatrist at the time of her evaluation, Dr. Stellman expressed concern that, if a prisoner were acutely mentally ill, it might be necessary to initiate treatment or a transfer based on a verbal order, or based on the judgment of the general medical physician.[610] Dr. Stellman believes that the Perryville facility needs a psychiatric nurse and a full-time psychiatrist and that a psychiatrist working only two days a week is not adequate.[611] Perryville gained a psychiatric nurse position in the summer of 1991.[612]

When Dr. Lang was a psychologist at Perryville, he was not able to see all the prisoners who asked to see him.[613] It was also difficult to have prisoners evaluated for the mental health ward at Alhambra because of the lack of psychiatric staff.[614]

### e. Winslow

The Winslow facility, with a capacity of 1,321 inmates,[615] has no psychiatrist.[616] Rather, a psychiatrist [Dr. Busfield] visits the facility once a quarter. In the interim, prescriptions for psychotropic medications are written by a nurse practitioner.[617] On

**599.** Schwegler testimony, 1/13/1992, p. 25, lines 14–24.

**600.** Schwegler testimony, 1/13/1992, p. 42, lines 8–17.

**601.** Newkirk testimony, 11/21/91, p. 132, lines 12–22.

**602.** Newkirk testimony, 11/22/91, p. 79, lines 24–25, p. 80, lines 1–12. *See also* Garabedian testimony, 1/7/1992, p. 209, lines 6–8 (the law requires that a psychological associate be supervised by a Ph.D. psychologist).

**603.** Schwegler testimony, 1/13/1992, p. 41, lines 16–17.

**604.** Schwegler testimony, 1/13/1992, p. 42, lines 2–7.

**605.** Cassady deposition, 10/23/1990, p. 13, lines 173; p. 21, lines 2–18.

**606.** Cassady deposition, 10/23/1990, p. 55, lines 18–24.

**607.** Cassady deposition, 10/23/1990, p. 55, line 18—p. 57, line 1.

**608.** Charles deposition, 10/23/1990, p. 27, line 25, p. 28, lines 1–4.

**609.** Charles testimony, 1/7/1992, p. 136, line 20—p. 137, line 24.

**610.** Stellman testimony, 1/27/1992, p. 143, lines 8–15.

**611.** Stellman testimony, 1/28/1992, p. 61, lines 13–16, 19–23.

**612.** Charles testimony, 1/7/1992, p. 136, lines 15–19.

**613.** Lang deposition, 10/25/1990, p. 56, lines 16–25.

**614.** Lang deposition, 10/25/1990, p. 45, lines 1–6.

**615.** Keeney testimony, 1/27/1992, p. 14.

**616.** Lutz testimony, 1/6/1992, p. 61, lines 4–10.

**617.** Sanders deposition, 4/8/1991, p. 41, lines 5–16.

his visit to the facility in January 1991, Dr. Busfield saw 60 prisoners in two days.[618] Before January of 1991, Winslow had no access to a psychiatrist at all. Rather, patients were seen by a nurse practitioner.[619] According to Dr. Newkirk, a psychiatrist should visit on at least a monthly basis, in order to prescribe and monitor psychotropic medications.[620]

Inmates with serious mental illness should not be classified to the Winslow facility.[621] At the time Dr. Stellman toured, Dr. Busfield was touring the state and pulling mentally ill prisoners to the four main prisons of Tucson, Florence, Perryville and Phoenix.[622]

### 2. *Impact of inadequate staffing*

Defendants admit that they have requested further staff and could function better with those staff.[623]

As a result of inadequate staffing, defendants fail to meet the serious mental health needs of prisoners. For example, a prisoner at Tucson had his treatment discontinued after seeing a psychologist weekly for two months. The record indicated that the psychologist had to stop seeing him because of a drastic increase in the psychologist's caseload.[624] Another prisoner, who had a long history of mental health problems and treatment, was unable to be followed monthly by a psychologist while he was at the Winslow facility.[625] An inmate at Santa Maria in Per-

618. Sanders deposition, 4/8/1992, p. 47, lines 4–8.

619. Sanders deposition, 4/8/1991, p. 53, lines 13–23.

620. Newkirk testimony, 1/22/1991, p. 8, lines 2–5, 19–23.

621. Stellman testimony, 1/27/1992, p. 190, lines 1–8.

622. Stellman testimony, 1/27/1992, p. 190, lines 8–11.

623. Plaintiffs' Exhibit 49, SPU treatment team meeting, 8/7/89 (discussion of lifting hiring freeze on psychologist II positions); 8/10/89; 8/24/89; and 9/7/89 (clinical practicum canceled due to lack of staff); 10/11/89 (in two weeks, SPU will have no psychiatrist unless one as been provided by then); Plaintiffs; Exhibit 50, Executive Staff Meeting Minutes, ASPC–Florence, 1/18/89, p. 3 (problems with mental health staffing—"we are struggling with staffing the Psych area. There are no psychologists in the state that can work with the Department and we can't get a cert. list. If we advertise nationwide, it'll take months before we can get someone hired."); ASPC–Winslow, 8/1/89, p. 5 (Alhambra psychiatrist does not want to authorize medications for Winslow prisoners; unclear what psychological associates are to do about prescribing medications. Warden states "it looks like the psychiatrist position will be frozen, so problems like this will continue to occur"); Plaintiffs' Exhibit 196 (memo from SMU deputy warden Upchurch acknowledging severe shortage of mental health staff); Keeney deposition, 11/14/1990, p. 58, lines 19–25 (Associate Director Keeney has expressed the view that more psychologists and psychological associates are needed); Plaintiffs' Exhibit 232, 11/6/89 letter from Director Lewis (psychiatric services at Perryville and Florence are performed

by three staff psychiatrists who are unable to meet the demand for their services. These institutions have two frozen psychiatrist positions); Plaintiffs' Exhibit 243bcl (as of 3/29/89, no psychiatrist assigned to Perryville); Plaintiffs' Exhibit 255bq (as of 11/90, Winslow is trying to recruit a psychiatrist); Plaintiffs' Exhibit 279, ASPC–Florence, 4/4/90, p. 5 (lack of trained mental health staff); Plaintiffs' Exhibit 84E, ASPC–Winslow Quality Assurance Audit Summary, 4/17/91, p. 1 (no psychiatrist at this facility; prisoners must be referred to Alhambra. This is not appropriate for those with only behavioral problems); p. 2 (lack of mental health staff, although Winslow has prisoners with serious mental health problems, on psychotropic medication); Plaintiffs' Exhibit 309, p. 127, line 24 (Dr. Pera sees 100 patients a week, a situation he characterizes as "ludicrous"); Stewart testimony, 1/16/92, p. 62, lines 19–25 (DOC has tried but has not been able to hire administrative staff so that medical health professionals are freed up to provide direct care because the Legislature will not appropriate money). Plaintiffs' Exhibit 116, 3/8/89 memo from Veloz to Facility Health Administrator Norrish (not enough staff for Women's Division, Central, and SPU. Only two psychiatric nurses to cover Women's, South, East, and North Units; no psychologist, psychological associate, or psychotherapist. Central and Women's continue to impose a strain on limited staff resources with increasing requests for services and crisis intervention).

624. Newkirk testimony, 11/21/1991, p. 161, lines 6, 13–24.

625. Newkirk testimony, 11/22/91, p. 8, line 24—p. 9, line 13; Plaintiffs' Exhibit 28n, notes 3/9/89, 4/20/89 [inmate Banich] (Florence–North prisoner not seen by psychiatrist due to lack of time, but psychiatrist renewed medication).

ryville was unable to see the psychiatrist for some time due to the psychiatrist's caseload.[626]

Dr. Newkirk found inadequate programming at the Special Program Unit because of a lack of staff.[627] Dr. Newkirk believes that SPU needs more staff in order to provide more intensive programming such as one-on-one counseling and group therapy.[628] The mental health staff of the SPU are not separate from that of the rest of the Florence complex. Staff at SPU are responsible for delivering mental health services throughout Florence, with the exception of the SMU.[629] SPU has been short-staffed, in part because SPU staff were diverted to other units in the Florence complex.[630] The treatment team briefings log indicated that staff were performing duties in other units, for example, doing psych (psychiatrist) line in CB6.[631] This limits the ability to have groups and intensive one-on-one therapy.[632] Further, prisoners are excluded from groups because they are full.[633]

Because of high prisoner-to-staff ratios, SPU mental health staff have had to develop a triage (priority) system.[634] Except for a crisis intervention program, there is no 24–hour mental health coverage at SPU.[635] SPU always has a waiting list for admission.[636]

Due to staff shortages at Baker and Flamenco, the ADOC is sometimes unable to have the maximum number of prisoners assigned to those facilities.[637]

The lack of mental health staff at Douglas results in delays in treating prisoners and a lack of follow-up services.[638] Mr. Sloboda has repeatedly requested additional mental health staff.[639] Dr. Stellman believes that the staffing at Douglas is not adequate to deal with the serious needs of mentally ill prisoners.[640] In April of 1991, Dr. Busfield identified five prisoners at Douglas who were seriously mentally ill and should not be housed at that facility.[641]

## D. Delays in Assessment and Treatment

Prisoners with serious mental health problems experience delays in receiving treatment that are potentially dangerous and cause the prisoners to endure unnecessary psychological pain. Dr. Stellman testified that, optimally, assessments by mental health professionals should be done by the next day

**626.** Plaintiffs' Exhibit 249ew (Perryville–Santa Maria prisoner [Michelle McNeil] complains of stress and depression; staff responds that there are too many prisoners on psychiatrist's caseload, and prisoner will not be seen for "some time.")

**627.** Newkirk testimony, 11/21/1991, p. 116, lines 9–24.

**628.** Newkirk testimony, 11/21/1991, p. 166, line 25—p. 167, line 2.

**629.** Newkirk testimony, 11/21/1991, p. 116, line 25, p. 117, lines 1–5.

**630.** Newkirk testimony, 11/21/1991, p. 166, lines 3–13.

**631.** Newkirk testimony, 11/21/1991, p. 117, lines 10–12, 16–20; Plaintiffs' Exhibit 199; Stellman testimony, 1/27/1992, p. 160, lines 13–25, p. 161, line 1 (description of psych nurses indicated they had other duties in Florence).

**632.** Newkirk testimony, 11/21/1991, p. 117, lines 5–9.

**633.** Veloz testimony, 1/9/1992, p. 161, lines 9–20; Veloz deposition, 10/25/1990, p. 44, lines 24–25, p. 45, lines 1–5 (there are lists of prisoners waiting to get into groups that are full).

**634.** Veloz testimony, 1/9/1992, p. 162, line 25—p. 163, line 2.

**635.** Veloz deposition, 10/25/1990, p. 31, lines 15–18.

**636.** Veloz testimony, 1/9/1992, p. 149, lines 18–23.

**637.** Plaintiffs' Exhibit 232 (more staff would allow the department to increase Baker's census from 21 to approximately thirty-eight and Flamenco from its level of 46 to its maximum of 125).

**638.** Sloboda deposition, 10/29/1990, p. 31, lines 7–25, p. 32, lines 1–7.

**639.** Sloboda deposition, 10/29/1990, p. 39, lines 12–24.

**640.** Stellman testimony, 1/28/1992, p. 69, line 24—p. 70, line 2.

**641.** Stellman testimony, 1/28/1992, p. 70, lines 3–7.

when a prisoner complains of hearing voices or complains of feeling anxious, tense, or about to explode.[642] A person with serious mental health complaints should be seen within a few days of making complaints.[643]

### 1. *Delays in Commitment to a Mental Hospital*

Prisoners in need of commitment to a mental hospital have experienced prolonged delays in being transferred to a state hospital. Plaintiffs presented the following examples of delays in commitment to a mental hospital:[644] In 1991, a prisoner at Perryville was in lockdown for two months in a four feet by four feet cell. The prisoner was only allowed out of the cell one hour per day in cuffs and chains. However, the prisoner was not transferred to the state hospital for two months until April of 1991.[645]

In another instance, Dr. Fernandez indicated that a female inmate at Perryville–Santa Maria needed a transfer to a mental hospital on March 1, 1988, but the patient did not receive a transfer until April 12, 1988.[646] Part of the time prior to transfer, the patient was kept in lockdown.[647] At the time the patient was finally admitted to the state hospital, she was reporting paranoia and had active hallucinations and delusions.[648]

In another instance with the same inmate on March 8, 1989, the staff indicated that there was a plan to transfer the patient as an involuntary admission to the Arizona State Hospital.[649] The patient was paranoid, with grandiose illusions and had severely impaired

insight into her illness.[650] The patient was not transferred but two months later placed in lockdown for eleven and one-half months.[651] She was not admitted to the hospital until April 27, 1990.[652]

In a third instance with the same inmate, Dr. Pera noted plans on May 28, June 4 and June 11 to commit this patient to the state hospital. On June 5, Dr. Pera signed an affidavit that she was a danger to herself and others, but she was not committed until August 1, 1991.[653] It took up to a week or two for this patient to be seen by a psychiatrist while she was in lockdown.[654]

On July 11, 1990, a male inmate in Central Unit was found to be delusional and staff were attempting to get him to Baker Ward for treatment.[655] On July 27, 1990, he was still in the Central Unit on watch swallow and waiting to be seen by Dr. Busfield on August 9, 1990.[656]

### 2. *Delays in Evaluation and Treatment by a Psychiatrist*

At Tucson, it may take several days to a week for a prisoner to be seen by a psychiatrist.[657] This delay does not appear to be unusual. Plaintiffs presented numerous examples of inmates who requested mental health care, but provision of that care was delayed:

In October and November of 1990, an inmate in SMU filed a series of grievances asking to see a doctor. In one grievance, he indicated that he was hearing voices and that

**642.** Stellman testimony, 1/28/1992, p. 89, lines 1–8.

**643.** Stellman testimony, 1/28/1992, p. 89, line 1—p. 90, line 22.

**644.** *See also,* Finding of Fact and Conclusions of Law, *Arnold v. Lewis*, 91–1808.

**645.** Plaintiffs' Exhibit 309, p. 112, lines 7–25.

**646.** Plaintiffs' Exhibit 311, p. 267, lines 11–17.

**647.** Plaintiffs' Exhibit 311, p. 268, lines 14–17.

**648.** Plaintiffs' Exhibit 311, p. 269, lines 6–13.

**649.** Plaintiffs' Exhibit 311, p. 269, line 18—p. 270, line 4.

**650.** Plaintiffs' Exhibit 311, p. 270, lines 10–17.

**651.** Plaintiffs' Exhibit 311, p. 270, lines 22–25.

**652.** Plaintiffs' Exhibit 311, p. 270, lines 5–9; *See also Arnold v. Lewis*, 91–1808, Findings of Fact and Conclusions of Law.

**653.** Plaintiffs' Exhibit 311, p. 271, lines 1–8; p. 272, lines 2–8.

**654.** Plaintiffs' Exhibit 312, p. 42, lines 9–12.

**655.** "Staff is continuing trying to get inmate to B–Ward for treatment." Plaintiffs' Exhibit 199, 7/11/1990.

**656.** Plaintiffs' Exhibit 199, 7/11/90 and 7/27/90.

**657.** Jolley testimony, 1/15/1992, p. 33, lines 1–6.

they were giving him headaches. In three other grievances, he indicated that he had an immediate need to see staff. Staff responded to all four grievances by telling him to see the nurse at sick call.[658]

In another instance, the records of a prisoner at Winslow show an intake examination noting a history of mood instability.[659] On February 20, 1991, he asked to see a psychiatrist.[660] On March 20, 1991, his records note that a consult from Dr. Springer, a psychologist, was reviewed, and that he was scheduled for Dr. Busfield's next visit.[661] On April 14, 1991, medical staff received a call from security staff that the prisoner was acting strangely; he said there was something in his room, and he was hiding in the corner. The LPN referred the inmate to a provider for a consultation for his paranoid ideation. On the same date, eighty-nine pills were confiscated from the prisoner.[662] On April 15, 1991, the medical unit received a call from a psychological associate, who said Dr. Springer felt that the patient was going to "go off." The staff on the same day received another call from security staff indicating that the prisoner was complaining of anxiety and "going crazy," and was asking to see the psychiatrist. Security staff was advised to contact psychology; it was noted that the prisoner would be seen by a psychologist that day.[663] A note on April 17, 1991 stated that the prisoner was being followed by Dr. Springer. Later the same day, security called to say that the prisoner had threatened to hurt himself. The medical unit advised security staff to monitor the prisoner's behavior and advise the medical staff if there was any change in behavior.[664]

Another inmate at SPU was seen by a psychological associate on approximately July 17, 1990, who indicated that the prisoner wanted to see a psychiatrist. The prisoner denied suicidal intent or ideation. The prisoner had a history of treatment for depression. The prisoner was subsequently transferred to the Central Unit at Florence, where he again requested to see the psychiatrist for depression. He had great difficulty receiving treatment until Dr. Lutz intervened.[665]

In addition, plaintiffs presented the following examples through the inmate grievances: [666]

On January 30, 1991 a female inmate at Perryville Santa Maria Unit was told that too many patients were in the psychiatrist's caseload and the psychiatrist could not see the prisoner for "some time." [667]

In another instance, on September 12, 1990, a prisoner at the Perryville Santa Maria Unit reported that she was experiencing a family crisis and was falling apart, and that she wanted to see someone before the scheduled appointment in three weeks. The staff responded that the patient would remain on Dr. Pera's list. The appointment that had been made was for the "soonest time available." [668]

On March 20, 1991, another prisoner at Perryville, Santa Maria indicated that she wanted to be seen as soon as possible because her medications were not helping her depression and she was in a destructive state of mind. In response, a staff member indicated that Dr. Pera had not been at the facility and he was behind in his caseload, with "many, many" patients who needed to be seen before the prisoner who filed the grievance. The grievance response further

**658.** Plaintiffs' Exhibit 19cc, 11/18/90; 11/21/90, 11/24/90, 10/7/90, 10/12/90.

**659.** Plaintiffs' Exhibit 287c, note 4/12/90.

**660.** Plaintiffs' Exhibit 287c note 2/20/91.

**661.** Plaintiffs' Exhibit 287c, note 3/20/91.

**662.** Plaintiffs' Exhibit 287c, notes 4/14/91.

**663.** Plaintiffs' Exhibit 287c, notes 4/15/91.

**664.** Plaintiffs' Exhibit 287c, note 4/17/91.

**665.** Newkirk testimony, 11/21/1991, p. 110, lines 6–24; Plaintiffs' Exhibit 199, 7/17/90, p. 3.

**666.** These are admissible for the defendants' responses to the grievances but not for the truth of the inmates' complaints.

**667.** Plaintiffs' Exhibit 249ew, 1/30/91.

**668.** Plaintiffs' Exhibit 249fg, 9/12/90 (kite); 9/20/90 (response).

indicated that Dr. Pera would try to get to the prisoner in two weeks if possible.[669]

On March 31, 1990, another Santa Maria inmate complained of problems sleeping and feeling really stressed and like she was "going off" after her prescription was discontinued. On April 27, 1990, the grievance response directed the prisoner to see the nurse at sick call to be referred to the unit psychologist or psychiatrist.[670]

On July 19, 1990 a prisoner at Perryville–Santa Maria filed a grievance asking for an appointment with a psychiatrist. She filed a second kite on August 6, 1990. On August 8, 1990, she was told she was on Dr. Pera's psych line for an appointment. On August 20, 1990, she was scheduled for an appointment with Dr. Pera.[671]

In another case, on April 9, 1990, a prisoner at Santa Maria requested to see Dr. Fernandez, stating that she was depressed and wanted her prescription renewed. On April 27, 1990, the grievance response indicated that she was scheduled to be re-evaluated in the "near future." [672]

E. Inappropriate Use of Lockdown Facilities

1. *Use of Lockdown as an alternative to mental health care*

The SMU and CB6 in Florence are not mental health facilities, but rather are maximum security lockup units.[673] Neither SMU nor CB6 are appropriate for the seriously mentally ill because they have insufficient programming for psychotics or those with major depressions.[674] According to Dr. Stell-

man, it is inappropriate to house an acutely psychotic prisoner in segregation facilities such as CB6, SMU and the women's detention unit at Perryville for more than three days.[675] The only time it is appropriate to put a suicidal or self-abusive prisoner in isolation cells in a non-treatment facility is if it is an emergency, there is absolutely no other place to put them, and they are there for only a short time with a maximum of twenty-four to forty-eight hours.[676] Dr. Pera recognizes that people have objected to the use of lockdown for mental health patients, but states that "economic conditions are such we cannot seem to change the system." [677] Dr. Fernandez, the clinical director for the ADOC Psychiatric Hospital for men (Baker Ward), indicated that lockdown damages people rather than helping them.[678]

Seriously mentally ill prisoners are routinely assigned to SMU and CB6 and placed in detention or isolation cells in non-mental health facilities throughout the ADOC for longer than three days. Isolation is used throughout the ADOC for prisoners with acute mental health problems. Dr. Schwegler, the Facility Health Administrator at Douglas, indicated that prisoners have been put in lockdown and retained there for five to seven days, awaiting transfer to the mental health facility in Phoenix.[679]

a. Female Inmates

Female prisoners exhibiting mental health problems necessitating psychiatric intervention are assigned to lockdown at the Santa Maria Unit in Perryville and retained for more than three days. Examples of such

---

669. Plaintiffs' Exhibit 249ga, 3/20/91 (kite); 3/22/91 (response).

670. Plaintiffs' Exhibit 249gz, 3/31/90 (kite); 4/27/90 (response).

671. Plaintiffs' Exhibits 249ho and 249hp.

672. Plaintiffs' Exhibit 249fn, 4/9/90 (kite); 4/27/90 (grievance).

673. Newkirk testimony, 11/21/1991, p. 111, lines 5, 17–18.

674. Newkirk testimony, 11/21/1991, p. 111, lines 20–21.

675. Stellman testimony, 1/28/1992, p. 80, line 9—p. 81, line 1.

676. Newkirk testimony, 11/21/1991, p. 168, lines 1–22.

677. Plaintiffs' Exhibit 309, p. 127, lines 8–22.

678. Plaintiffs' Exhibit 309, p. 129, lines 5–13, p. 153, lines 1–3.

679. Schwegler deposition, 10/29/1990, p. 56, lines 24–25, p. 57, lines 1–21.

lockdown include inmate Legg,[680] Brown,[681] Caltevedt,[682] Bloomfield,[683] and Martinez.[684] *See also, Arnold v. Lewis,* 91–1808. Dr. Pera, the psychiatrist responsible for providing psychiatric services at Perryville testified that he sees approximately seven to eight women in lockdown per week.[685] He only sees people in lockdown who are put there because of mental health problems.[686] Some of these are women with significant mental illnesses who are in need of hospitalization.[687]

### b. Male Inmates

### (1) *CB6*

CB6 is frequently used to house acutely mentally ill prisoners for longer than three days. Plaintiffs presented numerous examples of seriously mentally ill inmates housed in CB6 including inmates Munk, Mitchell, Brown, Honeycutt, Johnson, Tucker and Autrey:

On April 11, 1989, in Central Unit, Inmate Munk was placed on ten-minute watch in a *holding cell and stripped after threatening to eat light bulbs.*[688] On April 12, 1989, Inmate Munk was placed in isolation and stripped. He was "still hostile; smearing feces; and jumped on an officer." He was then sent to CB6.[689] On April 14, 1989, Munk was seen by Dr. Pera in CB6. Dr. Pera determined that he was still a behavior problem and should be seen again.[690] On April 17, 1989, Munk was still in CB6, "in observation" with "no change."[691] On April 18, 1989, Munk was still in CB6 and Dr. Pera placed him in four points and released him when he took his medication.[692] On May 10, 1989, Munk was still in CB6.[693]

On September 21, 1989, Inmate Mitchell was on seclusion watch in an observation cell in CB6. He "denied hallucinations or suicide ideations but [was] still very hyper." The notes indicated that the inmate would remain in CB6 until he calmed down.[694]

In another instance, records for October 10, 1989 indicate that Inmate Brown was in CB6, was given a shot of Prolixin by Dr. Pera, would remain at CB6 until "more stable" and then the Admission Team would reevaluate.[695] On October 13, 1989, Inmate Brown was in CB6 where he remained delusional ["Brown remains delusional; appears the same and a little less mellow; Dr. Pera

---

**680.** Plaintiffs' Exhibit 281(7), 9/12/90 (Legg placed on special watch in lockdown by Dr. Pera on 9/12/90 and retained through 9/22/90).

**681.** Plaintiffs' Exhibit 281(7), 12/31/90 (Brown in lockdown per Sergeant from 12/31/90 at least through 1/11/91 until seen by Dr. Pera).

**682.** Plaintiffs' Exhibit 281(7), 3/2/91 (Caltevedt put in lockdown on special 30 minute watch (changed to fifteen minute watch on 3/5/91) until seen by Dr. Pera; on watch until 3/13/91).

**683.** Plaintiffs' Exhibit 281(7), 3/8/90 (Bloomfield on watch until seen by "psych;" maintained to 3/13/91).

**684.** Plaintiffs' Exhibit 281(7), 3/16/91 (Martel Martinez in lockdown on 3/16/1991 until seen by Dr. Pera; still in lockdown as of 3/26/91).

**685.** Plaintiffs' Exhibit 309, p. 5, lines 8–10, p. 67, lines 22–25.

**686.** Plaintiffs' Exhibit 309, p. 68, lines 8–10.

**687.** Plaintiffs' Exhibit 309, lines 20–23, p. 6, lines 18 5, p. 7, lines 23–25, p. 8, lines 2, 14–25, p. 9, lines 1–6 (Daisy Brown is a schizophrenic prisoner who was assigned to Santa Maria Unit; placed in lockdown in July 1991 when displaying inappropriate and dangerous behavior such as smearing feces, refusing to talk, refusing to eat); p. 139, lines 22–23, p. 151, lines 16–25, p. 152, lines 1–12 (Guittiere, a woman Dr. Fernandez diagnosed with schizophrenia, paranoid type, was in lockdown in Perryville for more than a month before she was transferred to Flamenco); p. 112, lines –19 (Helen Brown stayed in lockdown two months after Dr. Pera requested she be transferred to the hospital); Garabedian testimony, 1/15/1992, p. 234, lines 10–13 (Helen Brown spent long periods of time in lockup because she would become psychotic).

**688.** Plaintiffs' Exhibit 49, 4/11/89.

**689.** Plaintiffs' Exhibit 49, 4/12/89.

**690.** Plaintiffs' Exhibit 49, 4/14/89.

**691.** Plaintiffs' Exhibit 49, 4/17/89.

**692.** Plaintiffs' Exhibit 49, 4/18/89.

**693.** Plaintiffs' Exhibit 49, 4/19–21/89, 4/25/89, 5/10/89.

**694.** Plaintiffs' Exhibit 49, 9/21/89.

**695.** Plaintiffs' Exhibit 49, 10/10/89.

will see today, needs to be seen daily."].[696] On October 17, 1989, Brown was brought back to SPU from CB6.[697]

On November 22, 1989, Inmate Honeycutt, while in Central Unit, cut himself seriously and was hospitalized at Maricopa Medical Center. However, he was refused admission to Baker Ward (Alhambra) for psychiatric evaluation and returned to Central Unit where he was placed on isolation and transferred to CB6. Inmate Honeycutt remained in CB6 until December 2, 1989 when he was sent to Flamenco for 72 hour evaluation.[698]

In CB6, on March 21, 1990, inmate Johnson was "delusional, out of contact with reality,"; and was being monitored by mental health staff.[699]

In May of 1990, inmate Tucker was decompensating in SPU. He had rambling speech, was disoriented and was wandering around lost. Tucker was sent to CB6, where he remained for five days.[700]

Inmate Mike Autrey was found dead from hanging in a cell in CB6 on December 27, 1989. He had made several suicide attempts in the past while in the custody of the ADOC, but was never admitted to Baker or SPU for more intensive evaluation or treatment.[701] He was placed in CB6 or SMU when he made these suicide attempts rather than receiving more intensive treatment.[702] There were times when he refused treatment; however, no psychiatrist ever recommended he go to any treatment facility.[703] He was followed by mental health and a psychiatric nurse had seen him and requested he be placed on the psychiatrist's line, but he had "adamantly" refused.[704] Although the psychiatric nurse had identified a need for him to see a psychiatrist, this was not forced on him. Perhaps if that had been done, he would not have committed suicide.[705] The general standard in recommending involuntary hospitalization is whether a person is a danger to self or others.[706] The department, under its own policies, could have involuntarily hospitalized him.[707]

### (2) SMU

Seriously mentally ill prisoners are also housed in the Special Management Unit (SMU). Examples of such inmates include inmates Barge;[708] Gooden;[709] Arvizu;[710]

696. Plaintiffs' Exhibit 49, 10/13/89.

697. Plaintiffs' Exhibit 49, 10/18/89.

698. Plaintiffs' Exhibit 49, 11/22/89, 11/27/89, 2/12/89.

699. Plaintiffs' Exhibit 199, 3/21/90, 3/23/90, 3/26/90.

700. Plaintiffs' Exhibit 199, 5/16/90, 5/17/90, 5/18/90, 5/21/90.

701. Newkirk testimony, 11/21/1991, p. 109, lines 10–20.

702. Newkirk testimony, 11/21/1991, p. 109, line 21—p. 110, line 3.

703. Newkirk testimony, 11/22/1991, p. 68, lines 2–9, p. 84, lines 3–11.

704. Stellman testimony, 1/27/1992, p. 144, lines 17–22.

705. Stellman testimony, 1/27/1992, p. 145, lines 7–10.

706. Newkirk testimony, 11/22/1991, p. 84, line 21—p. 85, line 6.

707. Plaintiffs' Exhibit 120.

708. Plaintiffs' Exhibit 49, 2/10/89 (Barge in holding cell for six days, "acting crazy at Alhambra, still erratic"), Plaintiffs' Exhibit 49, 2/27/89 (Barge in holding cell; standing orders that if he refuses medication three times in a row he be placed automatically in the holding cell), Plaintiffs' Exhibit 49, 2/28/89 (Barge in holding cell, taking medication intermittently, doing better but degenerates; will keep in holding cell until stable), Plaintiffs' Exhibit 49, 3/21/89 (Barge had been sent to Alhambra but refused to talk to anyone there so being returned to SMU for documentation and possible involuntary hospitalization).

709. Plaintiffs' Exhibit 49, 2/23/89 (Gooden's eyes were bright; totally unresponsive; talking gibberish; left on ten-minute close watch), 2/28/89 (Gooden is doing well but not well enough to put back in cell; medications will be doubled today; remains in restraints).

710. Plaintiffs' Exhibit 49, 2/27/89 (Arvizu is "totally out of it;" given shot of Benadryl and four-pointed), 2/28/89 (Arvizu still four-pointed; tried to take a shower but security had to forcibly remove from shower; will try to get him back to Alhambra), 3/2/89 (Arvizu is still in holding cell on close watch; Dr. Menendez started him on medication; in full restraints, arms and ankles are swollen badly), 3/7/89 (Arvizu still in bad

Verheim;[711] Jones[712] and Trotter.[713] Mr. Veloz indicates that there are people who are not appropriate for Baker and Flamenco and cannot function in SPU because they are too assaultive and present management problems. These inmates probably would be assigned to SMU.[714]

Defendants also house self-abusive prisoners in SMU. From her review of records, Dr. Newkirk, identified the following self-abusive prisoners who were inappropriately housed at SMU:[715]

Ralph Lara had a history of swallowing razor blades. He had been in and out of isolation cells and lockup cells because of his self-abusive behavior.[716]

William Morrows had been at SPU and CB6, and had to be isolated on several occasions because of his self-destructive behavior, which staff believed to be secondary to his psychiatric history.[717]

Frank Bartholic was a self-abusive prisoner housed at SMU.[718] He was placed in a holding cell and shackled because he threatened to harm himself.[719] Mr. Bartholic was put in lockdown on at least four occasions in 1989.[720] On one occasion, he was kept in lockdown for three and a half days.[721]

On December 7, 1989, Mr. Sanchez swallowed a piece of a razor blade. Medical staff refused to have him brought to the health unit; instead, they told the officer to check for blood.[722] Two weeks later, Mr. Sanchez cut himself on the chest.[723] The following month he tried to cut himself and was moved to the holding cell; he was heard saying that the Devil was talking to him.[724] On July 29, 1990, he cut his neck with a razor.[725]

Another inmate, Mr. Estrada, cut himself four times within a three-month period.[726] He also set fires in his cell.[727] He was seen by mental health after some, but not all, of these incidents.[728]

Other such self-abusive inmates include inmate Hinds, Barge, Villareal, Mendez,

shape), 3/31/89 (Arvizu going to Alhambra today).

**711.** Plaintiffs' Exhibit 49, 3/15/89 (Verheim is hallucinating; wants to come to SPU; file shows assaultive).

**712.** Plaintiff's Exhibit 49, 10/10/89 (Jones placed in observation cell [holding cell] threatening self-abuse), 10/11/89 (Jones appears to be suffering from paranoia), 10/12/89 (Jones still in holding cell; still refusing to sign "no self harm" contract), 10/13/89 (Jones hung himself with sheet; banged head), 10/16/89 (Jones escalated to stage of being terrified, sent to Maricopa Medical Center), 10/17/89 (Jones sent to Baker from Maricopa Medical Center).

**713.** Roy Trotter would sometimes become extremely explosive. Because of his psychotic behavior, he was being seen by mental health. But he was constantly in and out of lockup facilities and was housed at SMU. Newkirk testimony, 11/21/1991, p. 169, lines 10-15.

**714.** Veloz deposition, 10/25/1990, p. 72, line 10—p. 73, line 12; Plaintiffs' Exhibit 49, 2/17/1989, p. 2.

**715.** Newkirk testimony, 11/21/1991, p. 167, lines 16—p. 169, line 4, p. 170, line 1.

**716.** Newkirk testimony, 11/21/1991, p. 169, lines 7-10.

**717.** Newkirk testimony, 11/21/1991, p. 169, lines 16-19.

**718.** Newkirk testimony, 11/21/1991, p. 170, lines 9-14.

**719.** Newkirk testimony, 11/21/1991, p. 170, line 22-p. 171, line 1.

**720.** Stellman testimony, 1/27/1992, p. 199, lines 11-14.

**721.** Newkirk testimony, 11/22/1991, p. 6, lines 17-19, p. 7, lines 3-8.

**722.** Plaintiffs' Exhibit 19ooo, incident report 12/7/89.

**723.** Plaintiffs' Exhibit 19ooo, incident report 12/20/89.

**724.** Plaintiffs' Exhibit 19ooo, incident report 1/27/90.

**725.** Plaintiffs' Exhibit 19ooo, use of force report 7/29/90. Exh. 19uuu, incident report 12/14/90.

**726.** Plaintiffs' Exhibit 19uu, incident reports 10/29/90, 12/14/90, 12/28/90, 1/2/91.

**727.** Plaintiffs Exhibit 19uu, incident reports 5/25/90, 9/18/90.

**728.** Plaintiffs Exhibit 19uu, incident reports 5/25/90, 9/18/90.

Deutsch, and Jones.[729]

When a prisoner circulates in and out of the holding cell, it indicates that the prisoner has a psychiatric problem that is not being adequately addressed.[730] It is also disruptive to the functioning of the unit, because prisoners in holding cells are often placed on a 10 or 15-, minute watch, and the programming of the prisoner is disrupted.[731] Mr. Bartholic is an example of a prisoner who circulates in and out of the holding cell[732] because his behavioral problem is not being addressed. His record shows that a decision was made that he only needed to be seen by mental health when in a crisis, so the psychiatrist stopped seeing him on a regular basis. Nothing has been done in a treatment modality to decrease the self-destructive behavior.[733] Thus, Mr. Bartholic has attempted suicide four times while in ADOC custody; the last three of these attempts took place while he was housed at SMU.[734]

Defendants know that SMU is not suitable for self-abusive prisoners.[735] In late 1990 or early 1991, a pod for self-abusive prisoners was established at SMU. However, that pod has no mental health staff assigned to it.[736]

Moreover, Mr. Hanson, the SMU psychiatric nurse, does not know "whether there is any real specific programming provided for it, other than the fact that it gets more individual attention."[737]

Prisoners who continue to have serious mental health problems are discharged from Baker Ward and sent to SMU. Johnny Johnson, a prisoner who swallowed razor blades, lacerating his esophagus, was returned to SMU with a discharge summary of "very, high risk of suicide."[738] Another prisoner, Hanlon, jumped off a rail on the second floor with a rope around his neck. The suicide attempt was unsuccessful because the rope broke. Dr. Gopalan indicated the inmate had a history of serious suicide attempts, a volatile bipolar disorder, was a chronic suicide risk, and needed placement in licensed mental health facility such as B Ward or Flamenco.[739]

The mental health staff at SMU refer prisoners to Baker, when they "decompensate and become quite disturbed," and to SPU. However, pursuant to Director Lewis' policy, prisoners living in urine and feces for two or

**729.** Plaintiffs' Exhibit 49, SPU staff briefing, 2/10/89 (Hinds attempted to strangle self, is "real threat to self;" transferred from Perryville to SMU and put in holding cell in restraints); 2/21/89 (Barge throwing self against wall and banging head; refused medication; stripped and four-pointed); 2/23/89 (Villareal pulled out all sutures; treated and put back in holding cell in restraints); 2/23/89 (Mendez taken off close watch last night, then made six-inch slash on his arm); 8/22/89 (Deutsch hit head so hard he opened deep gash and was taken to Maricopa Medical Center for treatment); 10/13/89 (Jones tried to hang himself with a sheet; upon return from hospital, ripped helmet off and rammed head into wall, causing bleeding); 10/16/89 (Jones had huge hematoma on head from ramming into cell wall; sent to Maricopa Medical Center); 10/17/89 (Jones transferred to B-ward from Maricopa Medical Center).

**730.** Newkirk testimony, 11/21/1991, p. 173, lines 9–13.

**731.** Newkirk testimony, 11/21/1991, p. 173, lines 3–8.

**732.** In this section, the terms "holding cell," "lockup," and "lockdown" are used interchangeably. The SMU holding cell is smaller than a regular cell, and is triangular in shape. A bench that serves as a bed is bolted to the wall, and there is a toilet. Newkirk testimony, 11/21/1991,

p. 171, lines 17–23. Dr. Newkirk described it as a "very small, cramped space." Newkirk testimony, 11/21/1991, p. 171, line 3. A prisoner is usually placed in the cell wearing only his undershorts. He may be given a blanket, but nothing else. Newkirk testimony, 11/21/1991, p. 72, lines 20–24.

**733.** Newkirk testimony, 11/21/1991, p. 173, line 18—p. 174, line 4.

**734.** Bartholic testimony, 12/17/1991, p. 176, lines 4–16.

**735.** Plaintiffs' Exhibit 176, SMU mental health team minutes, 7/19/90, (remarks of Dr. Gopalan); Plaintiffs' Exhibit 177, SMU mental health team minutes, 8/15/90.

**736.** Hanson testimony, 1/9/1992, p. 115, lines 7–24.

**737.** Hanson testimony, 1/9/1992, p. 106, lines 8–19.

**738.** Plaintiffs' Exhibit 176, p. 2.

**739.** Plaintiffs' Exhibit 199, 7/12/90 (Hanlon referred to SPU by Tim Hanson on recommendation from Dr. Gopalan).

three days are no longer allowed to go to Baker Ward.[740] Moreover, not all prisoners referred to SPU and Baker are accepted.[741] When accepted, inmates still may have to wait in SMU for more than three days before transfer.[742] Inmate Simpson is an example of a prisoner who had to wait for his transfer. He was referred for admission to SPU on May 4, 1990. On May 9, 1990, Mr. Hanson called SPU and indicated the prisoner was acting "very strange." On May 17, 1990, Mr. Simpson was still in SMU, with a plan that he be moved to SPU that day.

### (3) Other facilities

There are other facilities that improperly house seriously mentally ill prisoners in lockdown. In North Unit, in September of 1989, Inmate Oliveras was "acutely psychotic; responding to auditory and hallucinatory ideations." Dr. Pera decreased medication and sent the inmate to Central Unit isolation on a ten-minute watch.[743] On March 2, 1991, Inmate Weathersby was in Winslow lockdown unit and exhibiting bizarre and self-destructive behavior including urinating on cell floor, flooding the cell and cutting his wrists. He was not transferred to Alhambra until March 6, 1991.[744]

There are also self-abusive prisoners inappropriately housed at other facilities including inmate Thomas who was housed at Douglas, inmate Honeycutt who was housed at Central Unit and CB6, inmate Smith who was housed at Winslow, inmate Maxwell who was housed at CB6 and inmate Bronkinson who was housed in Tucson detention.[745]

### F. Problems Prescribing Medication

#### 1 Monitoring of Medication

Plaintiffs allege that ADOC fails to appropriately monitor the prescription of psychotropic medication. A patient on psychotropic medication should be seen by a psychiatrist on a monthly basis to review the prescription.[746] Dr. Stellman does not know of an ADOC policy that requires patients on psychotropic medications to be monitored.[747] Pursuant to ADOC Policy 704.1, a psychotropic prescription is valid for only sixty days.[748] The HSB Monthly Activity Reports for Safford for 1989 and 1990 indicate that patients are prescribed or continued on psychotropic medications without a face-to-face evaluation by a psychiatrist, because the reports show a larger number of prisoners on psychotropic medication than the number of prisoners seen by a psychiatrist.[749] Similarly, the HBS Monthly Activity Reports for Ft. Grant for 1989 and 1990 indicate that patients at that institution are also prescribed or continued on psychotropic medications

740. Plaintiffs' Exhibit. 176, p. 3.

741. Stellman testimony, 1/28/1992, p. 86, lines 21–25 (Dr. Pushkash has asked for acutely mentally ill prisoners to be transferred to Baker who have not been accepted); Pushkash deposition, p. 27, lines 10–19, p. 28, lines 8–20.

742. Pushkash deposition, p. 27, lines 10–19, p. 28, lines 8–20.

743. Plaintiffs' Exhibit 49, Cochise Detention Unit Log, 9/13/89; Exh. 281(10) (prisoners on suicide watch: 3/2/90–3/5/90 [Olivas]; 3/7/90 to 3/12/90 [Smart].

744. Plaintiffs' Exhibit 95, 3/2/91–3/6/91.

745. Plaintiffs' Exhibit 49, SPU staff briefing, 8/22/89 (Thomas at Douglas ordered back to SPU by Dr. Scalzo; Mr. Veloz noted that prisoner had made a serious suicide attempt, and should be sent to Alhambra psychiatric hospital; Dr. Menendez agrees); 11/22/89 (Honeycutt in Central Unit cut himself seriously and sent to hospital); 11/27/89 (Dr. Menendez refuses to accept Honey-

cutt at Baker; he is returned to Central Unit with a recommendation he go to CB6); 12/11/89 (Honeycutt in CB6 cut himself and sent to hospital); Plaintiffs' Exhibit 52, Winslow weekly summary of outside referrals, 3/25/91–3/31/91 (Smith attempted suicide; sent to hospital to have neck sutured); Plaintiffs' Exhibit 199, SPU treatment team briefings, 3/19/90 (Maxwell in CB6 attempted overdose; air evacuated to hospital); Plaintiffs' Exhibit 281(9), Tucson Complex Detention Unit Log, 1/20/91, 2033–2130 (medical staff in unit for Bronkinson, who injured himself; he was later sent to Rincon, D-wing).

746. Newkirk testimony, 11/22/1991, p. 7, line 25, p. 8, lines 1–5, 16–23.

747. Stellman testimony, 1/28/1992, p. 77, line 21—p. 78, line 2.

748. Stellman testimony, 1/28/1992, p. 60, lines 29–14.

749. Plaintiffs' Exhibit 147, 1/89–12/89, 1/90–12/90.

without a face-to-face evaluation by a psychiatrist.[750]

The same practice exists at Winslow[751] and Douglas.[752] At Winslow, psychological associates, who are master's level mental health providers, call Dr. Menendez to prescribe Thorazine. Dr. Menendez prescribes Thorazine based on these conversations without evaluating the patient in person. Plaintiffs presented the following example: On November 29, 1990, staff responded to a prisoner grievance at Winslow regarding the failure to monitor patients on psychotropics by indicating that "[b]oth ASPC–W Health Services and HSB are aware of this problem. We are both trying to recruit a psychiatrist for ASPC–W and are in touch with a psychiatrist in the Phoenix area institutions for consultation. DOC psychiatrists are presently developing guidelines concerning the prescribing of psychotropic drugs and for evaluating non-drug needs of inmates in the mental health area." [753]

### 2 Delays in receipt of Medications

Inmates experience delays in the receipt of prescribed psychotropic medication. The following are examples of such delays:

In February of 1990, a patient at the Central Unit had psychotropic medications ordered but did not receive them for a month.[754] On March 27, 1989, prescriptions at SPU for several medications expired but no physician could be located to renew the prescriptions.[755]

A prisoner saw Dr. Fernandez at Perryville–Santa Maria on December 27, 1989. As of January 31, 1990, she had not received a prescription. She was told she would be rescheduled for Dr. Fernandez' next visit to Santa Maria on February 19, 1990.[756]

A patient transferred to Perryville–Santa Maria indicated in a grievance that she had not received her prescription from ACW. In response to the patient's grievance, she was told on November 9 that the medication had been ordered and she was placed on a psych line for an appointment with Dr. Pera.[757]

On August 8, 1990, a prisoner filed a grievance indicating that the medication had been received, but in the wrong dosage. The staff subsequently responded that he was now receiving the correct dosage prescribed by Dr. Pera.[758]

On April 4, 1989, a prisoner at Perryville–Santa Cruz was told, in response to a grievance, that "there is no guarantee that the prescription will be delivered at the time due to varied circumstances in our environment." [759]

Prisoners who were transferred may be without their medications for a period of time. If an inmate is transferred from one facility to another, such as from Alhambra to SMU, and the inmate is on medications, in order to maintain the continuity of care, a psychiatric nurse sees the patient then makes an assessment.[760] For example, if someone comes into SMU on a Friday afternoon, he probably will not receive his medication until Monday.[761]

### 3 Discontinuing medications without face-to-face interviews

Defendants sometimes discontinue a prisoner's psychotropic medications based on a laboratory report that the level of medication in the prisoner's blood is low, without conducting a face-to-face interview with the pris-

**750.** Plaintiffs' Exhibit 148, 7/89–12/89, 1/90–3/90.

**751.** Plaintiffs' Exhibit 151, 1/89–12/89; 1/90–8/90, 10/90–12/90.

**752.** Plaintiffs' Exhibit 169, 2/89–11/89, 1/90/90, 4/90–6/90, 12/90.

**753.** Plaintiffs' Exhibit 255bq, 11/5/90.

**754.** Plaintiffs' Exhibit 199, 2/1/90.

**755.** Plaintiffs' Exhibit 49, 3/22/89.

**756.** Plaintiffs' Exhibit 244ppp, 1/17/90 (grievance); 1/31/90 (response).

**757.** Plaintiffs' Exhibit 249fc, 11/6/90.

**758.** Plaintiffs' Exhibit 249bk, 8/8/90.

**759.** Plaintiffs' Exhibit 250ao, 4/4/89.

**760.** Hanson testimony, 1/9/1992, p. 25, lines 6–16.

**761.** Hanson testimony, 1/9/1992, p. 96, lines 1–9.

oner.[762] It is important to monitor blood levels for inmates taking psychotropic medications to ascertain whether the dosage is in the therapeutic range or is toxic.[763] The other use of blood level monitoring is to check on compliance with the medication to see if someone is really taking the doses that are prescribed.[764] It is important for the mental health professional to know whether an inmate is really taking his psychotropic medication because it affects the safety of all the people in the population.[765] Blood level monitoring is an acceptable practice both in and out of a correctional setting in the areas of psychiatry.[766] In some situations, it is appropriate to discontinue psychotropic medications based on low blood levels.[767]

Discontinuing medication based solely on blood levels is not appropriate because a number of factors can cause blood levels to vary.[768] For example, other medications the prisoner is taking can distort the blood levels, as can the functioning of the patient's liver.[769] In particular, blood levels for antipsychotic drugs are not reliable.[770]

Before taking a prisoner off psychotropic medication, the mental health staff should look at the prisoner's clinical functioning.[771] If a prisoner's blood level is low, and the practitioner suspects the prisoner may not be taking the medication, there are alternatives to stopping the medication. For example, the prisoner can be watched while taking the medicine, or it can be given in liquid or injection form.[772] In any event, psychotropic medication should not be stopped for noncompliance unless the noncompliance is, documented in the chart, the prisoner's behavior is under control, and the practitioner has had a face-to-face interview with the prisoner.[773] Dr. Stellman agreed that in her own general practice she would not discontinue medication without seeing the prisoner.[774]

The practice of discontinuing psychotropic medications based on blood levels, without a face-to-face interview, has caused mentally ill prisoners to decompensate. Plaintiffs presented the following examples of inmates who decompensated after their medications were discontinued based only on blood levels.

Mr. Ezell was a prisoner at Douglas with a history of swallowing razor blades.[775] He was taking Thorazine, but based on his blood levels, the psychiatrist suspected he was not taking the medication, so it was stopped, without having Mr. Ezell actually seen by a psychiatrist.[776] He was placed on a suicide watch, and was eventually transferred to Douglas.[777] There is no indication that the psychiatrist offered to give Mr. Ezell his medication in injection form, to alleviate any

762. Newkirk testimony, 11/21/1991, p. 124, lines 10–17.

763. Stellman testimony, 1/27/1992, p. 112, lines 19–25.

764. Stellman testimony, 1/27/1992, p. 113, lines 1–4.

765. Stellman testimony, 1/27/1992, p. 113, lines 5–7.

766. Stellman testimony, 1/27/1992, p. 113, lines 18–21.

767. Stellman testimony, 1/27/1992, p. 145, line 23—p. 146, line 4.

768. Newkirk testimony, 11/21/91, p. 131, lines 10–14.

769. Newkirk testimony, 11/21/91, p. 131, lines 15–18.

770. Newkirk testimony, 11/21/1991, p. 132, lines 4–6.

771. Newkirk testimony, 11/21/1991, p. 131, lines 18–20.

772. Newkirk testimony, 11/21/1991, p. 131, lines 21–24; 11/22/91, p. 59, lines 20–25, p. 60, lines 1–4, 7–11; Stellman testimony, 1/27/92, p. 114, line 15—p. 115, line 3.

773. Newkirk testimony, 11/21/1991, p. 59, lines 9–16, p. 63, lines 16–22, p. 79, lines 12–16.

774. Stellman testimony, 1/28/92, p. 51, line 23—p. 52, line 9.

775. Newkirk testimony, 11/21/1991, p. 125, lines 6–7, 9–10.

776. Newkirk testimony, 11/21/1991, p. 125, lines 10–15; Stellman testimony, 1/27/1992, p. 146, line 16—p. 147, line 1.

777. Newkirk testimony, 11/21/1991, p. 129, lines 14–16.

concerns about possible hoarding.[778] Mr. Ezell's medication was later reinstated.[779] Dr. Stellman testified that the doctor's actions in this case were warranted based on the fact that Mr. Ezell had a history of swallowing razor blades and on one occasion he overdosed on a psychotropic medication while at Flamenco.[780] In addition, Mr. Ezell was placed in an observation cell so he could be watched closely by mental health.[781]

Mr. Rossi, a prisoner in CB6, had been seen by mental health for some time, and was taking medication for tension and irritability.[782] He had previously been diagnosed as a paranoid schizophrenic.[783] His prescription was discontinued based on low blood levels. By the time Dr. Newkirk saw him, he was complaining of being quite tense and irritable.[784] After the prescription was discontinued, mental health staff did not evaluate Mr. Rossi to determine if he was able to function without the medication.[785] Ten days after the medication was stopped, a physician noted Mr. Rossi's agitation, and prescribed Benadryl.[786]

Dr. Stellman testified that Mr. Rossi's medical chart indicated that he appeared to be a management problem rather than a mental health illness.[787] According to Dr. Stellman, the treatment plan was to begin to decrease the medication and reevaluate the inmates.[788] Despite full levels of antipsychotic medication, blood levels repeatedly returned as below therapeutic, indicating that Mr. Rossi was not taking his medication.[789] Despite the low blood levels, Mr. Rossi was not evidencing acute mental illness or decompensation. Thus, Dr. Stellman believed that he did not need the drugs.[790] Further, after discontinuation of his medication, Mr. Rossi was seen by a psychiatrist on September 13, 1990.[791] There was no indication in the medical chart to indicate that Mr. Rossi was suffering from a psychotic illness upon discontinuation of his medication.[792]

Dr. Newkirk also reviewed the record of Mr. Villario in CB6. According to his record, he had had psychotic episodes and been out of touch with reality, sometimes to the point of smearing feces on the wall.[793] On one occasion, the physician suspected that he was not taking his medication; a blood level was ordered, and when the result was low, Mr. Villario's prescription for Navane was discontinued.[794] Approximately two weeks later, he began to complain of hearing voices, and appeared to be psychotic. He was then placed on Thorazine.[795]

## G. Equal Protection

Defendants do not provide female prisoners with mental health facilities and pro-

778. Stellman testimony, 1/28/1992, p. 128, lines 9–19.

779. Stellman testimony, 1/27/1992, p. 147, lines 9–10.

780. Stellman testimony, 1/27/1992, p. 147, lines 9–15.

781. Stellman testimony, 1/27/1992, p. 147, lines 15–25.

782. Newkirk testimony, 11/21/1991, p. 129, lines 17–24.

783. Stellman testimony, 1/28/1992, p. 131, lines 10–16.

784. Newkirk testimony, 11/21/1991, p. 129, line 24—p. 130, line 1.

785. Newkirk testimony, 11/21/1991, p. 130, lines 2–8.

786. Newkirk testimony, 11/22/1991, p. 63, line 22—p. 64, line 8.

787. Stellman testimony, 1/27/1992, p. 150, lines 14–15.

788. Stellman testimony, 1/27/1992, p. 150, lines 16–17.

789. Stellman testimony, 1/27/1992, p. 151, lines 1–25.

790. Stellman testimony, 1/27/1992, p. 152, lines 7–25.

791. Stellman testimony, 1/27/1992, p. 153, line 23—p. 154, line 2.

792. Stellman testimony, 1/27/1992, p. 154, lines 2–15.

793. Newkirk testimony, 11/21/1991, p. 130, lines 12–21.

794. Newkirk testimony, 11/21/1991, p. 130, lines 22–25.

795. Newkirk testimony, 11/21/1991, p. 130, line 25,—p. 131, line 2.

gramming comparable to those offered to male prisoners.

### 1 *B Ward*

There are no facilities for the involuntary committment of women in ADOC such as the Baker Ward for men.[796] While male prisoners can be committed involuntarily to Baker Ward, an ADOC psychiatric hospital, until recently ADOC had no facility to which females could be committed involuntarily.[797] Thus, women would be committed to the Arizona State Hospital (ASH), where they would remain for a very short period before being returned to prison, where they would often be placed in lockup. Dr. Garabedian characterized this as a "vicious cycle." Due to a recent statutory change, female prisoners can now be committed either to ASH or to G-ward.[798] This statutory change took effect in September 1991; both Dr. Garabedian and Executive Assistant Director Stewart lobbied for its passage.[799] Although the female inmates can now be involuntarily committed to Flamenco, it does not provide the higher level of care provided in Baker Ward, which is a licensed psychiatric hospital.

### 2 *Flamenco*

Flamenco is designed to provide psychiatric treatment and custody to prisoners who are acutely disturbed and/or psychotic and require voluntary placement in a correctional psychiatric setting.[800] Flamenco has three wards for male prisoners. Each of these wards serves a different purpose; K is the acute unit, J is sub-acute, and I is the "functional" unit.[801] At Flamenco, male prisoners can progress from the J to I ward and then into SPU or general population. The purpose of this phase program is to provide each prisoner the care appropriate to his needs, and to encourage improvement in the prisoner.[802]

There is only a single ward at Flamenco for female prisoners. G-ward was opened in May or June of 1990.[803] Before that time, there was no facility at Alhambra for women with serious mental illness. Rather, ADOC staff would petition to have such persons committed to the Arizona State Hospital (ASH).[804] G-ward "gets uncomfortable" when its population reaches sixteen or seventeen; its average census is fifteen or sixteen, although it has gone as high as eighteen.[805]

The programming available to women in G-ward is markedly inferior to that available in the male wards at Flamenco. For example, the men have a large occupational therapy area with various kinds of equipment; the women receive occupational therapy in the unit, and a limited amount of supplies can be brought to the unit.[806] Men have many more opportunities for occupational therapy than women.[807] Occupational therapy is important for the mentally ill, as it helps improve socialization with peers.[808] There are other inequalities in the programming offered to men and women at Flamenco. These inequities are clear from the mental health activity reports. For example in April of 1990, men were offered basketball, volleyball, computer training, communication training, stress man-

796. Newkirk testimony, 11/21/1991, p. 103, line 6—p. 104, line 23.

797. Newkirk testimony, 11/21/1991, p. 103, lines 19–2; Plaintiffs' Exhibit 1(2), pp. 37–38, 42.

798. Garabedian testimony, 1/71992, p. 214, lines 9–20.

799. Garabedian testimony, 1/7/1992, p. 224, line 4—p. 225, line 11.

800. Plaintiffs' Exhibit 1(3), p. 17.

801. Plaintiffs' Exhibit 1(3), p. 20.

802. Plaintiffs' Exhibit 1(3), p. 21.

803. Guy deposition, 10/22/1990, p. 13, lines 8–25, p. 14, lines 1–7.

804. Charles deposition, 10/23/1990, p. 43, line 19—p. 44, line 2.

805. Garabedian testimony, p. 215, 1/7/1992, lines 1–7, p. 225, lines 13–19.

806. Newkirk testimony, 11/21/1991, p. 103, line 24—p. 104, line 15; Garabedian testimony, 1/7/1992, p. 219, lines 23–25, p. 220, lines 1–5, 20–3, p. 229, lines 4–10.

807. Garabedian testimony, 1/7/1992, p. 229, lines 8–10.

808. Newkirk testimony, 11/21/1991, p. 104, line 16—p. 105, line 3.

agement, anger control, work crew, and current events. Women were offered aerobics.[809] In June of 1990, men were offered computer training, basketball, walking, volleyball, work crew, values training, and basic hygiene. Women were offered board games, movies, and "Women Who Love Too Much".[810]

### 3 SPU

There is no progressive unit or level system for women as there is for men at Florence SPU.[811] The principle of the level system for men is to house prisoners with similar levels of functioning in the same unit; by contrast, G-ward may house a mixture of levels, ranging from those who are actively psychotic to those who are ready to enter general population.[812]

The Special Program Unit (SPU) is a special living unit where mentally ill prisoners are housed, and specially trained staff provide mental health programming. Some prisoners, who would have difficulty living in general population, are placed in SPU long-term; for others, it is an acute, transitional unit.[813] However, SPU is a male unit; there is no similar facility for female prisoners.[814] Women who need SPU-type care may be treated in G-ward.[815] Thus, for example, if a male prisoner at Florence had some kind of breakdown, he would be sent to SPU. However, if a female prisoner were in the same situation, there would really be no place to house her pending an evaluation; she would probably be placed in isolation.[816]

Conversely, chronically mentally ill women who are stabilized while on G-ward go back to general population; similarly situated men may go either to population or to SPU. Mr. Garabedian testified that "we have one more option with the men." [817] According to Dr. Newkirk, after being stabilized in a Baker-type unit, it would be important for a prisoner like H.B. to be placed in an SPU-type unit.[818] Dr. Newkirk opined that she needs long-term chronic care, but such care is not available for women in ADOC.[819] There are other examples of female prisoners, including Ms. Cordra and Ms. Velah, who would be appropriate candidates for an intermediate care facility, if one were available.[820]

### 4 Impact

The consequences of the lack of equivalent mental health facilities for women are illustrated by the case of H.B. See Findings of Fact and Conclusions of Law in *Arnold v. Lewis*, 91–1808. Rather than receiving treatment for their mental illness, female inmates are locked down in the Santa Maria Unit in Perryville. *Id.* For ten years, the defendants have neglected to treat H.B.'s severe mental illness [schizophrenia, chronic, paranoid type]. Rather, her treatment has followed a pattern of lock-down for prolonged periods of time with denial of mental health treatment during lock-down. As a result, her mental condition deteriorates and she is eventually transferred to Flamenco or ASH. When her condition is under control, she is released to general population and again locked down, sometimes within 24 to 72 hours.[821] Defendants have placed her in

**809.** Plaintiffs' Exhibit 239, Mental Health Activity Report, Baker/Flamenco, 4/90.

**810.** Plaintiffs' Exhibit 239, Mental Health Activity Report, Baker/Flamenco, 6/90.

**811.** Garabedian testimony, 1/7/1992, p. 225, lines 20–25, p. 226, lines 1–9.

**812.** Garabedian testimony, 1/7/1992, p. 226, lines 10–20.

**813.** Newkirk testimony, 11/21/1991, p. 105, line 17—p. 106, line 11.

**814.** Newkirk testimony, 11/21/1991, p. 105, lines 12–16.

**815.** Garabedian testimony, 1/7/1992, p. 218, line 21—p. 219, lines 6.

**816.** Norrish deposition, 10/24/1990, p. 63, lines 11–21; p. 64, lines 7–24.

**817.** Garabedian testimony, 1/7/1992, p. 229, line 11—p. 230, line 13.

**818.** Newkirk testimony, 11/21/1991, p. 107, lines 4–25.

**819.** Newkirk testimony, 11/21/1991, p. 98, lines 8–14.

**820.** Newkirk testimony, 11/21/1991, p. 106, line 22—p. 107, line 1.

**821.** *See Arnold v. Lewis*, 91–1808, Findings of Fact and Conclusions of Law, pp. 4–9.

lock-down to punish her for behavior that was a result of her mental illness; failed to monitor her medications; and failed to transfer her to ASH when mental health staff recommended transfers.[822] The mental health care system at Santa Maria is inadequate to meet her needs because it lacks staff so that she can be seen by a psychiatrist or psychologist, especially in lock-down.[823]

## V. POST–FILING CHANGES

This lawsuit was filed on January 12, 1990. Since that time, the defendants have taken numerous steps in an attempt to remedy the following specific problems identified by plaintiffs:

### A. General Medical/Dental Care

In the latter half of 1990, a Quality Assurance Medical Committee was established to audit the various facilities.[824]

Before May of 1991, Mr. Norrish, the Health Administrator at Florence, was responsible for the entire complex. In May of 1991, that position was divided, so that two persons now share the work previously performed by Mr. Norrish.[825]

Mr. Charles, Facility Health Administrator at Perryville, began holding bi-weekly meetings with key contact people in early 1991.[826] Monthly meetings between Perryville health staff and security staff began after Dr. Warren's visit to the facility in connection with this litigation.[827]

In approximately December of 1991, Dr. Scalzo, chief of dentistry, began holding bi-weekly telephone conferences with the dentists under his supervision.[828]

### (a) Improvements in sick call/medical care

The defendants developed the self-referral sick call system in response to the scarcity of nurses, which threatened to force a further reduction in sick call.[829] The system was developed in late 1990 or early 1991.[830] Defendants implemented the program in the Central and Rynning Units at Florence in approximately April of 1991.[831] The self-referral system was scheduled to be implemented at SMU in January of 1992.[832] Mr. Norrish testified that provisions for illiterate or non-English speaking prisoners to use the self-referral system were established within the two month immediately preceding his testimony in January of 1992. This program is a pilot project that has not been formally developed into policy.[833]

The Tucson facility established 24–hour on-site registered nurse coverage in November of 1991.[834] That facility also began providing a neurology clinic on January 30, 1992.[835]

The ADOC promulgated Division Order 255, effective September 4, 1990, regarding dental classification, and treatment plans. This document sets forth maximum waiting periods for prisoners with various dental

---

**822.** See Arnold v. Lewis, 91–1808, Findings of Fact and Conclusions of Law, pp. 5–14.

**823.** See Arnold v. Lewis, 91–1808, Findings of Fact and Conclusions of Law, pp. 15–19, 25.

**824.** Plaintiffs' Exhibit 279, Florence, 10/3/90; Lutz deposition, 11/13/1990, p. 8.

**825.** Norrish testimony, 1/8/1992, p. 62, lines 12–22.

**826.** Charles testimony, 1/7/1992, p. 131, lines 12–16.

**827.** Warren testimony, 1/29/1992, p. 151, lines 10–24.

**828.** Scalzo testimony, 1/7/1992, p. 11, line 15—p. 12, line 1.

**829.** Stewart testimony, 1/16/1992, p. 52 line 19—p. 53, line 3.

**830.** Stewart testimony, 1/16/1992, p. 53, line 11—p. 54, line 7, p. 88, lines 19–23, p. 89, lines 3–4.

**831.** Lutz testimony, 1/6/1992, p. 70, lines 17–24.

**832.** Bishop testimony, 12/17/1991, p. 156, line 7—p. 157, line 3.

**833.** Stewart testimony, 1/16/1992, p. 54, line 21—p. 55, line 2.

**834.** Jolley testimony, 1/15/1992, p. 42, line 18—p. 43, line 3.

**835.** Jolley testimony, 1/15/1992, p. 36, line 23—p. 37, line 9.

needs.[836]

### (b) *Continuity of care guidelines*

The defendants developed continuity of care guidelines in early 1991. As a result, when a prisoner is transferred providers at the receiving facility now temporarily follow orders from the sending facility (on such matters as orthodontic devices and shaving waivers) until the chart and the patient are reviewed.[837]

In 1991 or 1992, the ADOC sponsored legislation that would require county facilities to provide the ADOC with a prisoner's medical record when that prisoner is the custody of the ADOC.[838]

### (c) *Staff*

In January of 1991, Jeanette Turner, director of nursing, received permission to hire ten nursing assistants at Florence, and six at Winslow.[839] The nursing assistants perform time-consuming clerical tasks that would otherwise be done by nurses.[840] Nursing assistants were hired at Florence in early 1991.[841] The nursing assistant program is a pilot program.[842] To pay for the nursing assistant positions, Director Lewis ordered that vacant nurse positions be frozen, thus decreasing the effectiveness of this innovation.[843]

Effective November 15, 1991, ADOC nurses are paid time and a half for working overtime, in an effort to encourage the nurses to work when the Department would otherwise be required to hire registry nurses.[844]

In October or November of 1991, the Executive Assistant Director researched the possibility of having ADOC prisons designated as serving an "underserved population" in order to be eligible to participate in a program in which medical providers repay their student loans by working in prisons.[845]

In November of 1990, Dr. Lutz was planning to initiate a staff orientation program in the first half of 1991.[846]

A Facility Health Administrator began work at the Winslow facility in November of 1990.[847] The Winslow facility gained a psychiatrist in January 1991.[848]

The Perryville facility hired an additional dentist in June of 1990, thus increasing dental services.[849]

### (d) *Preventative care/chronic illness/education*

As of November of 1990, a state-wide AIDS education and care program was becoming final.[850]

On June 26, 1990, Dr. Lutz sent the facility Health Administrators a memorandum on prevention and control of tuberculosis.[851]

At the time of trial, health staff at the Florence women's facility were revising the

---

**836.** Defendants Exhibit 960, §§ 4.4, and 4.5.

**837.** Lutz testimony, 1/6/1992, p. 104, lines 3–13.

**838.** Stewart testimony, 1/16/1992, p. 72, lines 5–12.

**839.** Turner testimony, 1/9/1992, p. 61, line 23—p. 62, line 5.

**840.** Turner testimony, 1/9/1992, p. 67, line 10—p. 68, line 8.

**841.** Norrish testimony, 1/8/1992, p. 98, lines 21–23.

**842.** Turner testimony, 1/9/1992, p. 66, line 23—p. 67 line 4.

**843.** Turner testimony, 1/9/1992, p. 61, line 19—p. 62, line 16.

**844.** Stewart testimony, 1/16/1992, p. 51, line 9—p. 52, line 18.

**845.** Stewart testimony, 1/16/1992, p. 35, lines 7–20, p. 86, lines 7–25, p. 87, line 1.

**846.** Lutz deposition, 11/13/1990, p. 87, lines 2–12.

**847.** Lutz deposition, 11/13/1990, p. 29, lines 14–16; Sanders deposition, 4/8/1991, p. 6, lines 18–23.

**848.** Sanders deposition, 4/8/1991, p. 45, lines 3–15.

**849.** Charles deposition, 10/23/1990, p. 38, lines 15–25.

**850.** Lutz deposition, 11/13/1990, p. 112, line 23—p. 113, line 18.

**851.** Defendants' Exhibit 892.

recall system for pap smears, attempting to "get it a little more caught up to date." [852]

In early 1991, the ADOC began requiring that every prisoner receive a dental examination with intake.[853] In December 1991 or January of 1992, the ADOC began distributing a handout on dental care to all prisoners at the reception center.[854] The ADOC began showing educational videotapes regarding dental care at Tucson in 1990.[855]

## B. Mental Health Care

In September and October 1990, defendants promulgated four major documents governing mental health care, including the Alhambra/Flamenco Treatment Program (9/1990), the Mental Health Services Manual (9/1990), the Staff Training Manual (10/1990) and the Training and Development Manual (19/1990).[856]

In late 1990, defendants established the policy requiring mental health staff to follow up when a prisoner fails to pick up his or her unit dose of psychotropic medication.[857]

In approximately April of 1991, Dr. Busfield was identifying mentally ill prisoners throughout the system and having them reclassified and transferred to Florence, Tucson, or Perryville. He found five seriously mentally ill prisoners in Douglas who should not have been at that facility.[858] The purpose of this process was to move mentally ill prisoners to facilities where they would have greater access to trained staff, including psychologists, psychiatrists and psychiatric nurses.[859]

Effective January 1, 1992, all ADOC psychologists have been consolidated under the Health Services Bureau.[860] Previously, psychologists had been assigned to two different divisions in ADOC.[861]

In 1990, SMU implemented the residential program for emotionally disturbed prisoners with a levels system.[862]

Defendants have removed the "socialization chair" from the Special Program Unit (SPU), and discontinued its use.[863] Formerly, prisoners were placed in this chair and sometimes restrained.[864]

Defendants have discontinued use of the behavioral control area or "pens" at SPU. These were outdoor fenced areas adjacent to one of the dormitories, and contained no toilet facilities or equipment of any kind.[865] Prisoners were placed in this area for various reasons.[866] Dr. Newkirk was critical of the pens. She was especially concerned about prisoners being placed there in mid-day because the pens afforded no shelter from the sun and most psychotropic medications increase sensitivity to sunlight.[867] She also stated that prisoners in the pens should have

852. Bolick testimony, 1/13/1992, p. 79, lines 13–19.

853. Scalzo testimony, 1/6/1992, p. 232, lines 8–18.

854. Scalzo testimony, 1/6/1992, p. 213, lines 1–6.

855. Scalzo testimony, 1/7/1992, p. 35, lines 19–25.

856. Plaintiffs' Exhibit 1.

857. Lutz testimony, p. 59, line 15—p. 60, line 1, p. 150, line 9—p. 151, line 6.

858. Stellman testimony, 1/28/1992, p. 70, lines 3–13.

859. Stellman testimony, 1/27/1992, p. 190, lines 13–16.

860. Stewart testimony, 1/16/1992, p. 68, lines 6–14.

861. Stewart testimony, 1/16/1992, p. 67, lines 5–12.

862. Defendants Exhibit 184.

863. Stipulation, p. 35, § IV.

864. See, e.g., Plaintiffs' Exhibit 49, SPU briefing, 3/3/89 (Gonzalez placed in chair and restrained), 9/12/1989 (Barber put in chair).

865. Newkirk testimony, 11/22/1991, p. 10, line 21—p. 11, line 5.

866. See, e.g., Plaintiffs' Exhibit 49, Florence–SPU treatment team briefing, 2/24/1989 (Davenport put in pen due to "abnoxious [sic] behavior"); Plaintiffs' Exhibit 199, 8/22/1990 (Duniphin placed in pen because he was "extremely paranoid"), 9/11/1990 (Gurr placed in pen after shoving officer), 9/18/90 (Martin in pen after fighting).

867. Newkirk testimony, 11/22/1991, p. 13, lines 13–22.

access to water and toilet facilities.[868] Indeed, at least one prisoner appeared to suffer adverse health consequences while in the pen.[869] The behavioral control area was eliminated shortly after the deposition of Esteban V. Veloz, Mental Health Coordinator at Florence.[870]

### Conclusions of Law

## I. 8TH AMENDMENT CRUEL AND UNUSUAL PUNISHMENT CLAIMS

Plaintiffs allege that the medical, dental and mental health care systems violate the inmates' eighth amendment rights to be free from cruel and unusual punishment.

■ In order to prevail on a civil rights claim under 42 U.S.C. § 1983 because of inadequate medical care in violation of the eighth amendment right to be free from cruel and unusual punishment, a prisoner must establish "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.[1]" *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976); *Toussaint v. McCarthy*, 801 F.2d 1080, 1111 (9th Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). The indifference must be substantial to violate the constitution. *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir.1986). Generally, mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under 42 U.S.C. § 1983. *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.1980). Nor does a difference in medical opinion amount to deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.1989); *Franklin v. State of Oregon*, 662 F.2d 1337, 1344 (9th Cir.1981) (difference of opinion between patient and medical authorities).

■ Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay or intentionally interfere with medical treatment. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990). However, a mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See May v. Enomoto*, 633 F.2d 164, 167 (9th Cir.1980); *Shapley v. Nevada Bd. of State Prison Com'rs*, 766 F.2d 404, 407 (9th Cir.1985). A delay in treatment does not constitute a violation of the eighth amendment unless the delay caused substantial harm. *Wood v. Housewright*, 900 F.2d at 1335. In cases in which the system's constitutionality is at issue, deliberate indifference to the serious medical needs of prisoners may also be "evidenced by repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff" or by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment or procedures that the inmate population is effectively denied access to adequate medical care." *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir.1983), *cert. denied*, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885.

The Ninth Circuit set forth the eighth amendment standards for physical, dental and medical care systems in *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir.1982) as follows:

> The Eighth Amendment requires that prison officials provide a system of ready access to adequate medical care. Prison officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical problems known to medical staff. [Citation omitted] Access to the medical staff has no meaning if the medical staff is not competent to deal with

---

**868.** Newkirk testimony, 11/22/1991, p. 13, line 23—p. 14, line 1.

**869.** Plaintiffs' Exhibit 49, SPU treatment team briefing, 2/16/1989 (prisoner Lopez found to be non-responsive with a heart rate of 46 while in the pen, and taken to health unit; diagnosis unknown).

**870.** Veloz testimony, 1/9/1992, p. 173, line 20—p. 174, line 7.

**1.** A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir.1987). Similarly, a serious dental need is one that causes "pain, discomfort or threat to good health." *Dean v. Coughlin* 623 F.Supp. 392, 404 (S.D.N.Y.1985).

the prisoners' problems. The medical staff must be competent to examine prisoners and diagnose illnesses. It must be able to treat medical problems or refer prisoners to others who can. Such referrals may be to other physicians within the prison, or to physicians or facilities outside the prison if there is reasonably speedy access to those other physicians or facilities. In keeping with these requirements, the prison must provide an adequate system for responding to emergencies. If outside facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then the prison must provide adequate facilities and staff to handle emergencies within the prison. These requirements apply to physical, dental and mental health.

*Hoptowit,* 682 F.2d at 1253.

■ Courts may consider expert opinions to determine the constitutional requirements. However, such opinions do not ordinarily establish constitutional minimums. *See, Bell v. Wolfish,* 441 U.S. 520, 543–44, n. 27, 99 S.Ct. 1861, 1876, n. 27, 60 L.Ed.2d 447 (1979); *Rhodes v. Chapman,* 452 U.S. 337, 348, 101 S.Ct. 2392, 2400, n. 13, 69 L.Ed.2d 59 (1981).

■ Officials can be held liable for their failure to implement a proper mental health care program or failure to adequately train or supervise subordinates. *Greason v. Kemp,* 891 F.2d 829, 836–37 (11th Cir.1990).[2]

## A. Medical and Dental System

### 1. *Problems with the Medical and Dental Care Systems*

Plaintiffs have established that defendants have numerous problems with the medical and dental care systems within the Department of Corrections. Plaintiffs argue that these problems rise to the level of deliberate indifference to inmates' serious medical and dental care needs.

### a. Staffing

One of the most significant problems with the medical and dental care system is the inadequate number of medical staff, exacerbated by the vacancies in staff positions. Defendants are unable to obtain a sufficient number of staff positions from the Legislature. In addition, defendants are unable to find qualified individuals to fill those positions. Defendants are aware of the shortages of staff, as they have acknowledged such shortages in budget requests to the Legislature. In one instance, Director Lewis stated in a letter regarding the budget request for 1989–1990 that:

The Bureau of Health Services was funded 13% short in the area of Personal Services. This equates to a $1.4 million deficit from full funding. In order to keep within the funding limitations, 55 full-time health positions will have to remain vacant for the entire fiscal year. Keeping 55 positions vacant may place the department in a legally indefensible position as far as constitutionally and statutorily mandated inmate health care is concerned. As examples:

*Sick call at several institutions has been reduced from five days a week to three days a week as a result of frozen nursing positions.

\* \* \* \* \* \*

*Dental emergency waiting time at Florence has increased to several days due to a frozen dentist position.

*Psychiatric services at Perryville and Florence are performed by three staff psychiatrists who are unable to meet the demand for their services. These institutions have two psychiatric positions that are frozen.

Director Lewis further stated that:

We will not accrue vacancy savings which have been used in the past to offer

---

**2.** Generally, supervisory officials cannot be held liable under the theory of respondeat superior. *Monell v. Dept. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Rather, plaintiff must establish that the official personally participated in the constitutional deprivation or that a state supervisory official was aware of the widespread abuses and with deliberate indifference to the inmate's constitutional rights failed to take action to prevent further misconduct. *King v. Atiyeh,* 814 F.2d 565, 568 (9th Cir.1987); *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036; *Williams v. Cash,* 836 F.2d 1318, 1320 (11th Cir.1988); *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1443 (11th Cir.1985). However, officials may be independently liable under § 1983. *Id.*

salary incentives that are so necessary in hiring health professionals. As an example, in July we were unable to employ a physician and dentist at the Florence complex due to the lack of funding for the positions and the special salary rates that would have been required to pay these professionals.

Relevant to mental health care, Director Lewis stated:

Currently the limitation in staff at Flamenco and the Psychiatric Hospital limits the number of inmates that can be effectively treated. Authorizing funding for three CPO positions at the Psychiatric Hospital, will allow us to increase the census from the current level of 21 to approximately 38. In addition, authorizing funds to fill positions assigned to Flamenco will allow us to increase the census from the current level of 46 to its maximum of 125.

Plaintiffs' Exhibit 232.

This lack of staff results in delays in the assessment and treatment of inmates medical and dental needs. Generally, such delays must result in substantial harm to rise to the level of an individual constitutional violation. *Wood v. Housewright,* 900 F.2d at 1335. Plaintiffs did not establish injury to all of the inmates as a result of those delays. Yet, defendants should be aware that each instance of delay in care due to lack of staffing could rise to the level of a constitutional violation if the inmate suffers serious harm. *Wood v. Housewright,* 900 F.2d at 1335. Further, such repeated examples of delays or negligence may result in constitutional violations. *Wellman,* 715 F.2d at 272.

Since the filing of this action, defendants have acquired additional staff and filled some of the vacant positions. However, the problem of inadequate numbers of staff still exists. Both plaintiffs' and defendants' experts testified at trial that the defendants still needed more medical staff. Defendants admit that they could provide better care with additional medical staff. Further, although they have increased the numbers of staff since the filing of this action, there is no guarantee that those positions will remain funded.

### b. Security involvement in Medical/Dental Care

■ A second very significant problem with the provision of care is the extent of security involvement in the provision of medical care. Security staff have inappropriate roles in the medical care system, including conducting health and welfare checks on seriously ill inmates without the supervision of medical personnel. In addition, when no medical staff are on duty, security staff are forced to make medical judgments. Security staff also have the authority to overrule medical orders. Finally, in some instances, security staff interfere with access to medical care. Such interference can rise to deliberate indifference so that a constitutional violation occurs. *Brown v. Hughes,* 894 F.2d 1533, 1537–39 (11th Cir.1990); *Parrish v. Johnson,* 800 F.2d 600, 605 (6th Cir.1986); *Lewis v. Cooper,* 771 F.2d 334, 336–37 (7th Cir.1985).

### c. Sick Call System

■ Prison officials must provide a system of "ready access to medical care." Deliberate indifference exists if prisoners are unable to make their medical problems known to staff. *Hoptowit,* 682 F.2d at 1253. Defendants provide care through a sick call system. The sick call system, except for the pilot programs, has numerous problems. First, it discourages use because inmates must stand in line for long periods of time. If the inmates leave the line, they lose their chance to see the nurse. In some facilities, inmates must reveal their medical problem either within hearing of other inmates or in writing on a list that other inmates may read.

Since the filing of this action, defendants have established a pilot program to remedy many of the problems enumerated by plaintiffs in the sick call system. This revised sick call system is effective in portions of the Tucson and Florence facilities. Defendants state that they intend to expand this pilot program throughout the Department of Corrections. The expanded program allows sick call to be conducted at least five days a week. In addition, inmates were giving good reports on the pilot program. It appears that expansion of the pilot sick call program

throughout ADOC would resolve many of the problems with the current sick call system.

#### d. Care Provided Through Outside Providers

 The ADOC uses outside providers for specialty care. The constitution requires that such referrals to outside care be "reasonably speedy." *Hoptowit*, 682 F.2d at 1253.

At the time of filing of this action and prior to the new policy for referrals, there were "frequently unacceptably long waits for specialty care" for inmates with significant medical conditions. Thus, specialty referrals were not "reasonably speedy." The delays set forth by plaintiffs ranged from a one month delay for a serious gynecological problem to a sixteen month delay in a referral to a dermatologist for an inmate with a history of skin cancer. One inmate lost his eyesight due to diabetic retinopathy because of the lack of follow-up on specialty appointments. These delays resulted in constitutional violations. *Hoptowit*, 682 F.2d at 1253.

Delays in referrals to outsider providers existed because (1) the department only contracted for specialists when enough inmates were referred; (2) appointments were cancelled because of funding or transfer of inmates to other facilities and (3) defendants lacked a procedure or policy by which they could determine when the referral had been completed.

At the time of trial, pursuant to a new policy, outside referrals were prioritized on a one through three system with a maximum of eight weeks between initiation and the patient being seen by the outside provider. It appears that the new policy will eliminate most of the problems that existed with the prior system for outside referrals.

#### e. Chronic Care/Preventative Care

Prior to the filing of this action, defendants had no system to manage the chronically ill inmates and provide preventative care. Plaintiffs' expert testified that the defendants' management of chronically ill inmates was not "optimal." Since the filing of this

action, defendants have established a limited tickler system for chronic and preventative care in the Cimarron Unit in Tucson, and the Rynning and East Units in Florence. Defendants state that this system will eventually be established throughout the system.

#### f. Continuity of Care within the System

Prior to the filing of this action, defendants had no guidelines to ensure that inmates' medical care treatment continued when the inmates were transferred to other facilities. Since the filing of this action, defendants established procedural guidelines to ensure that inmates' care is continued when they are moved from facility to facility. Pursuant to this policy, inmates should continue to receive their medical treatment, including shaving waivers, prescriptions and special orthodontic devices, upon transfer to another facility.

#### g. Infirmaries

Defendants have no infirmaries for women and only one small infirmary at Florence for men. Therefore, inmates either remain in the hospital longer than necessary or fairly sick inmates are returned to general population.

#### 2. *Constitutionality of the Medical/Dental Care System*

The provision of care generally within the medical/dental care system at the time of trial did not rise to a level of deliberate indifference to the serious medical/dental needs of the inmates. However, at the time of the filing of this lawsuit, defendants were deliberately indifferent to the inmates' serious medical and dental care needs and the medical and dental care systems were unconstitutional. Inmates were unable to make their medical problems known to medical staff because of the lack of staff and insufficient number of sick call days. Further, because of the staff shortages, inmates care was delayed. The majority of the components of the system that make the system constitutional are added staff, policy changes and pilot programs implemented since the filing of this action.[3] Should defendants

---

**3.** The record clearly supports the inescapable conclusion that these improvements were caused

by the plaintiffs' filing of this action. This Court is unwilling to characterize as mere coincidence

eliminate the pilot policies or not expand those policies state-wide as testified at trial or eliminate or freeze staff positions gained since the filing of this action, defendants would be providing care that is unconstitutional because such care would be deliberately indifferent to the serious medical/dental needs of the inmates. Further, if the prison population continues to increase without increases in the numbers of medical and dental staff, defendants' system will violate the constitutional minimum standards because the defendants will lack the staff to treat inmates.

 This Court commends defendants on their revisions of the system since the filing of this lawsuit. However, as a general rule, voluntary cessation of allegedly illegal conduct does not make a case moot. *Lindquist v. Idaho State Board of Corrections,* 776 F.2d 851, 854 (9th Cir.1985). The case is only moot if "it can be said with assurance that there is no reasonable expectation ... that the alleged violation will recur, and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. *Lindquist,* 776 F.2d at 854; *Gluth v. Kangas,* 951 F.2d 1504, 1507 (9th Cir.1991). Based on past experience with the ADOC, this Court cannot be assured that defendants will continue to implement the new programs and staff the facilities after the termination of this case. Further, with the history of the funding situation within the state and the current state of budget cuts, the Legislature is unlikely to appropriate additional funds for the ADOC. For these reasons, this Court cannot say "with assurance" that there is no "reasonable expectation" that the alleged violations will recur. Rather, it is likely that the constitutional violations will reoccur. Thus, the Court has the authority to monitor the medical and dental care systems for a reasonable period of time to assure that the department implements the pilot programs statewide and provides sufficient staff to treat the inmates' serious medical needs. *Id.*

so many improvements to those issues specifically raised by plaintiffs. It is clear that defendants attempted to resolve almost all of the problems with the system prior to trial.

### B. Mental Health Care System

#### 1. Problems with the Mental Care System

Plaintiffs have established numerous problems with the mental health care system provided to inmates by the ADOC. Plaintiffs allege that as a result of these problems, the mental health care system is inadequate to treat the serious mental health care needs of inmates.

##### a. Intake Procedure

ADOC lacks a system and the psychiatric staff to identify and evaluate female inmates with serious mental illnesses when those inmates come into the system. Thus, at the Perryville Santa Maria Unit, unqualified security staff must identify seriously ill inmates so that they may receive treatment.[4]

 Defendants have also implemented a policy that provides for reviews of inmates' medical records upon transfer to other facilities. However, such reviews are not routinely performed due to shortages of staff. Therefore, seriously mentally ill male and female inmates do not receive treatment until they request treatment or regress to the point that security staff recognize the illness or lock them down for the behavior caused by the mental illness. Thus, mentally ill inmates are unable to make their problems known to staff and their constitutional rights are violated. *Hoptowit,* 682 F.2d at 1253.

##### b. Staffing Problems

 Defendants fail to provide sufficient mental health staff to diagnose and treat the serious mental health needs of inmates. The experts agreed that shortages of mental health staff existed within the facilities. Alhambra is the only facility that has a full-time psychiatrist. The facilities also lack an adequate number of psychologists. SPU lacks sufficient staff to consistently provide all of the programs to the inmates that need such programs. The staff shortage has also resulted in no 24–hour mental health coverage at SPU. Further, there is always a waiting list of inmates for admission to SPU.

4. Defendants have established a routine intake procedure for males at Alhambra. In addition, Alhambra has the mental health staff available for the system.

Because of inadequate numbers of staff, the existing staff cannot adequately treat inmates and their constitutional rights are violated. *Hoptowit,* 682 F.2d at 1253.

The staffing problem exists partly because the Legislature will not fund positions and partly because ADOC has vacancies in positions that have been funded. Defendants admit that they have requested further staff and could function better with those staff. However, lack of funding is not a defense to eighth amendment violations. *Jones v. Johnson,* 781 F.2d 769, 771 (9th Cir.1986); *Harris v. Thigpen,* 941 F.2d 1495, 1509 (11th Cir.1991).

c. Programming for Mentally Ill Inmates

ADOC provides insufficient mental health programming at SMU. At the time of filing of this action, little or no programming existed at SMU. At the time of trial, more programming existed. However, programming for mentally ill inmates at SMU is still insufficient. The levels system behavioral modification program is implemented by security officers who are untrained both in mental health care and in the program they are implementing.

d. Delays in Assessment and Treatment

Inmates with serious mental health needs experience unacceptable delays in assessment and treatment. Assessments by mental health professionals should be made within a few days of an inmate's complaint of hearing voices or feeling anxious, tense or "about to explode:" Because of staffing shortages and inadequate policies, such assessments are rarely made by mental health personnel. Rather, inmates' mental health care is consistently delayed. Inmates experience delays assessment, treatment and in commitment to mental hospitals (Baker Ward for men or ASH for women). When inmates act out because of their mental illness, they are locked down. While in lockdown, inmates generally wait months for transfer to the mental hospital. In addition, it may take several days to a week for inmates to see a psychiatrist.

e. Inappropriate Use of Lockdown

Rather than providing timely mental health care to inmates with serious mental illnesses, defendants lock down those inmates in the higher security facilities such as SMU and CB6 for men and Santa Maria detention for women. Yet, both the plaintiffs' and defendants' experts agreed that it is inappropriate to house acutely psychotic inmates in segregation facilities for more than three days. Further, psychiatrists employed by the ADOC, Drs. Pera and Fernandez[5] admit that lockdown damages, rather than helps, mentally ill inmates. Despite their knowledge of the harm to seriously mentally ill inmates, ADOC routinely assigns or transfers seriously mentally ill inmates to SMU, CB6 and Santa Maria lockdown. The inmates remain in lockdown for more than three days. In most cases, the inmates are locked down because of the behavior resulting from their mental illness. In addition, the inmates are locked down on orders of security rather than medical personnel. According to Dr. Pera, economic conditions prevent this system from being changed.[6] Even when inmates are referred for transfer to mental health facilities, they remain in lockdown for more than three days waiting a transfer. Defendants also discharge inmates with serious mental illnesses from Baker ward and send them to SMU. Because they are assaultive or a behavior problem, they are not eligible for treatment at SPU.

During lockdown, inmates are provided improper mental health care or no mental health care. Inmates with serious mental illnesses who have been locked down should receive almost immediate psychiatric follow-up.[7] Further, inmates that are locked down should be seen daily by a psychiatrist.[8] Daily checks by nurses are insufficient care and according to Dr. Garcia are "not treatment at

---

5. *See, Arnold v. Lewis,* 91–1808, p. 3. (consolidated into this action).

6. Budgetary constraints are not a defense to liability for deliberate indifference to inmates' serious medical care needs. *Jones v. Johnson,* 781

F.2d 769, 771 (9th Cir.1986); *Harris v. Thigpen,* 941 F.2d 1495, 1509 (11th Cir.1991).

7. *See Arnold v. Lewis,* p. 8.

8. *See Arnold v. Lewis,* p. 9.

all." [9] Yet, inmates in lock-down for their mental illnesses are not seen by a psychiatrist either immediately for an evaluation or daily. Rather, security staff, or possibly the nurses, perform health and welfare checks. Most of the logs from the facilities indicate that security staff performs the welfare checks on these inmates.

The most egregious example of the inappropriate use of lockdown is H.B., who was locked down for approximately 11 and ½ months in the Perryville Santa Maria Unit.[10] During that time, she was seen only nine times by the psychiatrist. During her ten years of custody, she has been locked down numerous times for her mental health condition. Yet, she has never received immediate psychiatric evaluation. During these times, she was actively psychotic and hallucinating. H.B. is not the only inmate in this condition in Santa Maria. Dr. Pera testified that at any one time there were several seriously mentally ill inmates locked down in Santa Maria.

Defendants also inappropriately house self-abusive inmates in SMU, despite their knowledge that SMU is not suitable for self-abusive inmates. Since the filing of this action, defendants have established the self-abuser pod. However, they have not established that the pod is appropriately staffed or fully operational. At the time of trial, the psychiatric nurse at SMU did not know if there was any specific programming for the unit, other than the fact that the individuals received more attention.

This use of lockdown as an alternative to mental health care for inmates with serious mental illnesses clearly rises to the level of deliberate indifference to the serious mental health needs of the inmates and violates their constitutional rights to be free from cruel and unusual punishment.

### f. Medication

Defendants do not properly monitor the prescription of psychotropic medication. Despite the expert testimony that inmates on psychotropic medication should be seen on a monthly basis, ADOC prescribes, continues and discontinues psychotropic medication without face-to-face evaluations by the psychiatrists.

Defendants also have no system or method to insure that inmates take medications. The only policy presented at trial requires the nurse to talk to the inmate to convince him or her to take the medications and then note the refusal on the chart. The policy does not require that the inmate be seen by a psychiatrist.

### 2. Constitutionality of the Mental Care System

■ The mental health care provided at B Ward, Flamenco and Alhambra meets the serious mental health needs of inmates. If defendants had adequate staff to provide all of the programs at SPU,[11] the mental health care would meet the serious mental health needs of the male inmates incarcerated in that facility. Unfortunately, SPU also lacks staff and the capacity to house all of the inmates that qualify for such care.

However, the overwhelming evidence establishes that the defendants are deliberately indifferent to the serious mental health care needs of the inmates in other institutions throughout the state. Seriously mentally ill inmates are housed in most [12] of the other facilities. Such inmates tend to be concentrated in the lockdown facilities of SMU, CB6 and Santa Maria in Perryville. Those facilities have inadequate mental health staff and programming for inmates. Rather than providing mental health care for these inmates,

---

9. See Arnold v. Lewis, p. 9.

10. See, Arnold v. Lewis, CIV 91–1808, Findings of Fact and Conclusions of Law. The Arnold case, including the Findings of Fact and Conclusions of Law, has been consolidated into this case.

11. After the filing of this action and Dr. Newkirk's (plaintiffs' expert) review of SPU, that facility eliminated the socialization chair and pens. Use of these treatments rises to the level of

deliberate indifference to the serious medical/mental health care needs of inmates. Placing inmates into unshaded pens outside in the Arizona heat without bathroom facilities and water is clearly cruel and unusual punishment in violation of the eighth amendment.

12. Defendants presented evidence that seriously mentally ill inmates are not housed in the work camp type of facilities such as Yuma.

security staff lock inmates down for prolonged periods of time because of the behavior that is the result of their mental illnesses. During lockdown the inmates are provided little or no mental health care by psychiatrists or psychologists.

Because of the lack of staff and programming, inmates do not have "ready access" to mental health care. Severely mentally ill inmates cannot make their needs known to mental health staff. Untrained security staff assess inmates' mental health. Further, referrals to B Ward, Flamenco, and ASH are not "reasonably speedy." Inmates remain in lockdown for days to months waiting for transfer to these facilities. Although psychological staff request transfers, they are not consistently carried out by security staff. All of these problems result in deliberate indifference to inmates serious mental health needs such that the inmates' constitutional rights to be free from cruel and unusual punishment are violated by the defendants.

The fact that the lack of staff and programming is partially a result of lack of funding from the Legislature is not a defense to these constitutional violations. *Jones*, 781 F.2d at 771; *Harris*, 941 F.2d at 1509.

The system for female inmates is even worse than for male inmates because female inmates have no SPU or transitional facility. Rather, female inmates are returned to general population and are generally locked down for behavior caused by their mental illness. Sometimes, the lockdown reoccurs within 24 to 72 hours of return to general population. Seriously mentally ill female inmates are limited to the G Ward with its 15 to 17 beds or transferred outside ADOC to ASH. Even at G Ward, female inmates receive less programming than that provided to males.

■■■ The Court finds the treatment of seriously mentally ill inmates to be appalling. Rather than providing treatment for serious mental illnesses, ADOC punishes these inmates by locking them down in small, bare segregation cells for their actions that are

the result of their mental illnesses. These inmates are left in segregation without mental health care. Many times the inmates, such as H.B. are in a highly psychotic state, terrified because of hallucinations, such as monsters, gorillas or the devil in her cell.[13] Nor does it appear that H.B. is the exceptional case as seven to eight mentally ill women may be locked down at the Santa Maria Unit in Perryville at any one time and may remain there for months without care. In addition, such treatment is common for male inmates in other lockdown facilities or units in the state including SMU and CB6. The Court considers this treatment of any human being to be inexcusable and cruel and unusual punishment in violation of the eighth amendment of the Constitution.

## II. EQUAL PROTECTION CLAIM

Plaintiffs also allege that defendants discriminate against female inmates in the delivery of mental health care in violation of the equal protection clause.

■■■ The equal protection clause states that no State shall "deny to any person within its jurisdiction the equal protection of the laws." Thus, all similarly situated persons should be treated alike. *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3253, 87 L.Ed.2d 313 (1985). Gender based differences require a heightened standard of review. A party seeking to uphold dissimilar treatment based on gender must show an "exceedingly persuasive justification." *Kirchberg v. Feenstra*, 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981). To withstand constitutional challenges, classifications based on gender must serve as important governmental objectives and must be substantially related to achievement of those objectives. *Craig v. Boren*, 429 U.S. 190, 198, 97 S.Ct. 451, 457, 50 L.Ed.2d 397; *McCoy v. Nevada Dept. of Prisons*, 776 F.Supp. 521, 523 (D.Nev.1991). Under this standard of review, female inmates must be treated "in parity" with male inmates. *McCoy*, 776 F.Supp. at 523.

---

**13.** In fact, one psychiatric expert stated he wouldn't treat his dog the way the defendants treated H.B. *Arnold v. Lewis*, Exhibit A at 125.

Defendants clearly provide, because there are fewer women in the system, fewer mental health services for women than they provide for men within the prison system. In addition, the lack of these mental health services for women result in more egregious cases of deliberate indifference to the women's mental health needs.

For men, defendants provide a psychiatric hospital within the ADOC. Women are given access to the ASH, which is not within ADOC. Inmates cannot remain in ASH during the period of incarceration unless they were found innocent by reason of insanity. Thus, women inmates are discharged after a short period of time, returned to general population and often again locked down. After September of 1991, women inmates can be involuntarily committed to G Ward. However, it is not a psychiatric hospital.

At Flamenco, men are provided more advanced programming and facilities than women. Men can progress in a phase program from the acute unit to the sub-acute unit and then into SPU or general population. Women of all levels are treated in G ward. Men have better access to occupational therapy with more equipment and supplies. In addition, mental health activities logs indicate that men are offered more substantive programs such as computer training, communication training, stress management and anger control. However, at the same time, women are offered aerobics, board games, movies and "Women Who Love Too Much."

ADOC also has the SPU progressive unit for men, but no comparable unit for women. Thus, ADOC houses men with other men of similar levels of functioning. However, women of all levels of functioning are housed together at G Ward. As a result, chronically ill women who are stabilized are returned to general population; act out when then are provided little or no mental health care; are locked down [sometimes within 24 to 72 hours]; remain in lockdown where they decompensate and eventually, after a serious delay, return to Flamenco or ASH. Yet, chronically ill men who are not assaultive are allowed to progress back to general population, through the SPU facility. Dr. Newkirk identified female inmates that needed long-term chronic care that could benefit from an SPU-type of unit for women.

 Defendants argue that the additional units, like SPU, are necessary for men because they are more predatory, and more likely to pick on weaker male inmates. However, such considerations do not justify the unequal treatment in the provision of mental health care. The Court does not consider that the different care serves any "important governmental objectives" so that the disparity could be constitutional. Clearly, the unequal treatment results in even more egregious denials of mental health care for seriously ill female inmates violating those inmates' equal protection rights under the constitution in addition to their rights under the eighth amendment.

Defendants also argue that female inmates receive the same number of beds in mental health facilities in proportion to the number of inmates within the system. However, this argument ignores the very clear differences in care and the impact of that unequal treatment.

## III. INJUNCTIVE RELIEF

 "The basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Such determination requires a balancing between the conveniences of the parties and possible injuries to them as they may be affected by the granting or withholding of the injunction. *Yakus v. United States,* 321 U.S. 414, 410, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944).

 Because of the lack of a constitutional mental health care system, inmates have suffered harm in the past and such harm is likely to reoccur absent injunctive relief. Because of economic conditions, ADOC will continue to lockdown inmates as an alternative to mental health care. As a result inmates' mental conditions will consistently deteriorate and they will suffer from hallucinations that seem very real and terrifying or they will harm themselves or others. Based on the continuing cycle of lack of treatment, the

harm is likely to reoccur. On the other hand, the only harm to defendants is additional costs to hire staff and implement programs. However, if these inmates are provided proper mental health care, security staff should be relieved of the time consuming problems caused when inmates become violent or assaultive due to mental illness. In addition, security staff should be relieved of the duty of performing health and welfare checks, which disrupt security duties and require that security personnel perform medical duties which they are not qualified to perform.

Because the harm and potential harm to the inmates for this lack of care clearly outweighs the harm to defendants, the Court has determined that injunctive relief is appropriate.[14]

### ORDER

### I. MEDICAL AND DENTAL CARE SYSTEMS

The Court is aware that Director Lewis has attempted to make the changes required to eliminate constitutional violations as described in this opinion, but the Legislature failed to provide him with the requested, necessary funding to remedy those constitutional violations.[15] Thus, the Court has determined that it should monitor the medical and dental care systems to make sure that the pilot programs and changes are further implemented or remain effective and that there are sufficient numbers of staff to meet the serious medical and dental needs of the inmates.

IT IS THEREFORE ORDERED THAT No later than *September 30, 1993*, and every six months thereafter, defendants shall file a status report regarding the implementation of the policies, staff levels and medical and dental care pilot programs state-wide that have cured the constitutional violations. The status report(s) shall explain what policies, staff and programs are currently in effect throughout the state, including the overall plan as well as detailed information relating to each unit for medical and dental care. The status report shall include such matters as numbers of prisoners per unit, numbers of staff currently hired in which positions, numbers of open positions, relevant dates and details concerning the policies and programs, including how they are administered.[16]

Plaintiffs shall have the right to contest the status report. If plaintiffs do contest the status report, defendants may be required to submit evidence to substantiate the facts set forth in the report.

### II. MENTAL HEALTH CARE SYSTEM

The court could work out a plan to remedy the deficiencies in the mental health system. However, it would be more appropriate and the Court would prefer that the parties, along with their various experts, work out the procedures and remedies to remedy those deficiencies. The parties, along with their experts and the staff and administration of ADOC know better than the Court what policies and changes will be effective solutions in the particular prisons. The court further notes that defendants cannot make such changes without cooperation from the Legislature and that attempts to provide an adequate system have been thwarted by inadequate appropriations.

The other alternative to this procedure would be for the Court to appoint a special master and/or expert. However, appointment of a special master and/or expert could

---

**14.** Injunctions and other court orders are not so inflexible that they can never be changed without time-consuming court proceedings. If changes in circumstances justify changes in the injunctions or orders, this Court is agreeable to necessary changes that defendants have discussed with plaintiffs. In fact, should counsel agree by stipulation to changes in the injunction or orders, the Court is willing to amend the injunction or orders without conducting court hearings. The parties are reminded that the appropriate way to seek changes is the method applied by the Ninth

Circuit recently in *Hook v. State of Arizona,* 972 F.2d 1012 (9th Cir.1992).

**15.** This lack of funding is not a defense to constitutional violations. *Jones,* 781 F.2d at 771; *Harris,* 941 F.2d at 1509.

**16.** Of course, defendants are encouraged to submit a complete status report. The more information available establishing that the constitutional standard is being met, the less likely it will be that the Court will need to conduct a hearing.

result in delays and additional expenses. Therefore, it is preferable that the parties work out the remedies.

IT IS THEREFORE ORDERED THAT:

(1) No later than *May 31, 1993*, counsel shall meet and discuss possible proposals to remedy the deficiencies in the mental health care system.

(2) No later than *September 30, 1993*, the parties shall jointly file a proposed plan to remedy the deficiencies in the mental health care system. The plan shall address the following issues:

A. STAFF: The plan shall provide for sufficient numbers of qualified staff to provide evaluation, diagnosis and treatment of mental health problems of inmates. The plan shall also provide for recruitment and incentives for such staff to assure that defendants are able to fill staff positions with qualified persons.

B. FACILITIES: The plan shall provide for the development of sufficient and adequate mental health housing facilities for male and female inmates who are unable to function in general population facilities to prevent their retention in segregated facilities for medically inappropriate periods of time. The plan should provide for appropriate facilities for those mentally ill inmates that are too assaultive or are behavior problems such that they are not placed in SPU. The plan should also provide for the development of appropriate seclusion rooms for special housing units, such as SPU, to assure that defendants do not revert to utilization of the socialization chair or behavior pens or transfer inmates to isolation cells in nonmental health units such as CB6, SMU or other lockdown or detention units.

C. MEDICATIONS: The plan shall include written policies for the administration and monitoring of psychotropic medications by qualified mental health professionals.

D. EQUAL PROTECTION: The plan shall provide for the development of mental health programming for women, comparable to that provided for men.